UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GARY WEINSTEIN, Individually and as
Representative of the Estate of JUDITH
WEINSTEIN, as Representative of the Estate
of ALEXANDER WEINSTEIN, and as
Representative of the Estate of SAMUEL
WEINSTEIN,

                  Plaintiffs,              Case No. 07-15000
                                              Hon. Nancy G. Edmunds

v.

UGS CORP.,
                  Defendant.
                                            /

**MOTION OF DEFENDANT UGS FOR RULE 11 SANCTIONS
AGAINST PLAINTIFF'S COUNSEL, FRANK GUERRA IV
AND THE WATTS LAW FIRM, L.L.P.
<u>WITH BRIEF IN SUPPORT</u>**

Herschel P. Fink   (P13427)
Brian D. Wassom (P60381)
Honigman Miller Schwartz and Cohn LLP
Attorneys for Defendant UGS
2290 First National Building
Detroit, MI   48226
(313) 465-7400
hfink@honigman.com
bdw@honigman.com

# MOTION

Defendant UGS, Inc. (UGS), by its attorneys Honigman Miller Schwartz and Cohn LLP, hereby move this Court for an award of sanctions against Attorney Frank Guerra IV and the Watts Law Firm of San Antonio, Texas, in at least the amount of the costs and attorneys' fees that UGS has incurred in this matter, and award the same amount to UGS, in addition to any further relief that this Court deems just and warranted.

In accordance with Fed. R. Civ. P. 11(c)(2), UGS served a draft of this motion on Frank Guerra and Barry LaKritz, counsel for Plaintiffs, on February 11, 2008, via Federal Express. No response was received.

In support of its motion, UGS offers the following brief.

## BRIEF

### Issue Presented

Where Plaintiffs' complaint is premised on knowingly false assertions, and strongly appears to have been filed for improper purposes, should Plaintiffs be sanctioned under Fed. R. Civ. P. 11?

### Controlling / Most Relevant Authorities

- Fed. R. Civ. P. 11
- *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)
- *Landis v. North Am. Co.*, 299 U.S. 248 (1936)
- *Union Planters Bank v. L & J Dev. Co.*, 115 F.3d 378 (6th Cir. 1997)
- *Mann v. G & G Mfg., Inc.*, 900 F.2d 953 (6th Cir. 1990)
- *Elsman v. Std. Fed. Bank*, 238 F. Supp. 2d 903 (E.D. Mich. 2003)

## I. Introduction

This case originates out of undeniably tragic circumstances. On May 3, 2005, Judith, Alexander, and Samuel Weinstein were killed in an auto accident caused by Thomas Wellinger. Wellinger's blood alcohol level at the time was an astonishing .40. The severity of Wellinger's recklessness, and the outpouring of public sympathy for Plaintiff Gary Weinstein's loss, led to extensive coverage in the local press. Wellinger subsequently pled no contest to charges of second-degree murder, and was sentenced to 19-30 years' imprisonment.

That is where the matter should have ended. But the lawyers representing Plaintiff have instead exploited his loss by filing knowingly false statements of fact in order to fabricate a basis for spurious legal theories against Wellinger's former employer, Defendant UGS, Inc.—all in the name of hunting pockets deeper than Wellinger's.

Our cherished adversarial system of justice breaks down when attorneys disregard truth in the pursuit of higher monetary recoveries. Rule 11 exists to punish such conduct, and the Court should apply it here.

## II. Relevant Background

In a complaint originally filed in the Eastern District of Texas, and now transferred to this Court, Plaintiff's attorneys claimed that:

(1) Wellinger drank *at his office*, and appeared obviously intoxicated *at work*, *on the day* of the accident,[1]

(2) UGS *ordered* Wellinger to go to a psychiatrist about his alcoholism and report back to his supervisor;[2] and

---

[1] See Complaint ¶¶ 3.8, 3.10, 3.12, 3.13, 4.4, 4.6, 5.1; Plaintiff Response (D/E 9) *seriatim.*

1

(3)  Wellinger drove directly from UGS to his psychiatrist's office, causing the crash in the process.[3]

These facts were alleged as predicates to establishing a "special relationship" between UGS and Wellinger, and hence UGS's vicarious liability for Wellinger's actions—especially under the peculiar theories of Texas law that Plaintiff has attempted to shape its case to fit. Of course, as UGS has explained in its motion to dismiss, these assertions are baseless, the legal theories are inapplicable, and UGS has no such liability.

It can also be shown, however, that not only is each of these statements false, but Plaintiff's attorneys *knew* them to be false when they made them. Plaintiff has been represented by local attorney Barry LaKritz since shortly after the accident. LaKritz has long been searching for an avenue by which Plaintiff's hands could reach into deeper pockets—including those of various insurance companies, in addition to UGS.

In support of that effort, LaKritz issued a Freedom of Information Act (FOIA) request to the Farmington Hills police and the Oakland County prosecutor. In response, LaKritz received the statements of co-workers (and investigators' notes concerning those statements) who said that Wellinger did not appear intoxicated at work that day, that he did not smell of alcohol, that Wellinger himself told them that he was leaving for a scheduled appointment with his psychiatrist to regulate his depression medications, and that these medications had been the reason for his poor performance on the job, and not alcohol problems, which he denied having.[4] He also received an affidavit for search

---

[2] See Complaint ¶¶ 3.9, 3.10, 3.11, 4.4, 4.6, 5.1; Response Brief *seriatim.*
[3] Complaint ¶ 3.11.
[4] Exhibit A (written witness statements); Exhibit B (investigator's interview notes); Exhibit C (investigator's "Person/Witness List").

2

warrant establishing the likelihood that Wellinger made at least one stop between leaving UGS and causing the crash.[5]

UGS is informed and believes, moreover, that Wellinger's own transcribed statement to LaKritz, made on the date of sentencing, says that he never drank at work (but UGS has never seen this document).

Plaintiff continues to be represented by Attorney LaKritz in this and related actions. LaKritz is local counsel in this case to "The Watts Law Firm, L.L.P." of San Antonio, Texas. Both the complaint in this case (originally filed in Texas and now before this Court) and Plaintiff's most recent filing (his response to UGS's motion to dismiss), however, are signed by the Watts firm. Attorney Frank Guerra IV of that firm is listed as counsel on the complaint, and personally signed Plaintiff's response brief. Guerra and the Watts firm had a duty under Rule 11 to satisfy themselves before filing the complaint that a good faith basis existed for their claims. At a minimum, that would have involved consultation with LaKritz and reviewing the documents he had obtained. Both Guerra and his firm, therefore, are subject to liability under Rule 11.

### III.  Argument

A.  **Filing a Complaint that Is Frivolous, or for an Improper Purpose, Is Sanctionable Under Rule 11**

"In the United States Sixth Circuit, the test for imposition of Rule 11 sanctions, remains . . . whether the individual's conduct was reasonable under the circumstances."[6] "Whether sanctions should be granted is not to be determined in hindsight, but rather by

---

[5] Exhibit D.
[6] *Jarvi v. IRS*, 2004 U.S. Dist. LEXIS 13319, *1-2 (E.D. Mich. 2004) (citing *Union Planters Bank v. L & J Dev. Co.*, 115 F.3d 378, 384 (6th Cir. 1997)) (internal quotations omitted).

examining counsel's conduct and reasonable beliefs when the offensive pleading was filed. Good faith is insufficient to establish reasonableness."[7]

Rule 11(b) prohibits attorneys from filing any paper which is unsupported in law or fact, or is filed for an improper purpose:

> By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,
>
> (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
>
> (3) the allegations and other factual contentions are warranted on the evidence or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .

Moreover, "[a]bsent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee." Rule 11(c)(1).

The Court also possesses an inherent power to sanction bad-faith conduct.[8] This power is in no way cabined by Rule 11.[9] Therefore, even if certain of the bad-faith

---

[7] *Elsman v. Std. Fed. Bank*, 238 F. Supp. 2d 903, 908 (E.D. Mich. 2003) (citing *Mann v. G & G Mfg., Inc.*, 900 F.2d 953, 958 (6th Cir. 1990))
[8] *Landis v. North Am. Co.*, 299 U.S. 248, 254 (1936).
[9] *Chambers v. NASCO, Inc.*, 501 U.S. 32, 42-43 (1991); *Schutts v. Bentley Nevada Corp.*, 966 F. Supp. 1549, 1561-62 (D. Nev. 1997) (inherent power can "fill the interstices" among various sanctions provisions).

4

conduct of Guerra and his firm escapes the precise boundaries of Rule 11, it is still within the Court's power to punish.[10]

**B.  The Complaint Is Premised on Knowingly False Assertions**

  **1.  Wellinger Did Not Appear Drunk at Work**

Plaintiff alleges that "Wellinger, an executive for UGS, had been drinking at his office on the day of the accident and was obviously intoxicated during his meetings with upper management that day . . . ."[11]  The factual record available to both parties, however, demonstrates the opposite.  Ed Arlin, the supervisor who met with Wellinger at 11:00 a.m. that day, said he had "been asked if I smelled alcohol, and I did not.  He seemed ok, but sort of like someone [who] has a cold tablet and [it] makes them slower."[12]  Co-worker Thomas Obuchowski "was the last one to see [Wellinger] before he left the office on Tuesday[,] May 3, 2005 . . . [and he] did not detect any odor or different mannerisms."[13]  Another co-worker, Christ Tayon, was outside smoking when Wellinger exited the building for the last time.  He watched Wellinger "walk to his car which was parked directly in front of the building, start the car, back up and then pull away.  He did not stumble or stagger and appeared in a normal state when he left the building."[14]

Every statement taken by police was consistent.  *No one* had *ever* seen him drink at work, and none who saw him on May 3, 2005 smelled alcohol or could say that he

---

[10] *In re Mroz*, 65 F.3d 1567, 1575 (11th Cir. 1995).
[11] Complain ¶ 3.12.
[12] Ex A at 4.
[13] Ex A at 9.
[14] Ex A at 14.

seemed intoxicated.[15]  Moreover, everyone police spoke to was under the impression that Wellinger's sometimes-odd behavior was the result of psychiatric medications—as Wellinger himself said—rather than alcohol.[16]

### 2. UGS Did Not Order Wellinger to See a Psychiatrist

Plaintiff alleges that Wellinger "left the office shortly after 2:30 p.m. for the psychiatric appointment he was directed to attend by Mr. [Ed] Arlin."[17]  To the contrary, Arlin's statements to police show that Wellinger had arranged the appointment of his own accord before he spoke to Arlin.  In January 2005—several months earlier—Wellinger had enrolled in an alcohol rehabilitation program funded by UGS's Employee Assistance Program (EAP).  But Arlin noted that, by May 3, Wellinger "had already used his EAP clinic time, which is why he was paying the doctor over $100/hour to treat him. [Arlin] interpreted this as [Wellinger's] way of telling [Arlin] he was getting regular and serious treatment."[18]  Arlin had not even known that Wellinger was seeing a doctor until that morning, when Wellinger told Arlin by email that he "was seeing a doctor twice a week."[19]  Accordingly, one of the investigators on the case swore in an affidavit "[t]hat Ed Arlin advised that Mr. Wellinger had left work early to attend a pre-arranged doctor's visit."[20]

The purpose of Arlin's May 3 meeting was to review Wellinger's declining job performance.  Arlin advised that he would immediately implement several procedures to supervise Wellinger's performance of his duties.  The only reason that those steps could

---

[15] See generally Exs A-C.
[16] Id.
[17] Complaint ¶ 3.11.
[18] Ex A at 7.
[19] Ex A at 4.
[20] Ex D at ¶ E(4).

6

not begin immediately, however, was that Wellinger had his pre-arranged doctor's appointment that day. It was in that vein that Arlin made the following statement to police, the meaning of which Plaintiff has twisted beyond recognition:

> *I said to go ahead and see the doctor*, but that going forward, he and I were going to begin every day with a meeting to plan daily objectives, that I was going to attend all his meetings, and that if his performance didn't immediately change then he would not be in his position.
>
> I told him I didn't want to have to be here in a year wondering whatever happened to Tom Wellinger. That I was willing to help him, I wanted him to be successful, but he had to change his performance immediately. I repeated the message that the New Value Team was our future, and [that] he needed to lead it. I repeated the message that we were going to start each day with planning meetings and that I was going to be involved in all of his meetings.
>
> *I also told him I wanted to hear what recommendations his doctor had after his meeting today.*[21] [emphasis added]

Those two isolated portions of that lone statement form the sole conceivable basis for Plaintiff's allegation that UGS "ordered" Wellinger to attend the appointment and "report back" to his superiors. Read in context, however, the only good-faith interpretation of Arlin's words is that he permitted Wellinger to attend an appointment that Wellinger had privately arranged, and that Arlin requested to know the results of this appointment so that he could better gauge Wellinger's work performance. Plaintiff's interpretation of this passage rips it entirely out of context to give it a meaning that it never had, and could not support.

---

[21] Ex A at 7 (emphasis added).

### 3. <u>Wellinger Made a Stop Before Causing the Accident</u>

Plaintiff alleges that "[a]t the time of the accident, Mr. Wellinger was driving from his UGS office to his psychiatric appointment, with a blood alcohol level of approximately 0.40."[22] This allegation serves Plaintiff's version of events by supporting the necessary conclusion that Wellinger must have "consum[ed] alcohol during the workday at his UGS office,"[23] as Plaintiff alleges.

But again, the documentary evidence available to Plaintiff's lawyers supported the opposite conclusion. Not only had no one seen him drink at the office that day, or exhibit intoxicated behavior, but police detective Gregory Hughes, one of the investigators on the case, concluded that Wellinger claimed to—and must have—stopped somewhere else to drink in between UGS and the accident. In Hughes' affidavit for a search warrant for Wellinger's phone records, he attests that "Wellinger advised that he had been at the home of [his girlfriend] Sally Baker prior to the accident."[24] Hughes further attested that he "checked the driving directions and average estimated driving time from UGS . . . to the intersection of Twelve Mile and Stansbury in Farmington Hills. . . . [T]he average driving time is eleven minutes and distance is 8.9 miles."[25] Yet *an entire hour* had passed between the time Wellinger left UGS and the accident.[26] "This indicate[d] to Affiant that Mr. Wellinger may have made at least one stop after he left [UGS] and arrived at the crash si[te]."[27] No document expresses a contrary view.

---

[22] Complaint ¶ 3.11.
[23] Complaint ¶ 3.13.
[24] Ex D at ¶ D(2).
[25] Ex D at ¶ E(6).
[26] See Ex D at E(3)(b) & E(5).
[27] Ex D at ¶ E(6).

8

Therefore, each of these three critical assertions, made in the papers that Attorney Guerra and the Watts Law Firm signed and submitted to this Court, are fabricated out of whole cloth, and are entirely contradicted by the factual evidence.

C. **Guerra Filed The Complaint for an Improper Purpose**

Guerra and the Watts firm should be sanctioned for the additional reason that their conduct strongly suggests an improper motive. As explained above, there was no reasonable basis for Guerra and the Watts firm to believe that their claims were legally warranted. Several courts have found this fact alone sufficient to warrant the conclusion that the motivation for filing the baseless lawsuit must have been improper harassment.[28]

A similar conclusion is warranted here, especially since the publicity already surrounding the Weinstein tragedy virtually guarantees that any litigation asserting blame for Wellinger's actions is more than likely to receive media attention. Indeed, Plaintiff's lawyers began taking advantage of the media attention to pressure UGS into settling as

---

[28] *See, e.g., Nugget Hydroelectric, L.P. v. Pacific Gas & Elec. Co.*, 981 F.2d 429, 439 (9th Cir. 1992) ("Nugget's second motion to compel largely duplicated its first motion . . . . The magistrate judge therefore decided that the pleading was filed for the improper purpose of harassing PG&E); *McLaughlin v. Bradlee*, 803 F.2d 1197, 1205 (D.C. Cir. 1986) ("when preclusion doctrine clearly forecloses consideration of the merits, the groundlessness of the litigation or the bad faith in which it was brought may become especially apparent"); *Edgeworth v. First Nat'l Bank*, 677 F. Supp. 982, 989 (D. Ind. 1988) ("The plaintiff's attempt to relitigate the claims which are the subject of this motion, in light of these facts and the applicable law, compels the conclusion that these portions of his complaint were interposed for improper purposes"); *Roberts v. Chevron U.S.A., Inc.*, 117 F.R.D. 581, 586 (D. La. 1987) ("This court cannot understand why the second suit was ever filed unless it was to delay Gulf from collecting its judgment, or to harass and unnecessarily require Gulf to spend more money litigating this matter"); *Sam & Mary Housing Corp. v. New York State*, 632 F. Supp. 1448, 1453 (S.D.N.Y. 1986) ("In light of the fact that the instant action against defendant Jo/Sal was totally groundless, there is a strong probability that it was brought in bad faith. This is therefore an appropriate case for an assessment of a portion of the attorney's fees against plaintiff's attorney").

9

early as Wellinger's sentencing—as demonstrated by a report carried that day on the Associated Press newswires:

> LaKritz said he will be asking for information Thursday that would help with a civil lawsuit Weinstein may file against Wellinger and other parties, such as where he was headed and how he got so drunk the day of the crash.
>
> Wellinger's employer, UGS Inc., of Plano, Texas, is one possible defendant, LaKritz said.[29]

Filing a lawsuit in order to generate publicity is an improper motivation worthy of Rule 11 sanctions, whether the goal behind generating the publicity is to boost the public profiles of Plaintiff's attorneys,[30] to denigrate UGS's public image,[31] or to pressure UGS into settling.[32]

### D. Guerra and the Watts Firm Should Be Severely Sanctioned

Rule 11(c) empowers the Court to enter a sanction against attorneys who violate the rule "sufficient to deter repetition of such conduct or comparable conduct by others similarly situated."

> [T]he sanction may consist of, or include, directives of a nonmonetary nature, an order to pay a penalty into court, or, if imposed on motion and

---

[29] *Man sentenced to 19 to 30 years in crash that killed 3*, THE ASSOCIATED PRESS STATE & LOCAL WIRE April 27, 2006 (Available on NEXIS) (Exhibit E).

[30] *Bryant v. Brooklyn Barbecue Corp.*, 932 F.2d 697, 699 (8th Cir. 1991) (affirming Rule 11 sanctions where "counsel knew he had not conducted a reasonable inquiry of the facts and the law prior to filing the original complaint, but filed it prematurely so as to benefit from the publicity generated").

[31] *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 661 (S.D.N.Y. 1996) ("While Gotbetter represented to the Court that he did not initiate any of the publicity attending this lawsuit, at a minimum, as a result of Gotbetter's and Katzman's actions, Defendants have been made to respond to a patently meritless complaint and to suffer unwarranted adverse publicity").

[32] *Morley v. Ciba-Geigy Corp.*, 66 F.3d 21, 25 (2d Cir. 1995) ("the supplemental complaint was clearly an attempt to intimidate the defendant into a large settlement, an attempt which, in light of the law-of-the-case bar, was an improper purpose under Rule 11(b)(1)").

10

warranted for effective deterrence, an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation.[33]

"Consistent with the purposes behind Rule 11," the Sixth Circuit has held, "the presentation of false testimony strongly suggests that sanctions are needed to deter the litigant from displaying similarly abusive tactics in the future."[34]

The Sixth Circuit has further explained that, under circumstances such as these, a monetary award to Defendant is appropriate:

> Even though Rule 11 now de-emphasizes monetary sanctions and discourages direct payouts to the opposing party, the rule explicitly allows for expenses incurred as a direct result of the violation to be paid directly to the other party if imposed on motion and warranted for effective deterrence. The drafters note that a direct payout to the injured party is particularly appropriate for Rule 11(b)(1) violations involving improper motivations . . . .[35]

The conduct of Guerra and the Watts firm in this case—including filing of claims based entirely on the factually unsupported lie that Wellinger was visibly intoxicated at work on May 3, 2005, and that UGS ordered him to visit his psychiatrist that day—cries out for the most severe sanctions at this Court's disposal. Defendant should, at the very least, be compensated for the expenses it has incurred as a result of this litigation. Guerra and his firm should be deterred from again so frivolously wasting the judiciary's time and resources.

---

[33] *Id*.

[34] *Union Planters Bank v. L & J Dev. Co.*, 115 F.3d 378, 386 (6th Cir. 1997); *see also Perkinson v. Gilbert/Robinson, Inc.*, 821 F.2d 686, 691 (D.C. Cir. 1987) ("In light of defendants' callous disregard of court orders and the Federal Rules, the severe monetary sanctions ordered against it were certainly justified").

[35] *Union Planters Bank*, 115 F.3d at 386.

## IV. Conclusion

For all of the foregoing reasons, UGS respectfully requests that this Court SANCTION Attorney Frank Guerra IV and the Watts Firm, LLP, in at least the amount of the costs and attorneys' fees that UGS has incurred in this matter, and award the same amount to UGS, in addition to any further relief that this Court deems just and warranted.

Respectfully submitted,

Dated:  April 11, 2008

/s/ Herschel P. Fink
Herschel P. Fink (P13427)
Brian D. Wassom (P60381)
Honigman Miller Schwartz and Cohn LLP
Attorneys for Defendant UGS
2290 First National Building
Detroit, MI   48226
(313) 465-7400
hfink@honigman.com
P13427

## CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2008, I electronically filed the foregoing paper(s) with the Clerk of the Court using the ECF system which will send notification of such filing to the following:  Frank Guerra, IV, Barry F. LaKritz and Dana LaKritz Marcus.

/s/ Herschel P. Fink
Honigman Miller Schwartz and Cohn LLP
Attorneys for Defendant UGS
2290 First National Building
Detroit, MI   48226
(313) 465-7400
hfink@honigman.com

DETROIT.2976802.1