## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| GARY WEINSTEIN, Individually and as Representative of the Estate of JUDITH WEINSTEIN, as Representative of the Estate of ALEXANDER WEINSTEIN, and as Representative of the Estate of SAMUEL WEINSTEIN, <br><br> Plaintiffs. <br><br> vs. <br><br> UGS CORP. <br><br> Defendant. | § § § § § § § § § § § § § § | Civil Action No. 2:07-cv-15000 <br> Hon. Paul D. Borman |

## PLAINTIFFS' RESPONSE TO DEFENDANT UGS'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs (referred to herein as "the Weinsteins") file this Response to Defendant UGS's Motion for Summary Judgment, requesting the Court deny Defendant UGS Corp.'s Motion for Summary Judgment.

This lawsuit arises out of the deaths of Judith Weinstein and her two sons, Alexander Weinstein (age 12) and Samuel Weinstein (age 9), who were killed in an automobile accident at approximately 3:30 p.m., on May 3, 2005. The driver of the vehicle that crashed into the Weinsteins was Thomas Wellinger, an executive at UGS. Mr. Wellinger's blood alcohol level was approximately 0.40 (several times the legal limit). Mr. Wellinger was in the course and scope of his employment with UGS, as an executive manager, at the time of the accident, so that UGS is vicariously liable for his conduct under the doctrine of *respondeat superior*. The Weinsteins also claim that UGS is

independently liable for its own conduct in negligently supervising an employee when it knew or should have known of special circumstances regarding the employee that established a duty of care to third persons.

UGS has moved for summary judgment on all of the Weinsteins' negligence claims against it, contending there are no genuine issues of material fact that Mr. Wellinger was in the course and scope of his employment at the time of the accident and there is no evidence Mr. Wellinger was visibly intoxicated when he left the premises 45 minutes before the accident. UGS has also included a catchall argument that an employer can never be held liable for the conduct of an intoxicated employee, regardless of whether the person is in the course and scope of his employment or special circumstances exist, because it is against the public policy of Michigan to hold an employer responsible for an accident related to alcohol use and treatment.

The Weinsteins have presented summary judgment evidence, which is more fully discussed in their Memorandum in Support of Response to Defendant UGS's Motion for Summary Judgment, that raises genuine issues of material fact that Mr. Wellinger was in the course and scope of his employment at the time of the accident and that he was a habitual alcoholic that was visibly intoxicated at the office on the day of the accident. Further, the facts and claims in this case are not controlled by the public policy statements on which UGS relies. The Weinsteins request the Court deny UGS's Motion for Summary Judgment.

Respectfully submitted,

WATTS GUERRA CRAFT LLP

By:     /s/ Francisco Guerra, IV.
        MIKAL C. WATTS
        State Bar No. 20981820
        Federal ID No. 12419
        Attorney-in-Charge

        FRANCISCO GUERRA, IV.
        State Bar No. 00796684
        Federal ID No. 22568
        Of Counsel
        Bank of America Plaza, Suite 100 300
        Convent Street San Antonio, Texas
        78205 Phone: (210) 5270500
        Fax:    (210) 527-0501

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing document was, on this the 29th day of June, 2009, served in accordance with the Federal Rules of Civil Procedure on the following:

James P. Feeney
Sarah A. Kirkwood
Brittany M. Schultz
Dykema Gossett PLLC
39577 Woodward Ave., Ste. 300
Bloomfield Hills, MI 48304

Hershel P. Fink
Honigman Miller Schwartz and Cohn, LLP
2290 First National Building
Detroit, MI  48226

        /s/ Francisco Guerra, IV.
        FRANCISCO GUERRA, IV.

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

GARY WEINSTEIN, Individually and as
Representative of the Estate of JUDITH
WEINSTEIN, as Representative of the Estate
of ALEXANDER WEINSTEIN, and
as Representative of the Estate of
SAMUEL WEINSTEIN,

        Plaintiffs.

vs.

UGS CORP.

        Defendant.

§
§
§
§
§
§
§
§
§
§
§
§
§

Civil Action No. 2:07-cv-15000
Honorable Nancy G. Edmunds

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF RESPONSE TO DEFENDANT UGS'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS ................................................................. i

LIST OF AUTHORITIES ............................................................. ii

STATEMENT OF THE ISSUES PRESENTED ........................... iii

CONTROLLING OR MOST APPROPRIATE AUTHORITY ...................................... iv

I.    NATURE OF THE CASE.................................................... 1

II.   STATEMENT OF FACTS ................................................. 2

III.  ARGUMENTS AND AUTHORITIES.............................. 4

      A.    UGS's LIABILITY UNDER THE DOCTRINE OF RESPONDEAT SUPERIOR ........
            4

            1.    Under Michigan Law, an Employee Remains in the Course
                  and Scope of Employment when on a Special Mission for the
                  Employer, when the Employer Derives a Special Benefit from
                  The Employee's Activity or when the Travel Comprises a
                  Dual Purpose Combining Business Needs with
                  Personal Activity ................................................... 4

            2.    There is Evidence Mr. Wellinger was Expected to Attend
                  the Appointment and Even Directed to Attend, Ask his Doctor
                  Certain Questions, and Report Back the Doctor's Opinions
                  To UGS's Vice President, Ed Arlin, to Assist Mr. Arlin
                  Figure Out whether Mr. Wellinger could get out of his Fog
                  And Change his Work Performance or No Longer Remain
                  In his Position.................................................... 7

      B.    UGS's INDEPENDENT NEGLIGENCE-THERE IS EVIDENCE MR. WELLINGER
            WAS INTOXICATED AT THE OFFICE ........................... 13

            1.    The Weinstein's Claim for Independent Negligence is
                  Recognized Under Michigan Law ....................... 13

            2.    Evidence of Being Intoxicated at the Office-In General ........... 19

            3.    Evidence of Intoxication on the Day of the Accident ........... 23

      C.    PUBLIC POLICY DOES NOT PROHIBIT AN EMPLOYER BEING HELD
            LIABLE MERELY BCAUSE THIS ACCIDENT IS THE RESULT OF ALCOHOL USE   27

IV.    PRAYER ................................................................................................    28

## LIST OF AUTHORITIES

## **CASES**

*Allison v. Pepsi- Cola Bottling Co.,*
    183 Mich.App. 101, 454 N.W.2d 162 (1990) ...........................................    6, 11

*Bajdek v. Toren,*
    382 Mich. 151, 169 N.W.2d 306 (1969) ..................................................    7

*Bush v. Parmenter, Forsythe, Rude & Dethmers,*
    413 Mich. 444, 320 N.W.2d 858 (1982) ..................................................    5, 6, 7

*Camburn v. Northwest School Dist.,*
    459 Mich. 471, 592 N.W.2d 46 (1999) ....................................................    7

*Killian v. Caza Drilling, Inc.,* 131 P.2d 975 (Wyo. 2006) .....................................    14, 15

*Meyers v. Grubaugh,* 242 Kan. 716, 750 P.2d 1031 (1988) ..................................    14, 15

*Millross v. Plum Hollow Golf Club,*
    429 Mich. 178, 413 N.W.2d 17 (1987) ....................................................    15, 16, 17

*Otis Engineering Corp. v. Clark,* 668 S.W.2d 307 (Tex. 1983) .............................    14, 15

*Plains Resources, Inc. v. Gable,*
    235 Kan. 580, 682 P.2d 653 (1984)..........................................................    14

*Premo v. General Motors Corp.,*
    210 Mich.App. 121, 533 N.W.2d 332 (1995)...........................................    16, 18

*Rogers v. J.B. Hunt Transp., Inc.,*
    466 Mich. 645, 649 N.W.2d 23 (2002) ....................................................    5

*Stockley v. School Dist. No. 1 of Portage TP,*
    231 Mich. 523, 204 N.W. 715 (1925).......................................................    4, 5

*Vitaioli v. Burklund,*
    296 Mich. 56, 295 N.W. 557 (1941)..........................................................    7

*Zsigo v. Hurley Med. Ctr.,*
    475 Mich. 215, 716 N.W.2d 220 (2006) ..................................................    14, 19

## STATEMENT OF THE ISSUES PRESENTED

UGS's Motion for Summary Judgment presents three issues.

1.    The issue of whether an employee is in the course and scope of his employment at the time of an accident is usually an issue of fact for the jury. Based on the summary judgment evidence, is there a genuine issue of fact whether Mr. Wellinger was in the course and scope of his employment when he was driving to the appointment during the afternoon of the accident? If so, the Court must deny the request for summary judgment.

2.    Michigan law recognizes an employer can be independently liable for its negligent supervision of an employee, even if the accident that caused the injuries occurred while the employee was no longer in the course and scope of employment. Based on the summary judgment evidence, is there an issue of fact that UGS knew or should have known of special circumstances regarding Mr. Wellinger – specifically whether he was intoxicated when he left the office to attend the appointment? If so, the Court must deny the request for summary judgment.

3.    UGS's third argument is that the public policy of Michigan would prohibit UGS from being held liable under any factual circumstances because the accident at issue related to an employee's use and treatment for alcohol abuse. Does Michigan public policy prohibit an employer from ever being held liable for the conduct of an employee who is intoxicated, even if the employee is intoxicated or there is evidence of the employer's negligent supervision of the employee? If not, the Court must deny the request for summary judgment.

**CONTROLLING OR MOST APPROPRIATE AUTHORITY**

1. *Bush v. Parmenter, Forsythe, Rude & Dethmers,* 413 Mich. 444, 320 N.W.2d 858
   (1982)
2. *Stockley v. School Dist. No. 1 of Portage TP,* 231 Mich. 523, 204 N.W. 715 (1925)
3. *Millross v. Plum Hollow Golf Club,* 429 Mich. 178, 413 N.W.2d 17 (1987)

# I.
## EVIDENCE RELIED UPON

In support of its Response to UGS's Motion for Summary Judgment, the Weinsteins present the following summary judgment evidence that they rely upon and request the Court consider in deciding the issues presented:

- Excerpts from the Deposition of Edward Arlin, true and correct copies of which are attached hereto as Exhibit "A" and incorporated by reference herein as if set forth in full;

- Excerpts from the Deposition of Officer Andrew Plemmons, true and correct copies of which are attached hereto as Exhibit "B" and incorporated by reference herein as if set forth in full;

- The Affidavit of Officer Andrew Plemmons, a true and correct copy of which is attached hereto as Exhibit "C" and incorporated by reference herein as if set forth in full;

- Excerpts from the Deposition of Mary Ellen Charnley, true and correct copies of which are attached hereto as Exhibit "D" and incorporated by reference herein as if set forth in full;

- Excerpts from the Deposition of Lorna Olney, true and correct copies of which are attached hereto as Exhibit "E" and incorporated by reference herein as if set forth in full;

- Excerpts from the Deposition of Francois Sudres-Kovak, true and correct copies of which are attached hereto as Exhibit "F" and incorporated by reference herein as if set forth in full;

- Excerpts from the Deposition of Edward Arlin as the Corporate Representative of UGS, true and correct copies of which are attached hereto as Exhibit "G" and incorporated by reference herein as if set forth in full;

- Excerpts from the Deposition of Thomas Obuchowski, true and correct copies of which are attached hereto as Exhibit "H" and incorporated by reference herein as if set forth in full;

- The Affidavit of Detective Gregory Hughes, true and correct copies of which are attached hereto as Exhibit "I" and incorporated by reference herein as if set forth in full;

- Excerpts from the Deposition of Detective James Knittel, true and correct copies of which are attached hereto as Exhibit "J" and incorporated by reference herein as if set forth in full;

- The Affidavit of Detective James Knittel, true and correct copies of which are attached hereto as Exhibit "K" and incorporated by reference herein as if set forth in full;

- Excerpts from the Deposition of Dr. Felix Adatsi, true and correct copies of which are attached hereto as Exhibit "L" and incorporated by reference herein as if set forth in full;

- Declaration and attached exhibits of Dr. Brian Frist, true and correct copies of which are attached hereto as Exhibit "M" and incorporated by reference herein as if set forth in full.

## II.
### STATEMENT OF FACTS

This wrongful death action arises out of an accident that occurred on May 3, 2005, which took the lives of Judith Weinstein, and her sons, Alexander and Samuel. The accident occurred at 3:30 p.m., when Thomas Wellinger, who had a blood alcohol content of approximately .040, slammed his SUV into the back of Judith Weinstein's vehicle as she was waiting to turn left into an orthodontist's office.

Mr. Wellinger was an Executive Sale Director at UGS. He answered to Ed Arlin, who answered to the CEO of the company.

Mr. Wellinger is an alcoholic. In January 2005, he told his boss, Mr. Arlin he had an alcohol problem and was admitted into a detoxification program for a few days. [Depo. Arlin, pp. 17-23, ex. 39] Even after Mr. Wellinger returned from rehabilitation, his increased problems due to alcohol continued and even progressed. [Depo. Plemmons, pp. 58-61, ex. 51; Aff. Plemmons; Depo. Charnley, pp. 6, 22, 27-49, 66-68, 73-74, exs. 19-20; Depo. Olney, pp. 6-7, 21-22, 30, 39-40, 47-48, 52, 54-55, 74-75, 83, ex. 48;

2

Depo. Sudres-Kovac, pp. 5-8, 21-22, 32, 34, 36, 42-47, 62-63, ex. 22; Depo. Arlin, pp. 16-23, 26-28, 39-45, 49, 53-56, 59-60, 65-71, 75, 95, exs. 39, 40, and 41; Depo. Arlin Corp. Rep. exs. 29, 30, and 31; Depo. Obuchowski, pp. 57-58] Mr. Wellinger was missing deadlines, missing meetings, and not showing up for work. [Id.] His behavior was described as "incoherent and lethargic," "in a fog," "drowsy," "slurred words," "not tracking well." [Id.] His co-workers accused him of being intoxicated at work, sleeping at his desk, seeming as if he were drunk or on medication, and smelling of alcohol. [Id.] Mr. Arlin had recently made Mr. Wellinger the leader of a new sales team (the "New Value Team") at UGS and his ability to perform his work adequately was very important to Mr. Arlin and UGS. Mr. Arlin had several conversations with Mr. Wellinger during which they discussed Mr. Wellinger's poor performance and whether he was drinking. [Depo. Arlin, pp. 40, 59-60, 65, exs. 29, 30, 31, and 39] Mr. Arlin did not refer to Mr. Wellinger as an alcoholic, but referred to his condition as being in a "fog."

Mr. Arlin scheduled a meeting with Mr. Wellinger on May 3, 2005, to discuss his poor performance and what the path forward would be. The week before the meeting, Mr. Arlin said he asked Mr. Wellinger to call his doctor to change the medication that Mr. Wellinger claimed was making him be in a fog. [Depo. Arlin, pp. 75-76, ex. 39] On the day of the meeting, Mr. Arlin began his discussion of the "path forward" with whether Mr. Wellinger was drinking. [Depo. Arlin, pp. 64-70, exs. 39 and 41] Mr. Arlin noted that Mr. Wellinger was slower at the meeting, like he was on a cold tablet, which is consistent with the "fog" he had been in. [Depo. Arlin, pp. 59-60, 64-65, ex. 39]He then told Mr. Wellinger to see the doctor that afternoon, told him certain questions to ask the doctor, and told him to report back what the doctor had to say. [Depo. Arlin,

3

77-78, 83, ex. 39] Mr. Arlin made it clear that Mr. Wellinger's current position was in jeopardy and he was having this meeting and setting this path forward as a means of determining whether he would keep Mr. Wellinger in his position or do something different. [Depo. Arlin, pp. 42-44, 55-56, 64-72, 75-76, 81-85, exs. 39 and 40]

After the meeting, Mr. Wellinger left the office (around noon) for an hour. [Aff. Hughes] When he came back to the office, people who worked around him said he was intoxicated and acting strange. [Depo. Knittel, pp. 37-38, Aff. Detective Sergeant Knittel; Depo. Sudres-Kovac, ex. 22] At 2:28 p.m., Tom Obuchowski forwarded Mr. Wellinger an email, went into his office to make sure he received it (because he couldn't remember receiving before), and had a 10-15 minute discussion with him about the email. [Depo. Obuchowski, pp. 71-74, ex. 3] At approximately, 2:45 p.m., Mr. Wellinger left the office for his appointment. [Id.]

At 3:30 p.m., Mr. Wellinger was driving on Twelve Mile road on the way to his appointment. He had been driving erratically and aggressively for several minutes. He crashed into the back of the Weinstein's vehicle at a high rate of speed, resulting in the death of all three occupants – Judith Weinstein and her two sons, Alexander Weinstein (age 12) and Samuel Weinstein (age 9). Mr. Wellinger's blood alcohol level was approximately .40, within 45 minutes after he left the office. [Dec. Frist; Depo. Adatsi, pp. 45-47]

### III.
### ARGUMENTS AND AUTHORITIES

**A.    UGS'S LIABILITY UNDER THE DOCTRINE OF *RESPONDEAT SUPERIOR***

1.    <u>Under Michigan Law, an Employee Remains in the Course and Scope of Employment when on a Special Mission for the Employer, when the Employer Derives a Special Benefit from the Employee's Activity, or</u>

4

### when the Travel Comprises a Dual Purpose Combining Business Needs with Personal Activity

Michigan recognizes the doctrine of *respondeat superior*, in which an employer is held legally responsible for the negligent conduct of an employee committed in the course and scope of employment. *Rogers v. J.B. Hunt Transp., Inc.*, 466 Mich. 645, 650-51, 649 N.W.2d 23, 26 (2002) (holding that under Michigan law, "a master is responsible for the wrongful acts of his servant committed while performing some duty within the scope of his employment."). Further, Michigan recognizes that an employee is in the course and scope of employment not only while attending a special function or mission, but also while driving to and from such special function or mission. *Stockley v. School Dist. No. 1 of Portage TP*, 231 Mich. 523, 529-30, 204 N.W. 715, 717-18 (1925).

Michigan courts have recognized exceptions to the general rule that an employee is not in the course and scope of employment while traveling to and from the workplace. In *Bush v. Parmenter, Forsythe, Rude & Dethmers*, 413 Mich. 444, 320 N.W.2d 858 (1982), the Supreme Court of Michigan listed several exceptions to the general rule that an employee who is driving to or from his normal workplace is not in the course and scope of employment:

> [T]he rule is riddled with exceptions including situations where 1) the employee is on a **special mission** for the employer, *LeVasseur, supra,* 338 Mich. 121, 61 N.W.2d 93; 2) the **employer derived a special benefit** from the employee's activity at the time of the injury, *Nemeth v. Michigan Building Components,* 390 Mich. 734, 213 N.W.2d 144 (1973); 3) the employer paid for or furnished employee transportation as a part of the contract of employment, *Chrysler, supra,* 295 Mich. 606, 295 N.W.2d 331; 4) the travel comprised a **dual purpose combining the employment-required business needs with the personal activity of the employee,** *Burchett v. Delton-Kellogg School,* 378 Mich. 231, 144 N.W.2d 337 (1966); 5) the employment subjected the employee to "excessive exposure to the common risk" such as traffic risks faced by a truck rider deadheading to his rig, *Chrysler, supra,* 295 Mich. 60, 295 N.W.2d 331, quoting *Cudahy*

5

*Packing Co. v. Parramore*, 263 U.S. 418, 425, 44 S.Ct. 153, 154, 68 L.Ed. 366 (1923); and 6) the travel took place as a result of a split shift working schedule, *Howard v. Detroit*, 377 Mich. 102, 139 N.W.2d 677 (1966), or employment requiring a similar irregular nonfixed working schedule, *Wilhelm v. Angell, Wilhelm & Shreve*, 252 Mich. 648, 234 N.W. 433 (1931).

*Bush*, 413 Mich. at 452, n.6, 320 N.W.2d at 862 (emphasis added).

In *Stockley*, the Michigan Supreme Court held that a school teacher was in the course and scope of her employment while driving to a seminar her employer requested she attend. *Stockley*, 231 Mich. at 530-31, 204 N.W. at 717-18. The court noted that the accident happened during the teacher's usual working hours, and had the schools not been closed for teachers to attend the seminar, she would have been on duty in her school building at the time of the accident. *Id.* Consequently, because the teacher was not going to or returning from her customary place of employment before or after working hours, but was, by authority of her employer, going away from her home and place of regular employment on a special mission, she was in the course and scope of her employment while she was driving to the seminar. *Id.* Michigan courts have recognized this exception to the coming-and-going-from-work rule applies even when an employee is going home from a company-sponsored party that constituted a "special function" of employment. *Allison v. Pepsi- Cola Bottling Co.*, 183 Mich.App. 101, 111-12, 454 N.W.2d 162, 167 (1990).

Also, in *Bush*, the Supreme Court of Michigan explained that an employee is considered to be in the course and scope of employment for the entire time he is on a special mission. *Bush*, 413 Mich. at 452, 320 N.W.2d at 862. Further, even if the employee takes a deviation from his special mission, he can re-enter the course of

employment as long as the deviation was not substantial. *Bush*, 413 Mich. at 459, 320 N.W.2d at 865-66.

In its Motion for Summary Judgment, UGS concedes that Michigan law recognizes exceptions to the general rule that driving to and from work does not fall within the scope of employment. UGS cites a two-part test, set forth in *Camburn v. Northwest School Dist.*, 459 Mich. 471, 475, 592 N.W.2d 46, 48 (1999), regarding the special mission exception. Under that test, the issues are whether the employer directly benefits from the employee's actions and whether the employees actions were either, "compulsory or at least definitely urged or expected as opposed to merely encouraged." *Id.*

The issue of whether an employee is in the course and scope of employment is usually an issue of fact for the jury to decide, not an issue of law to be decided by the court. *Bajdek v. Toren*, 382 Mich. 151, 154, 169 N.W.2d 306, 308 (1969) (the issue of whether the employee was in the course and scope at the time of the accident is a question of fact for the jury to decide); *Vitaioli v. Berklund*, 296 Mich. 56, 59, 295 N.W. 557, 559 (1941) (trial court left the issue of course and scope to the jury). The evidence in this case raises a genuine issue of fact as to whether Mr. Wellinger was in the course and scope of his employment at the time of the accident, and summary judgment should be denied.

2. **There is Evidence Mr. Wellinger was Expected to Attend the Appointment and Even Directed to Attend, Ask His Doctor Certain Questions, and Report Back the Doctor's Opinions to UGS's Vice President, Ed Arlin, to Assist Mr. Arlin Figure Out whether Mr. Wellinger could Get out of his Fog and Change his Work Performance or No Longer Remain in his Position**

7

A week before the accident, Mr. Arlin had one of several discussions with Mr. Wellinger in which he addressed the fact that Mr. Wellinger's being in a fog was hurting his performance on the job. Mr. Wellinger told him it was due to the medications he was taking. Mr. Arlin testified that at that point, **"I asked him to call to change the medication."** [Depo. Arlin, 75:16-21, ex. 39] Mr. Arlin explained that he directed Mr. Wellinger to do this because, "whatever it takes, you got to do something different because your performance isn't working." [Depo. Arlin, 76:1-3] Mr. Wellinger later advised Mr. Arlin that an appointment had been made with his doctor for the following Tuesday, May 3, 2005. [Depo. Arlin, 75:16-21]

On May 3rd, Mr. Arlin had his performance review meeting with Mr. Wellinger. Before the meeting, Mr. Arlin created an outline of the topics to be covered during the meeting. The last topic was the issue of what is the path forward. [Depo. Arlin, exs. 39 and 41] One of the specific subtopics of determining the path forward was the issue of dealing with the "fog" Mr. Wellinger had been under that was affecting his work performance.

Mr. Arlin admits that in order to attempt to figure out how to get Mr. Wellinger out of his fog so that he could once again perform his work adequately, he had already "reached out, probably outside conformance," when he called Mr. Wellinger's ex-wife to see if she could, "give me any insight of what's going on with Tom." [Depo. Arlin, 49:7-12] During that conversation with Mr. Wellinger's ex-wife, Mr. Arlin was, "looking for any kind of treatment. . . . Treatment to get him better." [Depo. Arlin, 55:6-14] After that conversation, Mr. Arlin decided, **"I got to find out what's going on behind the curtain. And I'm going to get aggressive with it."** [Depo. Arlin, 67:15-17]

Mr. Arlin explained some of his reasoning for the "path forward" part of the meeting on May 3rd, as follows:

> But now, whereas Tom in the past confided in me; hey, you know what? I have a drinking problem. I'm getting treated. Hey, you know what? I'm going to AA. I don't have a drinking problem but I do have a depression problem.
>
> Okay, now, I'm not making meetings. I have a bad stomach, and my medication is wrong.
>
> Okay. Well, at the end of the day, you know what? **Your performance sucks. I'm sorry. Corporate says it's unacceptable.**
>
> All right. So, what's really going on? **Because if we keep going down this path**, performance path, where you're not getting the reports done in a timely fashion, et cetera, et cetera, **then you're not eligible for your job.** I'll find you some other job or we'll do something different. But what you're doing right now isn't working.

[Depo. Arlin, 67:24-68:15 (emphasis added)]

In keeping with his previous admissions that he was going "outside conformance" and that he was taking an active role in "looking for any kind of treatment" for Mr. Wellinger that would get him out of his fog so that he could change his job performance, during the May 3rd meeting Mr. Arlin not only directed him to attend the meeting with the doctor, but told him things to ask the doctor, and directed him to report back what the doctor told him. **"I told him to go ahead and see the doctor."** [Depo. Arlin, ex. 39] **"I told him to ask his doctor** if a new medication was enough or if he recommended more aggressive treatment like a clinic." [Depo. Arlin, ex. 39] **"Ask him if there's other options; if there's something more aggressive."** [Depo. Arlin, 77:2-3] "[Y]ou need to go press on your [doctor] and find out what more should be done." [Depo. Arlin, 78:4-5] **"I also told him I wanted to hear what recommendations his doctor had after his meeting today."** [Depo. Arlin, ex. 39] **"I**

9

**want to hear what your doctor had to say.** You know, what recommendations did he have." [Depo. Arlin, 83:5-7]

Based on Mr. Arlin's testimony, it is clear his interest in Mr. Wellinger's medical treatment was not merely personal, but had its basis in legitimate business reasons. Mr. Arlin had several conversations with Mr. Wellinger about his work performance. Although these conversations seemed to always relate to the fog Mr. Wellinger was in, it is unquestionable that the reason Mr. Arlin was having these conversation was in an attempt to directly benefit UGS by having Mr. Wellinger perform his job duties or relieving Mr. Wellinger of those duties. [Depo. Arlin, 42:6-44:24, 55:24-56:3, 64:4-72:12, 75:7-76:12, 81:23-82:15, 84:9-85:1] Mr. Arlin testified that even before the meeting on May 3rd, he had attempted to get Mr. Wellinger to, "get going and accept responsibility. . . [¶] But if I'm going to do your job, then I don't need you in that job; I'll get you in a different job." [Depo. Arlin, 42:13-43:3] The meeting on May 3rd was not a personal meeting, but rather, was a meeting designed to create a path forward so that Mr. Wellinger could once again properly perform his job functions for UGS. Mr. Arlin was dealing with a situation where Mr. Wellinger's "performance sucks," and "Corporate says it's unacceptable," and he was creating a path to turn this around through either Mr. Wellinger or somebody else taking his duties. [Depo. Arlin, 65:22-72:12] In describing the tone of the meeting, Mr. Arlin testified his approach was as follows:

> You and I are going to be it. You know, we're going to be hand in hand on these activities. And we're going to turn this around, and I'm here to tell you I'm going to help. I'll do anything I can. And if we can't, then we go to figure out what happens after.
>
> * * *

> But my commitment to you, Tom, is I'm going to invest my time to make sure you get your job done, and to figure out whether that's going to work, or if it doesn't work, then I'm going to figure out something else. That's the tone of the meeting.

[Depo. Arlin, 71:24-72:10]

Even though this meeting was clearly about business and the path forward for Mr. Wellinger to do the business needed for UGS, the scope of the "path forward" by Mr. Arlin and UGS was not only things Mr. Wellinger would be doing at the office, but also dealing with Mr. Wellinger being in a fog. In his pre-meeting agenda, under the topic "What is the path?," Mr. Arlin included only the following four subtopics, "Fog, AA?, Drugs, Illness." [Depo. Arlin, ex. 41] The first thing Mr. Arlin talked to Mr. Wellinger about during the "path forward" portion of the meeting, was whether Mr. Wellinger was "still drinking." [Depo. Arlin, ex. 39] It was during this "path forward" part of the meeting that Mr. Arlin told Mr. Wellinger to see his doctor, told Mr. Wellinger to ask his doctor certain pointed questions, and told Mr. Wellinger to report back the doctor's recommendations. [Depo. Arlin, ex. 39] Mr. Arlin needed this information so that he could better figure out how to address Mr. Wellinger's work situation and the "path forward."

UGS claims it is entitled to summary judgment because there is no evidence Mr. Arlin required Mr. Wellinger to attend the doctor's appointment. Even UGS admits, however, that the standard is not one of mandate or compulsion. In *Camburn*, the standard was either, "compulsion or at least definitely urged or expected." *Camburn*, 459 Mich. At 475, 592 N.W.2d at 48. Even in *Allison*, attendance was not mandatory, but there was evidence the employee's attendance was "strongly implied." *Allison*, 183 Mich. App. at 109, 454 N.W.2d at 166. There is some evidence that Mr. Arlin

11

required Mr. Wellinger to go the appointment, ask certain questions, and report back the doctor's recommendation.  The plain language of Mr. Arlin's statements, as well as the setting in which they were made – i.e., during a meeting at which Mr. Wellinger's boss is giving him the "path forward" for continuing in his current position in the company – are evidence of at the very least a strong implication, urging, or expectation that Mr. Wellinger not only attend the appointment, but also that he do certain things during and after the appointment for the benefit of Mr. Arlin and UGS.  Contrary to the picture UGS tries to paint in its Motion for Summary Judgment, this is not a situation where Mr. Arlin simply expressed an interest in an employee getting medical treatment so that he would get well.  Mr. Arlin specifically included Mr. Wellinger's attendance at his appointment, his asking certain questions of the doctor, and his reporting back to Mr. Arlin the doctor's recommendations as one of the elements of the "path forward" in Mr. Wellinger attempting to get out of his fog and retain his current job duties.

There is also evidence Mr. Arlin and UGS were to receive a direct benefit from Mr. Wellinger attending the appointment.   Although Mr. Arlin did not attend the appointment with Mr. Wellinger, he sent Mr. Wellinger with specific questions to ask the doctor.  Mr. Arlin also told Mr. Wellinger to report those recommendations back to him.  Mr. Arlin was attempting to use the doctor's treatment and recommendations as a means of helping him determine how to address his situation – i.e., what to do with his Executive Director of Sales who had been in a fog so that for the previous month or two his "performance sucks" and "Corporate says it's unacceptable."  UGS was planning to use the information obtained from Mr. Wellinger's appointment to determine how to move forward with its business plans.

The Weinsteins do not contend that every time an executive from UGS goes to a doctor's appointment during the day the person remains in the course and scope of his or her employment. But this specific appointment that Mr. Wellinger was driving to at the time of the accident was not an ordinary appointment. The impetus of the appointment was the week before when Mr. Arlin was talking to Mr. Wellinger about his poor performance and being in a fog and, **"I asked him to call to change the medication."** [Depo. Arlin, 75:16-21, ex. 39] Then on the day of the big meeting and the appointment, Mr. Arlin said, "I told" Mr. Wellinger to go the appointment, "I told" Mr. Wellinger to ask the doctor certain questions, and "I also told" Mr. Wellinger to report back the doctor's recommendations. [Depo. Arlin, ex. 39] These were not requests, but direct orders from his supervisor in the context of a meeting at which Mr. Arlin was discussing how to handle Mr. Wellinger's unacceptable work with a path forward.

There is an issue of fact whether Mr. Wellinger was in the course and scope of his employment when he was driving to his doctor's appointment at 3:30 p.m., and crashed into the Weinstein vehicle. The Court should, therefore, deny UGS's Motion for Summary Judgment.

**B.    UGS's INDEPENDENT NEGLIGENCE – THERE IS EVIDENCE MR. WELLINGER WAS INTOXICATED AT THE OFFICE**

**1.    The Weinstein's Claim for Independent Negligence is Recognized Under Michigan Law**

In addition to their claims that UGS is vicariously liable in negligence for the conduct of Thomas Wellinger, the Weinsteins alternatively have alleged UGS is independently liable for its own misfeasance with regard to how it handled the special circumstances of its habitually drunken executive, which made the situation worse.

Although there are situations under the laws of Michigan where an employer has no duty for injuries caused by off-duty employees, there are situations where an employer can owe such a duty.

Michigan recognizes that an employer can be held liable in negligence for its supervision of an employee. *Zsigo v. Hurley Med. Ctr.*, 475 Mich. 215, 227, 716 N.W.2d 220, 227 (2006) (refusing to adopt Restatement provision regarding vicarious liability, in part, because "employers will continue to be subject to liability for their negligence in hiring, training, and supervising their employees."). This liability for negligence in retaining an employee can apply even if the employee causes the injury outside the course and scope of his employment. *Meyers v. Grubaugh*, 242 Kan. 716, 724, 750 P.2d 1031 (1988). The *Meyers* court relied on its earlier holding in *Plains Resources, Inc. v. Gable*, 235 Kan. 580, 590, 682 P.2d 653 (1984), in which it held:

> Liability exists under either of these doctrines relating to negligent hiring or retention despite the fact the direct cause of injury to the injured person is the negligent or intentional acts of an employee acting outside the scope of his employment. 29 Am. Jur. Trials, Negligent Hiring of Employee §2, p. 276.

*Gable*, 235 Kan. at 590, 682 P.2d 653.

The fact that an employer can owe a duty to third persons injured by employees that are off-duty has been recognized by several courts, including some of those relied on by UGS in its Motion to Dismiss. In the case of *Killian v. Caza Drilling, Inc.*, 131 P.2d 975 (Wyo. 2006), the Supreme Court of Wyoming relied on Texas law in recognizing that under certain circumstances an employer can be held liable for injuries caused by employees who are not in the course and scope of their employment. *Killian*, 131 P.2d at 983-84. In the Texas case of *Otis Engineering Corp. v. Clark*, 668 S.W.2d 307 (Tex. 1983),

14

the Supreme Court of Texas recognized that an employer who takes control of an intoxicated employee and directs him to drive from the place of employment can be held liable for an automobile accident caused by that drunk employee. *Otis Engineering*, 668 S.W.2d at 309. In *Otis Engineering*, the key facts were that the employer had actual knowledge of the employee's intoxication and then performed an affirmative act of control over the employee in sending him on the roadway. *Id*. Likewise, the Supreme Court of Kansas recognized there are various circumstances in which an employer can be liable for the injuries caused by employees who are off-duty:

> Courts have recognized limited instances in which an employer may be held liable for injuries to a third party caused by an employee acting outside the scope of employment. One exception concerns off-duty employees who are either on the employer's premises or using a chattel owned by the employer. *McArthur Jersey Farm Dairy, Inc. v. Burke*, 240 So.2d 198 (Fla.Dist.App. 1970) (employer potentially liable for employee's reckless driving on employer's premises); *Marusa v. District of Columbia*, 484 F.2d 828 (D.C. Cir. 1973) (employer potentially liable for gunshot injury inflicted by employee required to carry gun at all times). The second exception occurs when the employer voluntarily and knowingly assumes a duty to control the employee. *Clark v. Otis Engineering Corp.*, 633 S.W.2d 538 (employer affirmatively takes charge of intoxicated employee). A third exception results when an employer is negligent in employing or in retaining an employee who the employer knew or should have known was incompetent or unfit. *Plains Resources, Inc. v. Gable*, 235 Kan. 580, 682 P.2d 653 (1984) (court recognized employer in such cases liable for own primary negligence).

*Meyers*, 242 Kan. at 724, 750 P.2d 1031. These holdings are consistent with the Supreme Court of Michigan's recognition in *Millross v. Plum Hollow Golf Club*, 429 Mich. 178, 413 N.W.2d 17 (1987), that whether there is a duty will depend on whether the employer "knew or should have known of the existence of any ***special circumstances*** regarding [the employee] that could establish a duty of care to third persons." *Millross*, 429 Mich. at 196-97, 413 N.W.2d at 25 (emphasis added). Consequently, the law would be the

15

same in Michigan that an employee can be held liable for the conduct of an employee it was negligent in supervising, even if the actual injury arose outside the course and scope of employment.

The Weinsteins have presented summary judgment evidence in support of its claims of negligence against UGS for its supervision of Thomas Wellinger. There is evidence UGS had knowledge, or at least should have known, of special circumstances regarding Mr. Wellinger's excessive alcohol abuse and his obvious state of intoxication when it supervised him.

UGS argues that if Mr. Wellinger was not in the course and scope of his employment, there are cases in Michigan with facts similar to these in which the courts found the employers owed no duties. Upon closer examination, however, the cases UGS relies upon do not have facts similar to those alleged in this case and do not prohibit a finding of negligence on UGS. This issue was previously addressed by the Court in its Order denying UGS's Motion to Dismiss the claims for negligent supervision.

Michigan courts have not often addressed an employer's potential liability for accidents caused by off-duty employees. The Michigan cases relied upon by UGS – *Millross, supra,* and *Premo v. General Motors Corp.,* 210 Mich.App. 121, 533 N.W.2d 332 (1995) – address the issue in some respects, although neither is on point with the facts or legal allegations in this case.

The Michigan Supreme Court addressed an employer's potential liability for an intoxicated off-duty employee in the dram shop case of *Millross*. The *Millross* court held the plaintiff's claims against the employer all fell within the exclusive remedy of the

dram shop statute. *Millross*, 429 Mich. at 195-95, 413 N.W.2d at 24-25. The court further held the plaintiff failed to state a valid cause of action against the employer for failing to supervise the consumption of alcohol and failing to provide alternative transportation to its employees, because there was no allegation that the employer "knew or should have known of the existence of any special circumstances regarding [the employee] that could establish a duty of care to third persons." *Millross*, 429 Mich. at 196-97, 413 N.W.2d at 25. It held that the mere allegation that an employee was tired is insufficient to plead, "a foreseeable risk that he would consume alcoholic beverages to the point where he would become a risk to others." *Millross*, 429 Mich. 197, 413 N.W.2d at 25-26.

The *Millross* court, therefore, did not hold that an employer can *never* owe a duty to third persons for injuries caused by off-duty employees. Instead, the court specifically left open the issue of *when* an employer's duty of care to third persons arises because of its knowledge of "the existence of any special circumstances" regarding its employee. *Millross*, 429 Mich. at 196-97, 413 N.W.2d at 25. This is consistent with the court's general discussion of duty, where it explained that duty under Michigan law is determined not by focusing on the particular standard of care created by the particular conduct, but on the situation and "whether the actor was under any obligation to exercise reasonable care under the circumstances." *Millross*, 429 Mich. at 193, 413 N.W.2d at 24.

The Michigan Supreme Court has clearly not closed the door on negligence claims against an employer with respect to injuries caused by employees for whom the employer knew or should have known of the existence of special circumstances that give rise to a foreseeable risk of harm, in a particular situation. Unlike the plaintiff in

*Millross*, the Weinsteins have presented facts pertaining to what UGS knew or should have known about the special circumstances pertaining to its employee Mr. Wellinger. The other Michigan case relied on by UGS – the appellate court decision of *Premo* – also does not prohibit such negligence claims.

In *Premo*, the employee, Kusowski, became intoxicated before and during his shift at GM. *Premo*, 210 Mich.App. at 122, 533 N.W.2d at 332. He left the workplace about an hour before his shift ended, without authorization, and went directly to a bar, where he consumed more alcohol. *Id.* Approximately an hour and a half later, he was involved in an automobile accident. *Id.* The victim of the accident brought suit against GM, claiming that it assumed a duty to the traveling public by creating a "practice, procedure and/or custom" of not allowing employees to drive from the plant while intoxicated. *Id.* The court of appeals affirmed the trial court's decision that this allegation failed to state a legal duty, because GM's "internal policy of preventing intoxicated employees from driving did not, as a matter of public policy, amount to General Motors' assumption of a duty to protect the public at large." *Premo*, 210 Mich.App. at 123-24, 533 N.W.2d at 333.

The Weinsteins are not alleging that UGS had a duty merely because it had policies in place for dealing with intoxicated employees, but that it undertook a duty when it actually took control over Mr. Wellinger because of his impairment. There is a substantial distinction between the nonfeasance in *Premo* where the employer failed to follow a policy and the misfeasance alleged in this case that UGS actually "increased the risk of harm to others" by undertaking to control Wellinger because of his impairment.

18

The Weinsteins have alleged UGS is independently liable in negligence because it failed to reasonably supervise its employee, which is a duty specifically recognized in Michigan. *Zsigo*, 475 Mich. at 227, 716 N.W.2d at 227. The Court confirmed in its Order denying UGS's Motion to Dismiss these negligent supervision claims, that the claims are valid under Michigan law. UGS's request for summary judgment is based on its claim that there is no evidence to support the claim.

UGS claims it is entitled to summary judgment on the Weinstein's claim for independent negligence because there is "absolutely no evidence that Mr. Wellinger showed obvious or visible signs of intoxication while at UGS on the day of the accident." [Doc #34, p. 14] This is not true. Mr. Wellinger's supervisor as well as other UGS employees described Mr. Wellinger's behavior on the day of the accident as being consistent with a person who was intoxicated. Mr. Wellinger admitted drinking six ounces of vodka on the morning of the accident. Experts have stated that Mr. Wellinger was more likely than not intoxicated when he left the office, which was approximately 45 minutes before the accident at which point his blood alcohol level was approximately .40. All of this evidence is consistent with the fact that Mr. Wellinger was an alcoholic who was regularly intoxicated while at the office and had been getting progressively worse over the past few months.

### 2. Evidence of Being Intoxicated at the Office – in General

Before addressing Mr. Wellinger's intoxication on the day of the accident, it is useful to place that day in the context of how he had been behaving over the previous months. In January 2005, Mr. Wellinger admitted to his boss, Ed Arlin, that he was an alcoholic and was being checked into a rehabilitation clinic for a few days because of his

alcohol abuse. [Depo. Arlin, ex. 39] Despite this attempt to control his alcoholism, Mr. Wellinger continued to be intoxicated at work.

Ed Arlin told Police Officer Andrew Plemmons that on "numerous occasions" from December 2004 through May 3rd 2005, other employees at UGS stated that they believed Mr. Wellinger was intoxicated at work. [Depo. Plemmons, 58:17-61:8, ex. 51; Aff. Officer Plemmons, ¶D.6.]

One of Mr. Wellinger's co-workers, Mary Ellen Charnley, described two situations in which she observed Mr. Wellinger "obviously intoxicated at work." [Depo. Charnley, 27:23-36:13, 37:14-38:19, 41:16-43:12, 45:20-24, 49:5-16, 66:22-68:16, 73:7-74:19, exs. 19-20] The second occasion was in February 2005, when Mr. Wellinger arrived at the office drunk. Ms. Charnley smelled alcohol and observed him leaning on the doorjamb for support. Mr. Arlin later that day came to Ms. Charnley to discuss the incident with her, and she confirmed for him that, "I thought Tom Wellinger was drunk in the morning." [Depo. Charnley, exs. 19-20]

On April 13, 2005, Lori Pogoda, Mr. Wellinger's administrative assistant, had a conference with a member of UGS's Human Resources, Lorna Olney. After the conference, Ms. Olney typed a document and sent it to UGS's Compliance Officer, JoAnne Williams. [Depo. Olney, 21:14-22:18, 74:23-75:16, ex. 48] The gist of the meeting was that Ms. Pogoda was concerned that because of Mr. Wellinger's poor performance it would reflect poorly on her performance. The UGS document states, in part:

> Tom Wellinger having issues. She is having a hard time dealing with him as his administrator. . . . She doesn't know how to work for him in this condition. . . .
>
> . . . . **He is an alcoholic – comes to work drunk every day or on medication that makes him seem that way.**

\* \* \*

Yesterday (4/12/05) was convinced he had completed everything on Saturday (referencing performance reviews), but couldn't find anything – **not sure if he was drunk or on medication.**

This morning (4/13), looked at papers for eCDP – it's not done again. All the stuff that's happening, Lori feels it's a reflection on her. Doesn't know how to talk to him anymore. She has not talked with Ed or Tom because she will cry. Not wanting to talk to Tom because he is her boss.

\* \* \*

Ed fully aware of problem – advised him to get help. Tom doesn't seem to think it's that bad. Lori can't tell if he is drunk or on medication – **is always slurring his words**. She is trying not to treat him any differently but it is hard to work with him. She wants to help but doesn't know what to do or where to go. Doesn't know if she should do anything.

**She believes that everyone knows** because he had no meetings – they don't want him involved in anything. No one goes and talks to him anymore.

[Depo. Olney, ex. 48 (emphasis added)]

This evidence is consistent with statements UGS employees made to the police after the accident about Mr. Wellinger's showing signs of intoxication at the office within the months before the accident. For example, Mr. Arlin's executive assistant, Francoise Sudres-Kovac, stated she first realized Mr. Wellinger was having a problem in January, heard his administrative assistant, Lori Pogoda, on the phone with him several times about missing calls and being absent, found Mr. Wellinger asleep at his desk twice, heard others had smelled alcohol on his breath, and personally smelled alcohol a couple of times the last two weeks before the accident. [Depo. Sudres-Kovac, ex. 22] Ms. Sudres-Kovac stated that this was very unlike the way Mr. Wellinger would have behaved several months earlier. [Depo. Sudres-Kovac, ex. 22] In late March 2005,

Ms. Sudres-Kovac had to remind Mr. Wellinger of a report he needed to finish so she could complete his annual review and when she got it, she, "had to re-type the last paragraph because it was gibberish, with the letters all mixed up." [Depo. Sudres-Kovac, ex. 22] She mentioned this incident to Mr. Arlin. [Depo. Sudres-Kovac, ex. 22]

This evidence of Mr. Wellinger's increased intoxication and poor performance in the months and weeks leading up to the accident is also consistent with Mr. Arlin's interactions with Mr. Wellinger. Mr. Wellinger admitted to Mr. Arlin in January 2005, that he had a drinking problem. [Depo. Arlin, ex. 39] This confirmed what several employees of UGS had been discussing about Mr. Wellinger being intoxicated at the office and while on calls with customers. [Depo. Arlin, 17:23-20:9, 21:5-13] After Mr. Wellinger got back from alcohol detoxification in January 2005, there were still reports of his being intoxicated at the office. [Depo. Arlin, 26:13-28:23] By the middle of April 2005, Mr. Wellinger's work performance was becoming unsatisfactory, as he missed a meeting and was not getting his reviews done. [Depo. Arlin, 40:1-41:7; Depo. Arlin Corp. Rep., exs. 29, 30, 31] This coincides with the information Mr. Wellinger's administrative assistant had relayed to Human Resources. [Depo. Olney, ex. 48] In April 2005, Mr. Arlin had "pretty pointed conversation," with Mr. Wellinger about his lack of performance, at which time Mr. Arlin suspected Mr. Wellinger of drinking and asked him whether he had been drinking. [Depo. Arlin, 40:1-24] On his notes from one of his conversations with Mr. Wellinger, Mr. Arlin described him as sounding "incoherent and lethargic." [Depo. Arlin Corp. Rep., ex. 29] All of this led up to Mr. Arlin scheduling the meeting for Tuesday May 3, 2005, the morning of the accident, where Mr. Arlin again asked Mr. Wellinger if he had been drinking, during which

Mr. Wellinger seemed as if he was on "cold tablet," in a "fog," "slower," "drowsy," "not crisp," and was the same type of affect Mr. Arlin had been noticing in their previous meetings. [Depo. Arlin, 59:12-60:7, 65:3-5, ex. 39]

### 3.    Evidence of Intoxication on the Day of the Accident

The reason it is helpful to discuss the fact that Mr. Wellinger's co-workers and supervisor had notice him being intoxicated at work before the day of the accident is that it provides context for his conduct on the day of the accident. He was exhibiting signs of intoxication that were similar to signs he had previously exhibited while being intoxicated at the office.

A woman who worked in close proximity to Mr. Wellinger called the Farmington Hills Police Department and told Detective Sergeant James Knittel that Mr. Wellinger was at work on the day of the accident, he met with his boss, he went to lunch, when he came back from lunch he was intoxicated, and he left the office between 2:00 p.m. and 3:00 p.m. [Depo. Knittel, 37:20-38:5, Aff. Detective Sergeant Knittel, ¶2] The caller also told Detective Sergeant Knittel that Wellinger had a drinking problem that had been going on for four to five months and had been getting progressively worse. [Depo. Knittel, 40:3-8, Aff. Detective Sergeant Knittel ¶2] Although the caller did not provide her name, based on the accuracy of the specific information she provided as well as his own experience and training, Detective Sergeant Knittel determined she more likely than not was a female who worked in close proximity to Mr. Wellinger at UGS. [Depo. Knittel, 18:7-21:22, 32:10-18, 34:24-41:9, 42:19-43:19, 50:7-59:3, 63:3-14, 97:17-102:12; Aff. Detective Sergeant Knittel, ¶¶3-4]

In addition to this direct evidence that Mr. Wellinger was intoxicated at the office on the day of the accident, there is also evidence that Mr. Wellinger admitted drinking six ounces of vodka that morning before 10:00 a.m. [Aff. Detective Hughes, ¶(3)(D)(3)] Further, the descriptions that employees at UGS gave to the police of Mr. Wellinger on the day of the accident are consistent with the descriptions of a person who is intoxicated and with the way Mr. Wellinger had looked when he was intoxicated on previous occasions. Mr. Arlin described Mr. Wellinger as being slow, like he was on cold medicine, which he also said was consistent with the way he had previously described Mr. Arlin as being in a fog, drowsy, and slower. [Depo. Arlin, 59:12-60:7, 65:3-5, ex. 39] Mr. Arlin's executive assistant, Francoise Sudres-Kovac, stated that when Mr. Wellinger returned from lunch, "he came behind me and playfully hit me in the back. I turned around and he was standing, grinning, in a boxer's stand with his fists up. **He looked scary, smiling but with a wild look in his eyes**. . . . He had never acted like that before." [Depo. Sudres-Kovac, ex. 22 (emphasis added)] UGS at the very least should have known that Mr. Wellinger's conduct was consistent with him being intoxicated, especially given his recent history with alcoholism and progressively worsening problem.

Finally, there is also expert testimony that Mr. Wellinger was more likely than not intoxicated when he left his office (approximately 45 minutes before the accident), based on his level of intoxication at the time of the accident and other toxicological information. It is UGS's position that Mr. Wellinger was not intoxicated at the time he left the office, but became intoxicated within the time he left the office and the time of the accident. This is an incredible position, given Mr. Wellinger's extremely high blood

alcohol level and the very short time in which he would have had to obtain such a level if he had not already been intoxicated when he left the office.

The expert opinions are based on several objective facts. Mr. Wellinger's blood alcohol level at the time of the accident was between .36 and .40. [Dec. Frist, ¶5; Depo. Adatsi, 45:8-47:23] In order to reach this level of intoxication, Mr. Wellinger had to have consumed 20 to 22 ounces of alcohol (e.g., 80 proof vodka). [Dec. Frist, ex. A, p. 16; Depo. Adatsi, 50:23-56:18] Mr. Wellinger did not leave his office until approximately 2:45 p.m. [Depo. Obuchowski, 71:25-73:25, 74:11-17, ex. 3 (Mr. Obuchowski sent Mr. Wellinger an email at 2:28 p.m., then went into Mr. Wellinger's office and discussed the issue raised in the email for 10-15 minutes)] The site of the accident is approximately 10 minutes from UGS's office building, so Mr. Wellinger did not drive directly to the scene. [Dec. Frist, ex. A, pp. 10-14] Mr. Wellinger was not drinking in his vehicle, as the police found no bottles in or around the vehicle at the accident site. [Aff. Hughes, ¶3.F.3.] Another driver, Mr. Raj Nath, observed Mr. Wellinger driving erratically for several minutes before the accident occurred at approximately 3:30 p.m. [Dec. Frist, ex. A, p. 13] Based on this objective information, if Mr. Wellinger drank all the alcohol between the time he left the office and when the accident occurred, he had approximately a half hour to consume 20-22 ounces of vodka and allow it to be absorbed into his system to create a blood alcohol level of .40. [Dec. Frist, ex. A, p. 16; Depo. Adatsi, 50:23-56:18] The experts found this was likely not what happened.

Felix Adatsi, Ph.D., is a toxicologist who reviewed Mr. Wellinger's blood alcohol content for purposes of analyzing his state of intoxication at the time of the accident on behalf of the State of Michigan. [Depo. Adatsi, 5:1-9:5, 14:6-18:4, 20:8-18, 22:22-27:12,

33:22-44:4, 45:8-47:23, exs. 58, 59, 60, 61, 62, and 63] It was Dr. Adatsi's opinion that Mr. Wellinger's blood alcohol level at the time of the accident was between .36 and .39. [Depo. Adatsi, 45:8-47:23] Dr. Adatsi explained that this level of blood alcohol would have resulted in visible signs of intoxication as well as poor judgment and irrational behavior. [Depo. Adatsi, 48:17-50:22, 59:8-14, 60:16-68:19]

Dr. Adatsi also explained during his deposition that in order for Mr. Wellinger to reach a blood alcohol level of .36 to .39, he had to have consumed 20 to 22 ounces of vodka within an hour. [Depo. Adatsi, 50:23-56:18] He also stated that in his opinion, based on his research and training, its more likely than not that this amount of alcohol was not consumed within the hour before Mr. Wellinger was involved in the accident, but rather that it was consumed over a longer period of time, so that Mr. Wellinger was intoxicated before he left the office. [Depo. Adatsi, 57:2-59:6, 70:20-71:25, 123:10-126:15, 137:3-138:6, 143:19-144:15, 146:11-148:3] Dr. Adatsi also stated that in his opinion slowed or slurred speech and a person doing silly things, when taken in the context of a person who may have consumed alcohol, is a sign of intoxication. [Depo. Adatsi, 68:24-70:16, 70:20-71:25, ex. 65] Finally, he testified that if a person is known to be an alcoholic, one should look more carefully that unusual behavior might be a sign of intoxication. [Depo. Adatsi, 159:9-160:25]

Another expert in alcohol intoxication is Brian Frist, M.D., who opined that Mr. Wellinger's blood alcohol level at the time of the accident was approximately .40. [Dec. Frist, ¶5] Dr. Frist stated that in his opinion, based on his review of the objective data, including Mr. Wellinger's blood alcohol level and the timeline of events leading up to the accident, it is more likely than not that Mr. Wellinger did not consume all of

the alcohol necessary to reach .40 from the time he left the office in the afternoon until the time of the accident. [Dec. Frist, ¶7] He opined it is more likely than not that Mr. Wellinger consumed alcohol while at the office or while on his one-hour absence during lunchtime, which would have been absorbed while he was still working at the office and either resulted in or added to his state of intoxication while at the office. [Dec. Frist, ¶7] Dr. Frist stated that in his opinion UGS was aware of Mr. Wellinger's alcohol abuse in the months before the accident and that Mr. Wellinger's co-workers more likely than not observed and recognized visible signs of intoxication at the office on the day of the accident. [Dec. Frist, ¶¶8-9]

Contrary to UGS's contention, there is some evidence Mr. Wellinger was visibly intoxicated at the office on the day of the accident. The Court should, therefore, deny UGS's Motion for Summary Judgment as to the Weinstein's claims against UGS for its independent negligence.

## C. PUBLIC POLICY DOES NOT PROHIBIT AN EMPLOYER BEING HELD LIABLE MERELY BECAUSE THE ACCIDENT IS THE RESULT OF ALCOHOL USE

UGS's final, catchall argument is that holding UGS responsible for the conduct of Mr. Wellinger would be against public policy. Michigan public policy does not prohibit a finding of liability against a company whose employee caused an accident while intoxicated in the course and scope of his employment. Michigan law does not prohibit a finding of liability against a company whose independent negligence involves its failure to supervise a member of upper management who was a known alcoholic, yet was sent out of the office to an appointment while visibly intoxicated.

The public policy to which UGS relies is a policy against holding an employer liable simply for creating and then violating its own substance abuse procedures. The

facts of this case are distinguishable from the public policy argument UGS relies upon. First, in this case, Mr. Wellinger was in the course and scope of his employment. There is no indication from any of the authorities relied upon by UGS that Michigan public policy would favor an exception to the doctrine of *respondeat superior* merely because an employee was intoxicated while in the course and scope of his employment. Second, the Weinsteins are not claiming that UGS is liable simply because it violated its own guidelines regarding employees who have substance abuse problems. This is an exceptional case, in which UGS's independent negligence is based not on the fact that it had or did not have company guidelines for substance abuse, but rather, on the fact that UGS specifically had control over Mr. Wellinger, who it knew was intoxicated and was negligent in the manner in which it supervised his conduct as a known alcoholic. This is also a distinguishable case because Mr. Wellinger was in upper management and expected to be regularly in and out of the office as part of his job responsibilities.

Because the facts of this case and the causes of action alleged are distinguishable from those from which UGS claims its public policy argument, the Court should deny UGS's Motion for Summary Judgment on this public policy contention.

## IV.
### PRAYER

The Weinsteins request the Court deny UGS's Motion for Summary Judgment.

Respectfully submitted,

WATTS GUERRA CRAFT LLP

By:    /s/ Francisco Guerra, IV.
            MIKAL C. WATTS
            State Bar No. 20981820
            Federal ID No. 12419
            Attorney-in-Charge


            FRANCISCO GUERRA, IV.
            State Bar No. 00796684
            Federal ID No. 22568
            Of Counsel
            Bank of America Plaza, Suite 100 300
            Convent Street San Antonio, Texas
            78205 Phone: (210) 5270500
            Fax:    (210) 527-0501

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing document was, on this the 29th day of June, 2009, served in accordance with the Federal Rules of Civil Procedure on the following:

James P. Feeney
Sarah A. Kirkwood
Brittany M. Schultz
Dykema Gossett PLLC
39577 Woodward Ave., Ste. 300
Bloomfield Hills, MI 48304

Hershel P. Fink
Honigman Miller Schwartz and Cohn, LLP
2290 First National Building
Detroit, MI  48226


            /s/ Francisco Guerra, IV.
            FRANCISCO GUERRA, IV.