UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GARY WEINSTEIN, Individually and as Representative
of the Estate of JUDITH WEINSTEIN, as Representative
of the Estate of ALEXANDER WEINSTEIN, and as
Representative of the Estate of SAMUEL WEINSTEIN,

        Plaintiff,

vs.                              Case No. 2:07-CV-15000
                                    PAUL D. BORMAN
                                    UNITED STATES DISTRICT JUDGE

SIEMENS, F.K.A. UGS CORP.,
                Defendant.

_____/

<u>OPINION AND ORDER DENYING DEFENDANT SIEMENS CORPORATION'S MOTION
FOR SUMMARY JUDGMENT</u>

      Now before the Court is Defendant Siemens Corporation's ("Siemens") Motion for Summary

Judgment pursuant to Federal Rule of Civil Procedure 56. A hearing was held on October 21, 2009.

For the following reasons, the Court DENIES Defendant's Motion for Summary Judgment.

**I.    BACKGROUND**

      This action arises from a tragic accident that occurred on May 3, 2005. Thomas Wellinger,

then an employee of UGS Corporation, now doing business as Siemens (hereinafter referred to as

Siemens), was on his way from Siemens' offices to a doctor's appointment when he drove his

Chevrolet Denali SUV at a high rate of speed and struck the vehicle driven by Plaintiff's wife, Judith

Weinstein and occupied also by the Weinstein's two young sons, Alexander and Samuel. All three

Weinstein family members were killed.

Mr. Wellinger, who was at fault, was injured and survived.  Mr. Wellinger was intoxicated at the time of the accident, with a blood alcohol level of .435, nearly four times the legal limit. Subsequently, Mr. Wellinger pled no contest to second degree murder in Oakland County Circuit Court, and was sentenced to 19 to 30 years in prison.

The instant Complaint was filed in the United States District Court, Eastern District of Texas, on May 1, 2007.  On Siemens' motion for change of venue, the case was transferred to this District and assigned to United States District Judge Nancy G. Edmunds on November 26, 2007.

On November 29, 2007, Siemens moved to dismiss the case pursuant to Federal Rule of Civil Procedure 12.  The motion was granted in part and denied in part by Judge Edmunds.  (Dkt. No. 13.)  *Weinstein v. UGS Corp.*, 2008 WL 1766657, No. 07-15000 (April 17, 2008) (dismissing Plaintiff's negligent retention and vice principal claims, but denying the motion to dismiss as to Plaintiff's vicarious liability and negligent supervision claims).

Thereafter, due to a change in defense counsel, Judge Edmunds recused herself from the case, and the case was reassigned by the Court's blind draw system to the undersigned.  On May 29, 2009, Siemens filed the instant motion for summary judgment, seeking dismissal of Plaintiff's two remaining claims, vicarious liability and negligent supervision.

**II.     FACTS**

**A.     Drinking Issues**

Mr. Wellinger had a drinking problem that began to affect his job performance sometime in late 2004.  Edward Arlin, Mr. Wellinger's boss at Siemens, testified that there were suspicions that Mr. Wellinger was drinking, at least at home, toward the end of the year in 2004.  (Pl.'s Resp. Ex.

A, Arlin Dep. Ex. 39.)[1]  Mr. Arlin testified that he first confirmed Mr. Wellinger's drinking problems in January, 2005, when Mr. Wellinger came to Mr. Arlin to explain that he was going to be getting treatment for his alcohol problem and would be admitting himself to a health clinic for detoxification.  (Pl.'s Resp. Ex. A, Arlin Dep. 19-20, 22-23; Ex. 39.)

Mr. Arlin also testified that one day in early February he spoke with Siemens employee Mary Ellen Charnley, who indicated to him that on that day, she believed Mr. Wellinger smelled like alcohol at the office and seemed unsteady "like he needed to be stable or something, hold on to himself against the wall or in the office."  (Pl.'s Resp. Ex. A, Arlin Dep. 26-28.)  In fact, in her written statement, Ms. Charnley had a slightly different recollection of what she said to Mr. Arlin that day, stating that she "confirmed [with Mr. Arlin] that Tom Wellinger was drunk in the morning." (Pl.'s Resp. Ex. D, Charnley Dep. Exs. 19, 20.)  Also on that day in early February, Ms. Charnley, according to her statement, went to one of her co-workers, Tom Obuchowski, and told him that Mr. Wellinger "was loaded and to not let him near any customers."  (*Id.*)

Ms. Charnley also testified that she had personally observed Mr. Wellinger intoxicated at the office on one prior occasion, between Christmas (2004) and New Year's (2005), when he stumbled in the hallway approaching her office.  (Pl.'s Resp. Ex. D, Charnley Dep. 28-29.)  After Mr. Wellinger left her office that day, she went to a co-worker's office, George Lovequist, and told

---

[1] Many of the Siemens employees who were deposed in this case also were interviewed by police shortly after the accident.  The police instructed each employee with whom they spoke to memorialize his or her discussions with police in written form.  In most instances, these written recollections have been attached as exhibits to the witness's depositions.  During his deposition, Mr. Arlin was questioned at length about his written summary of his discussions with police.  Mr. Arlin's written statement is first identified at pages 16-17 of his deposition and is attached to his deposition, labeled as "Discovery Ex. No. 39." It is six pages long and bears prior Bates stamp numbers "181052-000133-000139."   When referring to these statements, the Court will use the discovery reference which appears on the first page of each statement, e.g. "Arlin Dep. Ex. 39."

him that: "Tom appeared to be drunk." (*Id*. at 32-33.) In his deposition, Mr. Obuchowski confirmed that early in January Ms. Charnley came into his office and said: "Your boss [Mr. Wellinger] is drunk." (Def.'s Mot. Ex. C, Obuchowski Dep. 44.) Mr. Obuchowski testified that he in turn reported that information to Lori Pagoda, Mr. Wellinger's administrative assistant, who "validated that there is some concern about Tom Wellinger." (*Id*. at 46-48.)

Françoise Sudres-Kovac, Mr. Arlin's administrative assistant, testified that she first realized Mr. Wellinger had a problem in January, 2005. (Pl.'s Resp. Ex. F, Sudres-Kovac Dep. 22, Ex. 22.) Ms. Sudres-Kovac stated that she began to hear rumors that Mr. Wellinger was drinking sometime after January of 2005. She stated that other employees told her that they had smelled liquor on Mr. Wellinger's breath and that she smelled it herself at a staff meeting on April 25, 2005 and again a couple of times in the two weeks before the accident. (*Id*. 32, 34; Ex. 22.) Ms. Sudres-Kovac noted in her statement that she had found Mr. Wellinger asleep at his desk on two occasions and that he told her it was medication that made him sleepy. (*Id*. Ex. 22.)

Another Siemens employee, Lorna Olney, testified that Lori Pagoda, Mr. Wellinger's administrative assistant, called her on April 13, 2005 to discuss some problems she was having with Mr. Wellinger and asked that Ms. Olney keep the conversation confidential. (Pl.'s Resp. Ex. E, Olney Dep. 38-39; Ex. 48.) Ms. Olney memorialized her conversation with Ms. Pagoda in a memorandum which she sent to Siemens compliance officer, Jo Anne Williams. (*Id*. at 40, 22, 75; Ex. 48.) In the course of her conversation with Ms. Olney, which was principally about Ms. Pagoda's concerns that Mr. Wellinger's performance issues would reflect poorly on her, Ms. Pagoda told Ms. Olney that people had told her that Mr. Wellinger "is an alcoholic - comes to work drunk every day or on medication that makes him seem that way." (*Id*. at 48; Ex. 48.) Ms Olney's

4

memorandum of their conversation states that Ms. Pagoda told her that she could not tell if Mr. Wellinger was drunk or on medication but was always slurring his words. (*Id.* 54-55; Ex. 48.) Ms. Olney's memorandum indicates that Ms. Pagoda told her that Mr. Arlin was "fully aware of problem - advised [Mr. Wellinger] to get help." (*Id*. at 54-55; Ex. 48.) When questioned about her notation that Ms. Pagoda indicated that Mr. Arlin was aware of the problem, Ms. Olney did not recall specifically what she meant by this statement. (*Id*. at 55.) Ms. Pagoda, when deposed, did not recall the specifics of her meeting that day with Ms. Olney and did not remember making some of the statements contained in Ms. Olney's memorandum of their conversation. (Def.'s Reply, Ex. 6, Pagoda Dep. 38-41.)

Mr. Arlin testified that between his February discussion with Ms. Charnley and late in April, nothing specific came to his attention about Mr. Wellinger's drinking problems. However, during that time frame, Mr. Arlin was aware that there was a problem, that Mr. Wellinger was missing important meetings, not getting his job done, and stated that he had a "pretty pointed conversation with [Mr. Wellinger] about it." (Pl.'s Resp. Ex. A, Arlin Dep. 39-40, 49; *Id*. Ex. 39.) In fact, in his statement to police after the accident, Mr. Arlin reported to investigating officer Plemmons that "on numerous occasions" other employees had told him that Mr. Wellinger was intoxicated at work. (Pl.'s Resp. Ex. C, Plemmons Aff. ¶ 6.) On one occasion in early April, when Mr. Wellinger called to say he couldn't make a meeting, Mr. Arlin noted that Mr. Wellinger seemed "incoherent and lethargic." (Pl.'s Resp. Ex. A, Arlin Dep. Ex. 29.) When examined about Ms. Olney's memorandum of her conversation with Ms. Pagoda in early April, Mr. Arlin stated that it was just not possible that Mr. Wellinger was "coming in drunk every day" as this was inconsistent with his own personal observations and discussions with Mr. Wellinger over that period of time. (Pl.'s Resp.

Ex. A, Arlin Dep. 43-44.)   Mr. Arlin testified that he didn't believe, in early April, that Mr. Wellinger was still drinking and thought that the real problem was depression and medication that Mr. Wellinger was taking for depression.  (Pl.'s Resp. Ex. A, Arlin Dep. 43-45.)  This testimony, however, is contradicted by Mr. Arlin's statement to police and by Mr. Wellinger's statement given under oath shortly after his sentencing, indicating that he met with Mr. Arlin in April and that the meeting "was all about" Mr. Wellinger's alcohol problem.  (Reply Brief in Support of Motion of UGS Motion for Rule 11 Sanctions, Dkt. No. 20, Ex. A 40-41.)[2]

Mr. Arlin was concerned enough about Mr. Wellinger's drinking problem to call Mr. Wellinger's ex-wife, Nancy Wellinger, the week before the accident to ask her if she thought Mr. Wellinger was still drinking.  She told Mr. Arlin that she believed that Tom Wellinger was still drinking.  (Pl.'s Resp. Ex. A, Arlin Dep. 53.)  By this time, Mr. Arlin testified, he was definitely "open to the idea" that Mr. Wellinger might be drinking again.  (Pl.'s Resp. Ex. A, Arlin Dep. 49.) Mr. Arlin testified that after his conversation with Mr. Wellinger's ex-wife, he began to think that Mr. Wellinger needed treatment for whatever the problem might be - whether it was depression, drinking or something else - because his performance was suffering, and Mr. Arlin intended to meet with Mr. Wellinger to address the problem.  (*Id*. at 55-56.)   Mr. Arlin also stated that when he looked back on Mr. Wellinger's behavior, in particular missing an important account review with Jim Milton, he had trouble accepting that Mr. Wellinger had really stopped drinking.  (Pl.'s Resp. Ex. A, Arlin Dep. 49, Ex. 39.)

---

[2]  On April 27, 2006, shortly after his sentencing, Mr. Wellinger gave a sworn statement, under examination by Plaintiff's lawyer, Barry LaKritz; Mr. Wellinger was represented by his personal counsel, Steven Z. Cohen.  This sworn statement was attached by Defendant's previous counsel, Herschel Fink, as an Exhibit to Siemens' Motion for Sanctions, filed before Judge Edmunds.  (Reply Brief in Support of Motion of UGS for Rule 11 Sanctions, Dkt. No. 20, Ex. A.)  References to this testimony will appear as "Wellinger Statement."

These numerous observations by employees of Siemens that Mr. Wellinger was coming to work under the influence of alcohol were confirmed by Mr. Wellinger himself who testified that he did in fact come to work intoxicated on several occasions.  In his statement given shortly after his sentencing, Mr. Wellinger testified as follows:

> Q:  (By Mr. Lakritz) Let me ask you this question under oath.  Had there been times between January of '05 and May of '05 when you came to work under the influence of alcohol?
> A:  (By Mr. Wellinger) Yes.
> Q:  And on those occasions you spoke with other people on the job, did you not?
> A:  Yes.
> Q:  You interacted with other people on the job, correct?
> A:  Yes.
> Q:  Including Ed. Arlin?
> A:  Yes.

(Wellinger Statement 49.)  Mr. Wellinger specifically testified that, on occasion, he drank before he came to work:

> Q:  (By Mr. Lakritz) You also said on occasion you would drink in the morning before work?
> A:  (By Mr. Wellinger) If I ever woke up at all shaky, yes.

 (*Id.* 59-60.)

## B.    The Day of the Accident

The morning of the accident, at approximately 11:00 a.m., May 3, 2005, Mr. Arlin had the meeting with Mr. Wellinger to discuss his performance and the "path forward."  (Pl.'s Resp. Ex. A, Arlin Dep. 49,  64-65; Exs. 39, 41.)  In a memo prepared in advance of the meeting, Mr. Arlin set forth several items to discuss, including the "fog" that Mr. Wellinger was in, Mr. Wellinger's progress with "AA", and his problems with "medications" and "illness."  (Pl.'s Resp. Ex. A, Arlin Dep. Ex. 41.)

Mr. Arlin testified that he told Wellinger at that meeting, that whatever the problem was,

7

they needed to get to the bottom of it because:

> "[A]t the end of the day, you know what? Your performance sucks. I'm sorry. Corporate says its unacceptable. All right. So, what's really going on? Because if we keep going down this path, where you're not getting reports done in a timely fashion, et cetera, et cetera, then you're not eligible for your job. I'll find you some other job or we'll do something different. But what you're doing right now isn't working."

(Pl.'s Resp. Ex. A, Arlin Dep. 68.)  Mr. Wellinger was the head of Mr. Arlin's "New Value Team" and Mr. Arlin was counting on Mr. Wellinger to get things done.  (Pl.'s Resp. Ex. A, Arlin Dep. Ex. 39.)  If Mr. Wellinger couldn't lead that team, Mr. Arlin explained during the May 3rd meeting, a demotion was possible.  (Pl.'s Resp. Ex. A, Arlin Dep. 69, 82.)  Mr. Arlin testified that he told Mr. Wellinger: "You're not delivering what we've talked about. And I need to know why, and I'm going to find out why."  (*Id*. at 71.)  Mr. Arlin planned to meet with Mr. Wellinger every morning going forward and to go "hand in hand on these activities."  (*Id*.)

At that May 3rd meeting, Mr. Arlin and Mr. Wellinger also discussed the fact that Mr. Wellinger had an appointment scheduled that afternoon with a Dr. Pearce.  Although the appointment was one of multiple appointments with Dr. Pearce that Mr. Wellinger had been scheduling since February, Mr. Wellinger testified that these appointments were only "somewhat regular," indicating that he did not always attend them on schedule.  (Wellinger Statement 42.)

Mr. Arlin testified that he had told Mr. Wellinger the previous week to call his doctor to change his medication; Mr. Wellinger responded to Mr. Arlin that the doctor was out of town.  (*Id*. 75; Pl.'s Resp. Ex. A, Arlin Dep. Ex. 39.)  Thus, Mr. Arlin was aware that Mr. Wellinger had not had a meeting with his doctor the previous week, and mandated that Mr. Wellinger attend his appointment that day.  (Def.'s Mot. Ex. D, Arlin Dep. 42, 71, 75-77.)  Further, Mr. Arlin not only told Mr. Wellinger that he had to meet with his doctor that day but also told him what to talk about

with the doctor that afternoon.  Mr. Arlin testified that he told Mr. Wellinger at the May 3rd meeting to ask the doctor if there was something more aggressive he should be doing, like a clinic, "not just [for] the pills hurting [his] stomach" but to "[f]ind out if there is something more you should be doing. Because whatever the doctor is doing, whatever pills you're taking, whatever else is going on, doesn't seem to be helping. So you need to go press on your guy to find out what more should be done."  (Def.'s Mot. Ex. D, Arlin Dep. 75-78.)  Mr. Arlin testified that he didn't know if Mr. Wellinger's problem was drinking or not but if that was one option, to "go pursue it."  (*Id*. 78.)

Mr. Arlin's message to Mr. Wellinger at the meeting was "ask your doctor what your options are because whatever the doctor is helping you do now, performance-wise, isn't working."  (*Id*. 77.) Mr. Arlin testified that although he and Mr. Wellinger were not shouting at the meeting, they were "very engaged."  (*Id*. 85.)  Mr. Arlin did not know whether or not Mr. Wellinger was planning to return to the office later that afternoon following his appointment, but knew for sure that they were going to meet the next morning.  (*Id*.)  Mr. Arlin told Mr. Wellinger to let him know at their meeting the next morning what the doctor had to say and what his recommendations were:  "I also told him I wanted to hear what recommendations his doctor had after his meeting today."  (*Id*. 83; Pl.'s Resp. Ex. A, Arlin Dep. Ex. 39.)

Significantly, at that meeting the morning of the accident, Mr. Arlin asked Mr. Wellinger if he was still drinking and Mr. Wellinger said "no."  Mr. Arlin responded something along the lines of "I hope you understand if I don't believe that."  (Def.'s Mot., Ex. D, Arlin Dep. 73.)  Mr. Arlin, at his deposition, sought to later modify his statement by explaining that he was trying to draw Mr. Wellinger out, to find out what exactly what was going on with him.  (*Id;* Pl.'s Resp. Ex. A, Arlin Dep. Ex. 39.)  Mr. Arlin testified that Mr. Wellinger did not smell at all of alcohol during the

9

meeting, but seemed "like someone that has a cold tablet and makes them slower." (*Id.*)  Mr. Arlin testified that Mr. Wellinger did not in any way seem to be intoxicated at their meeting and was not exhibiting any visible signs of intoxication.  (Def.'s Mot. Ex. D, Arlin Dep. 85.)  Mr. Arlin reported that he did not smell alcohol, but that his sense of smell is limited because he has a deviated septum and is congested most of the time.  (*Id.* 60.)  Mr. Arlin also testified that at that time he thought that Mr. Wellinger's problems stemmed from his depression and medication, not alcohol.  (Pl.'s Resp. Ex. A, Arlin Dep. 41, 44, 80.)

Mr. Arlin's deposition testimony is contradicted by his more contemporaneous statement to police following the accident, in which he recounted, *inter alia*, Mr. Wellinger's behavior at work, missing important meetings such as the account review meeting with Jim Milton, and the fact that Mr. Arlin had recently called Nancy Wellinger who confirmed that she believed Wellinger was still drinking. (Pl.'s Resp. Ex. A, Arlin Dep. Ex. 39.)

Mr. Wellinger left the office shortly after his closed-door meeting with Mr. Arlin "looking serious, preoccupied, maybe upset." (Pl.'s Resp. Ex. F, Sudres-Kovac Dep. Ex. 22.)  At some point before 2:45, Mr. Wellinger returned to the office.  (*Id.*)  Just before Mr. Wellinger left the office for his doctor's appointment on the day of the accident, at approximately 2:45, he had an encounter with Mr. Arlin's assistant, Ms. Sudres-Kovac, who described the situation as unusual.  Ms. Sudres-Kovac testified that Mr. Wellinger "playfully" came up behind her "playacting, being a boxer" and that he "was in turn, like scary-looking, and then smiling after that" with a wild look in his eyes and she thought it was strange.  (Pl.'s Resp. Ex. F, Sudres-Kovac Dep. 42-45.)  Ms. Sudres-Kovac testified that although she thought the exchange was "odd" she did not think that Mr. Wellinger was intoxicated and that fact never crossed her mind.  (Pl.'s Resp. Ex. F, Sudres-Kovac Dep. 62.)

10

Another employee, Rose Coffman, also observed this encounter and described it as "when you bump into someone in the hallway, you want to dance, and then you, you know move around and go your separate ways." (Def.'s Mot. Ex. F, Coffman Dep. 32, 37, 45.)  She testified that she did not think it was unusual and did not see Mr. Wellinger stagger or sway and did not smell alcohol or see any visible signs of intoxication.  (*Id*; 113-114.)

Just 15 minutes before he left for his doctor's appointment, Mr. Wellinger had a brief encounter with Thomas Obuchowski about an email.  Mr. Obuchowski testified that he and Mr. Wellinger were in very close proximity to one another and that Mr. Wellinger did not appear intoxicated and did not show any sign of visible intoxication.  (Def.'s Mot. Ex. C, Obuchowski Dep. 74-81.)  Two other Siemens employees, Christ Tayon and Dennis Rahn, were outside on a smoking break when Mr. Wellinger left a little after 2:45 p.m. to go to his appointment.  They saw Mr. Wellinger walk to his car, place his bags inside, get into the car, back out of the space and drive away.  Neither one saw any signs that Mr. Wellinger was intoxicated.  (Def.'s Mot. Ex. H, Tayon Dep. 64; Ex. I, Rahn Dep. 29.)

**C.**     **After the Accident**

Two days after the accident, Farmington Hills Police Sergeant Knittel received an anonymous phone call from a woman who told him that Mr. Wellinger had been intoxicated at the office on the day of the accident.  (Pl.'s Resp. Ex. K, Knittel Aff. ¶¶ 2-5; Ex. J Knittel Dep. 37-38.)  This caller has never come forward and identified herself.  (Pl.'s Resp. Ex. K, Knittel Aff. ¶5.)  This woman did not describe any specific signs of intoxication, only the fact that Mr. Wellinger was "intoxicated." She reported to Sergeant Knittel that Mr. Wellinger was at work on the day of the accident, met with his boss, went to lunch, came back from lunch and appeared to be intoxicated,

and left that afternoon between 2:00 and 3:00 p.m.  (*Id*. ¶ 2.)  Sergeant Knittel testified that, based upon the specificity and accuracy of the details of her call, he concluded that she was a co-worker of Mr. Wellinger's, at the office the day of the accident, and had personally observed Mr. Wellinger.  (Pl.'s Resp. Ex. J, Knittel Dep. 41; Ex. K, Knittel Aff. ¶ 4.)  Sergeant Knittel also recalled that the caller told him that in her opinion Mr. Wellinger had a drinking problem and that it had been going on for four or five months, getting progressively worse in the last couple of months.  (Pl.'s Resp. Ex. J. Knittel Dep. 40; Ex. K, Knittel Aff. ¶ 2.)

Another Farmington Hills Police Officer, Plemmons, testified that Mr. Arlin told him that "on numerous occasions" other employees had told Mr. Arlin that Mr. Wellinger was intoxicated at work.  (Pl.'s Resp. Ex. B, Plemmons Dep. 60, Ex. C Aff. ¶ D6.)  Another Farmington Hills officer, Detective Hughes, testified that Mr. Wellinger had advised him that he had consumed six ounces of alcohol the morning of the accident, but had not had a drink of alcohol since ten in the morning.  (Pl.'s Resp. Ex. I Hughes Aff. ¶ D3.)  Officer Hughes also testified that Mr. Wellinger's blood alcohol was .435 at the time of the accident and that, in spite of Mr. Wellinger's statement that he had not consumed alcohol since ten in the morning, he concluded that Mr. Wellinger must have consumed a large amount of alcohol after that time and before the accident.  (*Id*. ¶¶ F1-2.)

Two toxicologists testified that, based on blood alcohol levels and deductions about when Mr. Wellinger must have consumed the alcohol, any odd behavior noticed that day by Mr. Wellinger's co-workers would have been caused by his intoxication and that his co-workers necessarily would have observed signs of intoxication.  (Pl.'s Resp. Ex. M, Frist Decl. ¶¶ 8-9.)  The toxicologists also opined that Mr. Wellinger had to have consumed the alcohol before he left the office for his doctor's appointment that day and could not have achieved the concentration of alcohol

that was found in his blood if, as Siemens posits, he had consumed it after he left the office at approximately 2:45 p.m. but before the accident, which occurred at approximately 3:30 pm. (*Id*. ¶ 7.)

## II.   STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." Fed. R. Civ. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the non-moving party's case on which the non-moving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323; *See also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the non-moving party, there is no genuine issue of material fact

for trial.  *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23.  The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e). The rule requires the non-moving party to introduce evidence of evidentiary quality" demonstrating the existence of a material fact.  *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

"In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, *et al.*, 342 F.3d 493, 497 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "The judge is not to 'weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Id.* (citing *Anderson*, *supra* at 249).

## III.   ANALYSIS

Plaintiff alleges in this action that Siemens, Mr. Wellinger's employer at the time of the accident, is both vicariously and directly liable for the deaths of his family.  Plaintiff argues that Siemens knew or should have known that Mr. Wellinger was intoxicated when he left the office on the day of the accident to drive to his doctor's appointment.  Plaintiff claims that in spite of this

14

knowledge, Siemens required Mr. Wellinger, as a condition of his continued employment, to meet with his doctor that afternoon on a special mission for the benefit of Siemens, to ask the doctor the specific questions ordered by Mr. Arlin, and to report back immediately to Siemens about what transpired at his appointment.  Plaintiff argues that, therefore, Mr. Wellinger was within the course and scope of his employment when he drove to his appointment that day and that Siemens is vicariously liable for Mr. Wellinger's actions the day of the accident.  Further, Plaintiff argues that Siemens owed a duty to Plaintiff not to direct Mr. Wellinger, whom it knew or should have known was intoxicated that day, to leave the office to drive to his doctor's appointment and that, therefore, Siemens is also directly negligent for Mr. Wellinger's actions the day of the accident.

Siemens responds that it is not vicariously liable for Mr. Wellinger's actions on the day of the accident because Mr. Wellinger was on personal business, not a special Siemens mission, when he left that day to attend his doctor's appointment.  Siemens argues that it did not in any way require him to attend the appointment and did not arrange or pay for the doctor visit. Siemens argues that it did not know the name, location or specialty of the doctor and that Siemens did not derive any specific benefit from Mr. Wellinger's attendance at the appointment.  Siemens further argues that it is not directly liable for Mr. Wellinger's actions that day because it did not know that Mr. Wellinger was intoxicated when he left that day to attend his doctor's appointment and that, in any event, it did not owe a duty to Plaintiff to refrain from directing Mr. Wellinger to attend his doctor's appointment that day.

**A.      Vicarious Liability/Respondeat Superior**

Under Michigan law, an employer's vicarious liability for the acts of its employees under the doctrine of respondeat superior is as follows:  "[A] master is responsible for the wrongful acts of his servant committed while performing some duty within the scope of his employment" but "is not vicariously liable for acts committed by its employees outside the scope of employment, because the employee is not acting for the employer or under the employer's control."   *McMullen v. Duddles*, 405 F. Supp. 2d 826, 830 (W.D. Mich. 2005) (internal quotations and citations omitted); *Rogers v. J.B. Hunt Transp., Inc*., 466 Mich. 645, 650-51 (2002). "As a general rule, the trier of fact determines whether an employee was acting within the scope of his employment; however, summary disposition is appropriate if it is apparent that the employee was acting to accomplish a purpose of his own." *Caron v. Walmart Stores, Inc*., 2005 WL 1278480, No. 254915 at * 2 (Mich. Ct. App. May 31, 2005) (per curiam) (unpublished) (citing Green v. Shell Oil Co., 181 Mich. App. 439, 447 (1989)).

Taking the evidence in the light most favorable to the non-moving party, Plaintiff has set forth evidence that Wellinger was directed, on the day of the accident, to attend an appointment that afternoon with a doctor and to report back immediately to Siemens with the doctor's recommendations for treating his alcohol problem as a condition of his employment, and was on his way to that appointment when the accident occurred.

Generally, driving to and from work or to a personal appointment during the workday does not fall within the scope of employment.  *Camburn v. Northwest School Dist*., 459 Mich. 471, 478 (1999); *see also Leitch v. Switchenko*, 169 Mich. App. 761, 763 (1988).  However, Michigan courts have recognized exceptions to this general rule as discussed in *Bush v. Parmenter, Forsythe, Rude & Dethmers*, 413 Mich. 444 (1982):

16

> [T]he rule is riddled with exceptions including situations where 1) the employee is on a special mission for the employer, the employer derived a special benefit from the employee's activity at the time of the injury, 3) the employer paid for or furnished employee transportation as a part of the contract of employment, 4) the travel comprised a dual purpose combining the employment-required business needs with the personal activity of the employee, 5) the employment subjected the employee to "excessive exposure to the common risk" such as traffic risks faced by a truck rider deadheading to his rig, and 6) the travel took place as a result of a split shift working schedule, or employment requiring a similar irregular non fixed working schedule.

413 Mich. at 452 n. 6 (internal citations omitted).[3]

Plaintiff's argument in this case is an amalgam of three of these exceptions. Plaintiff states that: 1) Mr. Wellinger was on a special mission for Siemens when he left to attend his doctor's appointment; 2) that Siemens was to derive a special benefit from Mr. Wellinger's visit to his doctor on the day of the accident; and 3) that Mr. Wellinger's travel to his doctor's appointment comprised a dual purpose combining business needs with personal activity. (Pl.'s Resp. 4-5.)

In *Bush*, Bush was an attorney specializing in probate law who was attending a trust and investment seminar about 40 miles away from his office. 413 Mich. at 446. When the meeting ended, Bush began drinking with friends and continued drinking at various establishments until about 2:30 in the morning when he left a restaurant to return home. *Id*. at 447-48. He was found the next morning dead in his car from a shotgun wound to the head. Although the court ultimately held that the employment nexus was broken by Bush's extensive deviation on multiple frolics for

---

[3] *Bush*, like many of the cases relied on by the parties on the issue of course and scope of employment, involves a claim for worker's compensation benefits where the employee, as a condition of receiving benefits, must establish that the injury occurred in the course and scope of employment. These same tests have been applied in both the worker's compensation and the negligence arena. *See Stockley v. School Dist. No. 1 of Portage Twp.*, 231 Mich. 523 (1925) (worker's compensation); *Bajdek v. Toren*, 382 Mich. 151 (1969) (negligence).

his own personal benefit, the court first concluded that Bush was on a special mission in the interest

of and at the direction of his employer.  *Id*. at 451.  The court was persuaded in its finding by the fact

that (1) Bush's employer paid for attendance at the seminar, including travel to and from the

seminar, gasoline, attendance fees and any additional expenses; (2) the firm required every lawyer

in the firm to participate in continuing legal education seminars which allowed the firm to advertise

that it employed the most competent and up to date legal specialists; and (3) the firm owned the car

that Bush used to travel to the seminar.  Concluding that travel to and from such a special mission

would normally be within the scope and course of employment, the court explained:

> When an employee, having identifiable time and space limits on his
> employment, makes an off-premises journey which would normally
> not be covered under the usual going and coming rule, the journey
> may be brought within the course of employment by the fact that the
> trouble and time of making the journey, or the special inconvenience,
> hazard, or urgency of making it in the particular circumstances, is
> itself sufficiently substantial to be viewed as an integral part of the
> service itself.

413 Mich. at 452 (quoting Larson, Workmen's Compensation Law, § 16.10, p. 4-123).  As Justice

Cavanagh noted in his concurring opinion in *Camburn*, where he quoted this same language, implicit

in this observation by Professor Larson "is the notion that the employee must embark on the journey

at the request, direction, instruction or requirement of his employer."  *Camburn, supra* at 481.  See

*also Stockley, supra* at 718 (where employee teacher was required to attend seminar, on a day when

schools were closed for that very purpose, and was not free on that day to go where she pleased, but

 was directed by employer to go to a specified place, she was on a special mission of her

employment).

In *Camburn , supra* at 471, the court discussed this exception in a case involving a teacher

who was involved in an automobile accident on her way to attend a seminar sponsored by her school

18

district.  Discussing the compulsory nature of plaintiff's attendance, the court noted that attendance was not required and that plaintiff's principal testified that plaintiff had not been encouraged to attend the seminar any more than the general encouragement given to teachers to avail themselves of such opportunities.  *Id*. at 474-75.  The seminars were provided at no cost, so neither the teacher nor her employer paid.  The principal testified that attending such seminars did not provide a direct benefit to the school but could benefit the students and would be noted in a teacher's evaluation. *Id*. at 475.

The court affirmed the decision of the court of appeals which had upheld the Worker's Compensation Appellate Committee's determination that the school did not directly benefit from plaintiff's attendance, did not pay for or furnish transportation and did not urge or expect plaintiff to attend and therefore plaintiff was outside the scope and course of employment at the time of the accident. *Id*. at 478-479.  In discussing specific employer benefit, the court gave the example of a mechanic who attends an examination given by a manufacturer and receives a certificate which allows his employer to advertise that it employs "a factory-trained mechanic."  *Id*. at 478.  In evaluating the compulsory nature of plaintiff's attendance, the court stated that: "[S]ubstantial evidence supported the magistrate's conclusion that attendance was neither compulsory nor definitely urged or expected [but] merely encouraged, and, as such, was not an incident of employment."  *Id*.  *See also Oberhauser v. Mabe*, 2009 WL 2232012, No. CA2008-11-266 at * 6 (Ohio App. 12 Dist. July 27, 2009) (unpublished) (holding that where employee was not required to attend a seminar, the school was not certain that it would adopt the prototypes she learned about at the seminar and employee was furthering a primarily personal interest in maintaining her teaching certificate, employee was not in the course of her employment).

19

In *Allison v. Pepsi-Cola Bottling Co*., 183 Mich. App. 101 (1990), the court discussed the issues of compulsory attendance and employer benefit in a case involving employee participation in a company-sponsored social event.  The company sponsored a Vegas Night party at which the driver-salesmen were rewarded for achieving certain sales goals with fun money that they could "spend" at the party for valuable prizes.  *Id*. at 104.  While attendance at the party was not mandatory, the money could only be spent at the party and defendant paid for all of the prizes, food, beer and liquor at the party.  *Id*. at 105.  One of the attendees was killed in an accident on the way home from the party.  The court found that the employee was in the course and scope of his employment because: (1) the party-promotion benefitted the employer by increasing sales and the social outing was part of the business plan (*Id*. at 110); and (2) although attendance was not mandatory, the "must" nature of the attendance was strongly implied by the branch manager who told attendees "you better be there."  (*Id.* at 109.)

The question before this Court then, taking the evidence in the light most favorable to the non-moving party, is whether, Siemens required Mr. Wellinger as a condition of his employment to attend his doctor's appointment on the day of the accident, and whether Siemens stood to derive a specific benefit from Mr. Wellinger's attendance at the appointment that afternoon.  On the issue of "required" attendance, Plaintiff argues that Mr. Arlin had identified a required "path forward" with Mr. Wellinger, which included requiring Mr. Wellinger to attend his doctor's appointment that day and reporting back to Mr. Arlin the next morning about his doctor's recommendations that were going to help Mr. Arlin address the problems that were interfering with Mr. Wellinger's job performance.  (Pl.'s Resp. Ex. A, Arlin Dep. 42-44; 55-56; 64-72; 75-76; 81-82; 84-85.)  Plaintiff argues that Mr. Arlin directed Mr. Wellinger to attend the appointment with his doctor and directed

20

him to "report back" what the doctor had told him. (*Id.* 39) Mr. Arlin told Mr. Wellinger to press the doctor and find out what more should be done. (*Id.* 77-78.) Plaintiff argues that Mr. Arlin told Mr. Wellinger that if he kept going down this wrong path, he might no longer be eligible for his job. (Pl.'s Resp. Ex. A, Arlin Dep. 67-68.) Plaintiff argues that this amounted to Siemens sending Mr. Wellinger, with his job hanging in the balance, on a special mission on behalf of Siemens. "Mr. Arlin not only directed [Mr. Wellinger] to attend the meeting with the doctor, but told [Mr. Wellinger] things to ask the doctor, and directed him to report back what the doctor told him." Mr. Arlin had heard Mr. Wellinger's excuse for not meeting with his doctor the previous week and made clear, that not meeting that day with his doctor was not an option. (Pl.'s Resp. 9.) Plaintiff argues that Mr. Arlin "needed this information so that he could better figure out how to address [Mr. Wellinger's] work situation and the 'path forward.'" (Pl.'s Resp. 11.) Mr. Wellinger was the leader of Mr. Arlin's "New Value Team" and Mr. Arlin needed immediate feedback from that particular appointment to craft the "path forward" and ensure that Mr. Wellinger could lead that important new team.

Siemens counters that there is no factual evidence that Siemens "required" Mr. Wellinger to attend the appointment that day, much less that the appointment was a condition of his employment. (Def.'s Mot. 16.) While Siemens concedes that it was interested in Mr. Wellinger getting whatever care was necessary to return himself to health, this was no different than the interest any employer has in returning a sick employee to health – whether they suffer from cancer, back pain, or mental illness. (Def.'s Mot. 17.) Siemens argues that the evidence shows that Mr. Wellinger voluntarily made arrangements to see his doctor, whom he had been seeing twice a month since February (Def.'s Mot. Ex. J, Wellinger Dep. 121-22, June 15, 2006). Siemens argues that it

21

had no specific knowledge of the appointments and that no one at Siemens required Mr. Wellinger to attend the appointment that afternoon. Mr. Arlin testified that he first heard about the May 3, 2005 appointment a week prior but had no idea about the specifics of the appointment and testified that he didn't tell Mr. Wellinger to go, didn't make the appointment, didn't know the doctor's name or speciality, didn't pay for the appointment and didn't know exactly what Mr. Wellinger was being treated for, although he thought it was probably depression. (Def.'s Mot. Ex. D, Arlin Dep. 97-98.)

Mr. Arlin testified that Mr. Wellinger told him that he was on some medication that was making him sick and drowsy (Def.'s Mot. Ex. D, Arlin Dep. 60, 75) and Mr. Arlin suggested that he check with his doctor about adjusting the medication because Mr. Wellinger still seemed to be having trouble getting on top of his work performance, so maybe he needed to be taking or doing something different. (Def.'s Mot. Ex. D, Arlin Dep. 75-76.) Mr. Arlin encouraged Mr. Wellinger to seek help from his physician and to get his medication adjusted and to get whatever treatment he needed to get himself back on track. (Def.'s Mot. Ex. D, Arlin Dep. 75-76.) He did tell Mr. Wellinger to let him know at the meeting they were supposed to have the next morning, what the doctor had to say. (Pl.'s Resp. Ex. A, Arlin Dep. 75-76.) When asked whether he required Mr. Wellinger to attend the appointment, Mr. Arlin testified unequivocally that he did not and that if Mr. Wellinger had failed to inform Mr. Arlin about the appointment at their meeting the next morning, there would have been nothing he could have done about it: If 'you met him, you didn't meet him, you got treatment or not, I would have no way knowing that anyway; I don't have access to it. It wasn't my primary issue; it was his." (Def.'s Mot. Ex. D, Arlin Dep. 104-105.) Siemens argues that on this evidence, under *Camburn* and *Allison, supra*, Mr. Wellinger's "voluntary attendance at his standing physician's appointment cannot translate into a compulsory special mission." (Def.'s Mot.

17.) Siemens argues that there is no evidence that Mr. Wellinger was told "you better be there" or that anyone at Siemens implied that if he didn't attend that very meeting he would lose his job.

Plaintiff reads *Camburn* and *Allison* differently and argues that the standard is not mandated or compelled but "definitely urged or expected." Plaintiff argues that Mr. Wellinger's attendance at the appointment was part of the business plan to get Mr. Wellinger "out of his fog" and keep his job. (Pl.'s Mot. 12.) Not seeing the doctor that afternoon was not an option for Mr. Wellinger if wanted to keep his job. Although the appointment may have been rescheduled by Mr. Wellinger because the doctor was out of town, the appointment became a mandatory appointment that day per Mr. Arlin. Mr. Arlin had told Mr. Wellinger to see the doctor the previous week, and when that did not occur, he ordered Mr. Wellinger, at the May 3rd meeting, to see the doctor that day – or else.

Plaintiff argues that Mr. Arlin's direction to Mr. Wellinger to get to that appointment and to report back in the morning as to the recommendations for improving his job performance definitely meets the *Camburn* and *Allison* "urged or expected" test. Plaintiff further argues that Siemens stood to specifically benefit from this information, which was expected to enhance the performance of the leader of its "New Value Team." *See Barton v. Las Cositas*, 694 P.2d 1377, 1380-81 (N.M. Ct. App. 1985) (finding a genuine issue of fact on the issue of "special mission" where the employee's "speech therapy sessions were initiated as a business decision of the corporation to rehabilitate the plaintiff so he could perform the full range of his work duties.")

Viewing the facts in the light most favorable to the non-moving party, this Court finds that Plaintiff has produced sufficient evidence to create a genuine issue of fact as to whether Mr. Wellinger was "urged or expected" by Siemens to attend his "somewhat regularly scheduled" doctor's appointment that day and whether doing so had the potential to specifically benefit Siemens

and the "New Value Team's" path forward.  Issues of whether an employee was acting within the

course and scope of his employment are generally left to the trier of fact.  *Caron*, *supra* at * 2.

Accordingly, Siemens' motion for summary judgment on Plaintiff's claim of liability based upon

respondeat superior is denied.[4]

## B.    Direct Liability/Negligent Supervision

Plaintiff argues that Siemens, as Mr. Wellinger's employer,  had a duty to Plaintiff not to

direct its intoxicated employee to attend his doctor's appointment.  Plaintiff claims that (1) Siemens

knew or should have known that Mr. Wellinger was intoxicated when he left that day to go to his

doctor's appointment and (2) that in spite of this knowledge Siemens took affirmative control of Mr.

Wellinger and directed him, as a condition of his continued employment, to attend the appointment

that afternoon.

### 1.    Defining the Duty

A claim proceeding on the theory of direct negligence/negligent supervision requires that

---

[4] Although never mentioned in its motion or reply, Siemens argued at the hearing on October 21, 2009, that Siemens could not be held liable for Mr. Wellinger's "criminal acts," citing as authority *Zsigo v. Hurley Med. Ctr.*, 475 Mich. 215 (2006) (refusing to adopt Restatement Agency, 2d, § 219(2)(d) "aided-by-agency" exception to the general rule of non-liability for criminal acts); *MacDonald v. PKT, Inc*., 464 Mich. 322 (2001) (holding there is no duty to third parties on the part of a premises owner who could not have foreseen the criminal acts of third parties); and *Graves v. Warner Bros*., 253 Mich. App. 486 (2003) (the "Jenny Jones" case) (holding that a talk show host did not owe a cognizable duty to protect a guest on the show from the homicidal acts of third parties).  While these cases support the general propositions that an employer is not responsible for the criminal acts of its employees when those acts are beyond the scope of employment and will owe no duty to third parties for the criminal acts of its employees, these general rules of non-liability do not apply in cases where, as here, the employer knew of prior acts of the employee which put the employer on notice of a propensity on the part of the employee to commit the type of crime as to which the employer seeks the cloak of non-liability.  *See Brown v. Brown*, 478 Mich. 545, 561 (2007) (observing that "'[t]he employer's knowledge of past acts of impropriety, violence or disorder on the part of the employee is generally considered sufficient to forewarn the employer . . .'") citing *Hersh v. Kentfield Bldrs., Inc*., 385 Mich. 410, 413 (1971).

plaintiff establish, as an initial matter, that defendant owed plaintiff a duty. *Murdock v. Higgins*, 454 Mich. 46, 500 (1997). The question of duty is one for the court to decide as a matter of law. *Williams v. Cunningham Drug Stores, Inc*., 429 Mich. 495, 500 (1988). If the law does not impose a duty on Siemens which runs in favor of Plaintiff, then no claim of negligence will lie. "Duty is a question of whether the defendant is under any obligation for the benefit of the particular plaintiff and concerns the problem of the relation between individuals which imposes upon one a legal obligation for the benefit of the other. *Buczkowski v. McKay*, 441 Mich. 96, 100 (1992)*.*

In denying Defendant's motion to dismiss in the instant case, Judge Edmunds stated that a valid claim of negligence could lie if Plaintiff could establish that Siemens "knew or should have known of the existence of any special circumstances regarding [Mr. Wellinger] that could establish a duty of care to third persons." *Weinstein, supra* at * 8. Judge Edmunds concluded that the Michigan Supreme Court pointedly declined to pass judgment on the viability of such a duty in *Millross v. Plum Hollow Country Club*, 429 Mich. 178 (1987) when it "expressly left open the issue 'whether a plaintiff, who alleges that an employer knew or should have known that its employee could not be entrusted with the responsibility imposed by the employer so as to give rise to a foreseeable risk of harm to others,' states a valid negligence claim against an employer." *Id*. (citing *Millross*, *supra* at 196). In concluding that this theory had some merit, Judge Edmunds summarized that the relevant inquiry on summary judgment would be whether: "Siemens knew or should have known about its employee's alcohol problem and intoxication on the day of the accident and [directed him], as a condition of his continued employment, to drive to an appointment during the workday, thus increasing the risk of harm to others." *Id*. at * 9. This Court agrees with Judge Edmunds' analysis.

### a. *Millross* **and its Implications**

Plaintiff argues that its proposed theory of recovery in this case was contemplated by the Michigan Supreme Court's decision in *Millross*.  Plaintiff states that: "The Michigan Supreme Court has clearly not closed the door on negligence claims against an employer with respect to injuries caused by employees for whom the employer knew or should have known of the existence of special circumstances that give rise to a foreseeable risk of harm, in a particular situation." (Pl.'s Resp. 17.)  In *Millross*, which was fundamentally a dram shop case, Plum Hollow Golf Club hosted an event for its caddies and required that Tomakowski, the caddie master at the club, attend.  429 Mich. at 182.  Plum Hollow served Plaintiff, who had worked a 13-hour shift that day, alcohol at the event.  On his way home, Tomakowski struck and killed Mr. Millross who had stopped to help another vehicle that had been involved in an accident.  *Id*. at 181.  Plaintiffs claimed that Plum Hollow was negligent in "permitting an employee who is tired and has been drinking, but is not visibly intoxicated, from driving his own vehicle."   Analyzing plaintiff's claim with reference to *Restatement (Second) Torts* § 317, the Court expressly declined to find a duty running from Plum Hollow to Millross, holding that "the special relationship between employer and employee does not of itself require the employer to protect third parties from off-premises injuries, either by supervising the consumption of alcohol or providing alternate transportation."  *Id*. at 196.  As Judge Edmunds pointed out in her opinion, the Court expressed no opinion on the viability of a claim that alleges "defendant knew or should have known of the existence of any special circumstances regarding [the employee] that could establish a duty of care to third persons."  *Id*. at 196-197.  Finding insufficient allegations for such a claim in the case before it, the Court in *Millross* stated:  "The mere fact that the employee was tired does not allege a foreseeable risk that he would consume alcoholic beverages

to the point where he would become a risk to others.  A lengthy work day, combined with required attendance at the banquet, does not create a reasonably foreseeable risk of harm from which would arise an independent duty to supervise or provide alternate transportation." *Id*. at 197.

The case to which the *Millross* Court refers in discussing the potential viability of such a claim, *Costa v. Able Distributors, Inc*., 3 Haw. App. 486; 653 P.2d 101 (1982), also declines to find such a duty on the facts before it, but notes that such a theory may arise if plaintiff can "show that the employer knew or should have known of the necessity and opportunity for exercising such control over the employee." *Id*. at 105 (citing the Restatement of Torts § 317).  In *Costa*, the employee, Arata, had been drinking with friends on the premises after hours and was found to be intoxicated on the drive home when he struck and injured the plaintiff.  *Id*. at 103.  Plaintiff argued that Able (Arata's employer) had a duty to control Arata's after-hours drinking on its premises.  The court disagreed, stating: "Able's duty in this case would arise only if Able knew or should have known that Arata had a propensity for causing automobile collisions while driving under the influence of alcohol, and thus, should have prevented Arata from consuming beer on its premises. The record does not indicate any such knowledge or that Arata had any previous collisions or drunk driving arrests."  *Id*. at 105.  While *Costa* clearly speaks to the importance of the knowledge component, the Michigan Supreme Court in *Millross* framed the issue specifically to include a showing of an employer's knowledge that the employee "could not be entrusted with the responsibility imposed by the employer," thus adding a component that the employer have affirmatively directed the employee's conduct that results in harm to a plaintiff.  *See Weinstein*, *supra* at * 9 (Edmunds, J.) (recognizing that plaintiff must establish that Siemens "directed him as a condition of his continued employment to drive to an appointment during the work day," with

knowledge of Mr. Wellinger's intoxication).[5]

### b.    Interpreting and Applying *Millross*

Plaintiff acknowledges that its claim of negligent supervision on these facts requires this Court to broadly interpret existing Michigan law to find a duty on the part of Siemens to Plaintiff for the alleged negligent acts of its employee, Mr. Wellinger. Plaintiff proposes that such a duty should be found here because: (1) the employer had actual knowledge of the employee's intoxication and (2) armed with such knowledge, the employer performed an affirmative act or took control over the employee sending him out on the roadway on employer business.  (Pl.'s Resp. 15, 18.)

Plaintiff proffers, in part, the reasoning in the Texas Supreme Court opinion in *Otis Engineering Corp. v. Clark*, 668 S.W.2d 307 (Tex. 1984).[6]  *Otis* was a wrongful death action by the husbands of two women who were killed in an automobile accident involving an Otis employee

---

[5]  Siemens argues that this Court is bound by the holdings of two worker's compensation cases which Siemens suggests preclude any claim of direct negligence against an employer who directs an intoxicated employee to leave the employer's premises.  *See Benedict v. General Motors Corp. et. al.*, 1997 U.S. Dist. LEXIS 9230, No. 5:96-CV-88 at * 11 (W.D. Mich. June 2, 1997) (unpublished) ("[A]n employer simply does not have a common law duty to make sure intoxicated employees removed from the work site make it home safely."); *Pierron v. General Motors Corp.*, 1998 WL 1991076 , No. 2013-74 at * 1 (Mich. App. July 10, 1998) (unpublished) (involving the same accident as *Benedict* but a different claimant, holding that "[t]he employer-employee relationship between defendant and the intoxicated employee did not give rise to a duty to plaintiff's decedent.").  First, Siemens' suggestion that such a duty can never exist directly contradicts the Michigan Supreme Court's inference in *Millross, supra*, that such a duty may in fact exist under the appropriate circumstances.  Second, neither *Benedict* nor *Pierron* involved facts, such as those in the present case, taking the evidence in the light most favorable to the non-moving party, which suggest that the defendant employer affirmatively directed an employee whom it knew or should have known was intoxicated to leave the employer's premises on a special mission for the employer, in furtherance of the employer's business.

[6] Judge Edmunds correctly concluded, in her opinion denying in part and granting in part Siemens' motion to dismiss, that Michigan law, not Texas law, applies in this case.  2008 WL 1766657 at 3.  Plaintiff urges this Court to consider the discussion in *Otis*, however, a Texas case which Plaintiff proposes is analogous to the facts presented in the instant case.

(Robert Matheson). *Id.* at 307.  The case was in the supreme court on appeal of the decision of the court of appeals, which had reversed and remanded the trial court's grant of summary judgment in favor of the defendant.  The parties conceded that Matheson was not in the course of his employment at the time of the accident, thus making the claim one of direct negligence.  *Id.*  According to the evidence presented on summary judgment, Otis had a history of drinking on the job and was intoxicated on the night of the accident.  One of Matheson's co-workers testified that he told Matheson's supervisor on the night of the accident that Matheson was slurring his words, was not coordinated and that they "need[ed] to get him off the machines."  *Id.* at 308.  Another co-worker testified that Matheson was "either sick or drinking" and was "weaving and bobbing" on his stool, about to "fall into the machine."  *Id.*  Based on this information, the supervisor suggested to Matheson that he go home and escorted Matheson to the parking lot, inquiring whether he could make it home, which Matheson indicated he could.  *Id.*  Thirty minutes later and three miles away, the fatal accident occurred.  *Id.*  The medical examiner testified that Matheson had a blood alcohol level several times the legal limit and that "one hundred percent of persons with that much alcohol exhibit signs of intoxication observable to the average person."  *Id.*  The testimony further indicated that Matheson's supervisor knew that Matheson was in no condition to drive home that night and that, when he heard about the accident, he immediately suspected that Matheson might have been involved.  *Id.*

The court reasoned that if a duty could be imposed on Otis under these circumstances it would be based on more than "*mere knowledge*" and would require "additional factors."  *Id.* at 311 (emphasis in original).  Acknowledging that it was creating a new duty, the court was emboldened by the observations of Dean Prosser that:  "'[c]hanging social conditions lead constantly to the

29

recognition of new duties.  No better general statement can be made, than the courts will find a duty where, in general, reasonable men would recognize it and agree that it exists.'" *Id. at* 309 (quoting W. Prosser, *The Law of Torts* § 56 at 343 (4th ed. 1971) at 327).  The court concluded that such a duty did exist: "when, because of an employee's incapacity, an employer exercises control over the employee, the employer has a duty to take such action as a reasonably prudent employer would take to prevent the employee from causing an unreasonable risk of harm to others." *Id*. at 311.

The three cases relied on by the *Otis* court in support of its conclusion, illustrate the type of employer behavior that the court reasoned could form the basis for finding such a duty.  *See Leppke v. Segura*, 632 P.2d 1057 (Colo. Ct. App. 1981) (finding a duty where the employer jump started the vehicle of a visibly intoxicated driver, giving him mobility where he otherwise would have been unable to move on the roads); *Brockett v. Kitchen Boyd Motor Co*., 264 Cal.App.2d 69, 70 Cal.Rptr. 136 (1968) (finding a duty where the employer hosted a Christmas party, served a minor alcohol and then placed the minor in his vehicle directing him to drive home); and *Robertson v. LeMaster*, 171 W.Va. 607, 301 S.E.2d 563 (1983) (finding a duty where an employer required his employee to work 27 consecutive hours of hard labor, refused the employees repeated requests to go home and finally drove the employee to his car to drive home).  *Id*. at 314-315.

Plaintiff urges this Court to extend the holding of the Court in *Millross* and to embrace the reasoning adopted by the Texas Supreme Court in *Otis* to find a duty on the part of Siemens to Plaintiffs in this case.  Plaintiffs argue that this theory of recovery was contemplated by the Court in *Millross* and that this case presents the "special circumstances" which the Court discussed, but found lacking, in *Millross.*

### 2.    Siemens' Affirmative Acts of Control Over Mr. Wellinger

The ultimate question of duty in this case is whether Siemens' actions or inactions prior to the accident on May 3, 2005 created a foreseeable risk of harm to Plaintiff that Siemens had a duty guard against.  As Judge Edmunds observed in her opinion denying Siemens' motion to dismiss Plaintiff's negligent supervision claim, the Michigan Supreme Court in *Millross*, *supra* expressly left open this issue: "'[W]hether a plaintiff who alleges that an employer knew or should have known that its employee could not be entrusted with the responsibility imposed by the employer so as to give rise to a foreseeable risk of harm to others' states a valid negligence claim against the employer." 2008 WL 1766657 at * 8 (quoting *Millross*, *supra* at 26.)  Turning to the facts in the present case, taking the evidence in the light most favorable to the non-moving party, the Court finds that such a duty may exist where, as here, Plaintiff has presented evidence that Siemens affirmatively directed Mr. Wellinger to attend his doctor's appointment that day, in spite of the fact that Siemens employees, including Mr. Arlin, were aware that Mr. Wellinger was acting slow, drowsy, crazy, wild-eyed that day – behaviors they had observed in the past and associated with Mr. Wellinger's drinking problems. By ordering Mr. Wellinger to attend that meeting with his doctor that day and to respond back immediately with the doctor's answers to Mr. Arlin's dictated questions, as a condition of keeping his job, Siemens created a risk of foreseeable harm to third parties and therefore had a duty to take reasonable steps to prevent that harm.[7]

---

[7] Siemens suggests that in order to charge Siemens with knowledge of Mr. Wellinger's intoxication on the day of the accident, Plaintiff must provide eyewitness testimony of visible intoxication, which Siemens suggests requires a very specific showing of legally recognized signs of intoxication as outlined in Michigan cases addressing the issue of dram shop liability.  Siemens argues, based upon the holding of the Michigan Supreme Court in the dram shop case of *Reed v. Breton*, 475 Mich. 531, 542 (2006), that this Court cannot find a genuine issue of fact on the issue of Siemens' knowledge of Mr. Wellinger's intoxication the day of the accident absent direct eyewitness testimony that Mr. Wellinger was slurring words, stumbling, having difficulty getting into a car, driving erratically, speaking loudly or had bloodshot eyes.  This Court does not feel bound by this dram shop case in this very different context of a negligence action against an employer with intimate knowledge of the employee's history of alcohol abuse and the employer's knowledge of that

In support of its claim that Siemens knew or should have known that Mr. Wellinger was obviously intoxicated at Siemens on the afternoon of the accident, Plaintiff offers the police report and deposition testimony of Sergeant James Knittel who testified that a couple of days after the accident, he received an anonymous phone call from a female caller, (never identified), whom he assumed from the context of her call was a co-worker of Mr. Wellinger's.  From the context of the call, Sergeant Knittel concluded that the woman had been at the office on the day of the accident, and she told him over the phone that Mr. Wellinger had been intoxicated at the office that day.  (Pl.'s Resp. Ex. K, Knittel Aff. ¶¶ 2-5;  Ex. J Knittel Dep. 37-38.)  Although this woman has never come forward, Sergeant Knittel testified that based upon the specificity of her statement that Mr. Wellinger "met with the boss, left for lunch, returned intoxicated and left work at 1400 to 1500 hours on the day of the accident," he was certain that she had been in the office with Mr. Wellinger that day and had observed that he was intoxicated.

Plaintiff also relies on the testimony of Ms. Sudres-Kovac, Mr. Arlin's administrative assistant, who testified that Mr. Wellinger "playfully" came up behind her that day a little after 2:00 p.m. in the afternoon and "pretended to be like boxing" and that he had "a wild look in his eye" and she thought it was strange.  (Pl.'s Resp. Ex. F, Sudres-Kovac Dep.  43-45, November 13, 2008.) Plaintiff also relies on the testimony of Mr. Arlin who observed in his meeting with Mr. Wellinger that day that he seemed slow, not crisp "like he was on cold medication or something."  (Pl.'s Resp. Ex. A, Arlin Dep. 59-60.)  Plaintiff further relies on the statements made by Mr. Arlin and other Siemens employees to Farmington Hills police right after the accident.  Plaintiff further relies on the testimony of two toxicologists who opined, based upon blood alcohol levels and deductions about when Mr. Wellinger must have consumed the alcohol, that any odd behavior noticed that day by Mr.

---

employee's past manifestations of intoxication and his behavior on the day of the accident.

Wellinger's co-workers more likely than not would have been caused by his intoxication and that his co-workers would have observed signs of intoxication.  (Pl.'s Resp. Ex. M, Frist Decl. ¶¶ 8-9.)  The toxicologists also opined that Mr. Wellinger had to have consumed the alcohol prior to leaving his office at approximately 2:45 p.m. and could not have achieved such a high concentration of alcohol if, as Siemens posits, he had consumed it after he left the office but before the time of the accident, approximately 3:30 p.m.  (Pl.'s Resp. Ex. M, Frist Decl. ¶ 7.)  The Court also observes that Mr. Wellinger admitted to police that he had consumed six ounces of alcohol the morning of the accident before going to work. (Pl.'s Resp. Ex. I Hughes Aff. ¶ D3.)

To counter this evidence, Siemens offers the testimony of seven Siemens employees who directly observed Mr. Wellinger at the office that day, some in the few minutes just before Mr. Wellinger left for his appointment, and two who saw him walking to his car at around 2:45 p.m., just 45 minutes before the fatal accident. Although all of these employees testified uniformly that Mr. Wellinger did not exhibit any signs of visible intoxication, Mr. Wellinger's own admission that he consumed six ounces of alcohol at ten in the morning, Mr. Arlin's observations of Mr. Wellinger's "slow" behavior and Ms. Sudres-Kovac's report of Mr. Wellinger's "odd" behavior, when coupled with the reports of the investigating officers and the toxicologists, cast significant doubt on the credibility of the testimony of the Siemens employees.  In addition, there was evidence of statements by some of these employees, provided to police soon after the accident, that undermine their deposition testimony.  (Pl.'s Resp. Ex.C, Plemmons Aff. ¶ D6) (reporting that Mr. Arlin stated that on numerous occasions from December 2004 through May 2005 other employees of Siemens stated that they believed Tom Wellinger was intoxicated at work); (Pl.'s Resp. Ex. F, Sudres-Kovac Dep. Ex. 22) (stating that she smelled liquor on Mr. Wellinger's breath at a staff meeting in April and a

couple of times in the two weeks before the accident); (Pl.'s Resp. Ex. D, Charnley Dep. Ex. 20) (twice stating that Mr. Wellinger was "drunk" at the office).  Mr. Wellinger's conduct at the office the day of the accident was consistent with his historical behavior at Siemens which had been observed and reported to his employer on "numerous occasions" and which Siemens knew to have been associated with Mr. Wellinger's alcohol problem.

       This Court concludes that, taking the evidence in the light most favorable to the non-moving party,  there exists a genuine question of fact as to whether Siemens knew or should have known, before it mandated, as a condition of his further employment in his position, that Mr. Wellinger meet with his doctor that day, that Mr. Wellinger was intoxicated and "could not be entrusted with the responsibility" it imposed upon him to go to that appointment and to report back to Mr. Arlin what the doctor recommended.  The cases discussed above in section III(B)(1)(b), and relied upon by Plaintiff to support its claim of negligence, give shape and context to the issue left open by the Michigan Supreme Court in *Millross*, and  framed by Judge Edmunds in her earlier opinion in this case.  Judge Edmunds concluded that Plaintiff would need to establish that Siemens "directed [Mr. Wellinger], as a condition of his continued employment, to drive to an appointment during the workday, thus increasing the risk of harm to others."  2008 WL 1766657 at * 9.  Plaintiff has presented facts from which a reasonable jury could conclude that Siemens controlled Mr. Wellinger's conduct and affirmatively acted to direct him to attend his doctor's appointment or face a possible demotion at work, in spite of Mr. Wellinger's known intoxication on that day. Plaintiff states that: "[Siemens] undertook a duty when it actually took control over Mr. Wellinger because of his impairment . . . Siemens actually 'increased the risk of harm to others' by undertaking to control Mr.

Wellinger because of his impairment." (Pl.'s Resp. 18.) This Court agrees that the evidence presented creates a genuine issue of fact on the issue of Siemens' duty to Plaintiff in this case.

**IV.     CONCLUSION**

For the foregoing reasons, this Court DENIES Siemens' Motion for Summary Judgment.


**IT IS SO ORDERED**.



s/Paul D. Borman                                
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  November 23, 2009

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on November 23, 2009.


s/Denise Goodine                                 
Case Manager