UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GARY WEINSTEIN, Individually and as Representative
of the Estate of JUDITH WEINSTEIN, as Representative
of the Estate of ALEXANDER WEINSTEIN, and as
Representative of the Estate of SAMUEL WEINSTEIN,

        Plaintiff,

vs.                          Case No. 2:07-CV-15000
                                     PAUL D. BORMAN
                                     UNITED STATES DISTRICT JUDGE

SIEMENS, fka UGS CORP.,
                Defendant.

_____/

## OPINION AND ORDER DENYING SIEMENS' MOTIONS *IN LIMINE* NOS. 4-15 TO EXCLUDE CERTAIN WRITTEN STATEMENTS BY VARIOUS SIEMENS EMPLOYEES (DKT. NOS. 64-75)

      This matter is before the Court on Defendant Siemens, fka UGS Corp.'s ("Siemens") Motions *in Limine* Nos. 4-15 To Exclude Certain Written Statements by Various Siemens Employees. (Dkt. Nos. 64-75.) Plaintiff has filed responses (Dkt. Nos. 92-99, 103-106) and Siemens has filed replies (Dkt. Nos. 136-147.) The Court held a hearing on November 18, 2010. For the reasons that follow, the Court DENIES Siemens' motions *in limine* Nos. 4-15.

## I.    BACKGROUND

      The relevant facts underlying this case were set forth by this Court in its November 23, 2009 Opinion and Order Denying Defendant Siemens Corporation's Motion for Summary Judgment. *Weinstein v. Siemens*, 673 F. Supp. 2d 533 (E.D. Mich. 2009). This action arises from a tragic accident that occurred in the early afternoon of May 3, 2005. Thomas Wellinger, then an employee

1

of UGS, a subsidiary of Siemens, left Siemens' offices and was scheduled to attend a doctor's appointment to address his problems with alcohol abuse when he drove his Chevrolet Denali SUV at a high rate of speed and struck the vehicle driven by Plaintiff's wife, Judith Weinstein and occupied also by the Weinstein's two young sons, Alexander and Samuel. All three Weinstein family members were killed. Mr. Wellinger, who was at fault, was injured and survived. Mr. Wellinger was intoxicated at the time of the accident, with a blood alcohol level of nearly four times the legal limit. Subsequently, Mr. Wellinger pled no contest to second degree murder in Oakland County Circuit Court, and is currently incarcerated, serving a 19 to 30 year sentence.

Plaintiff's Complaint against Mr. Wellinger's employer, Siemens, was filed in the United States District Court, Eastern District of Texas, on May 1, 2007. On Siemens' motion for change of venue, the case was transferred to this District and assigned to United States District Judge Nancy G. Edmunds on November 26, 2007. On November 29, 2007, Siemens moved to dismiss the case pursuant to Federal Rule of Civil Procedure 12. The motion was granted in part and denied in part by Judge Edmunds. (Dkt. No. 13.) *Weinstein v. UGS Corp.*, 2008 WL 1766657, No. 07-15000 (April 17, 2008) (dismissing Plaintiff's negligent retention and vice principal claims, but denying the motion to dismiss as to Plaintiff's vicarious liability and negligent supervision claims). Thereafter, due to a change in defense counsel, Judge Edmunds recused herself from the case, and the case was reassigned by the Court's blind draw system to the undersigned.

On November 23, 2009, this Court denied Siemens' motion for summary judgment, permitting Plaintiff to proceed with this case to a jury on the following two issues: (1) whether Siemens is vicariously liable for the deaths of Plaintiff's family members because "Siemens required Mr. Wellinger as a condition of his employment to attend his doctor's appointment on the

day of the accident, and [] Siemens stood to derive a specific benefit from Mr. Wellinger's attendance at the appointment that afternoon," and (2) whether Siemens is directly liable for the deaths of Plaintiff's family members because it "knew or should have known, before it mandated, as a condition of his further employment in his position, that Mr. Wellinger meet with his doctor that day, that Mr. Wellinger was intoxicated and 'could not be entrusted with the responsibility' it imposed upon him to go to that appointment and to report back to Mr. Arlin what the doctor recommended." (*Weinstein,* 673 F. Supp. 2d at 545, 553.)

## II.     LEGAL STANDARD

"The Federal Rules of Evidence, the Federal Rules of Criminal and Civil Procedure and interpretive rulings of the Supreme Court and this court all encourage, and in some cases require, parties and the court to utilize extensive pretrial procedures-including motions in limine-in order to narrow the issues remaining for trial and to minimize disruptions at trial." *United States v. Brawner*, 173 F.3d 966, 970 (6th Cir.1999). District courts have broad discretion over matters involving the admissibility of evidence at trial. *United States v. Seago*, 930 F.2d 482, 494 (6th Cir.1991).

## III.    ANALYSIS

Following the fatal crash on May 3, 2005, the Farmington Hills Police conducted interviews with several Siemens employees. Siemens arranged to have these interviews take place at Siemens' offices and Siemens' corporate counsel, Jo Anne Williams, was present for the interviews. Following the interviews, Ms. Williams asked the employees to memorialize the substance of the interview in a written statement, which Siemens then retained for its records. These employees were authorized, indeed "encouraged," by Siemens to cooperate in the investigation and to relate their "observations of Tom Wellinger, conversations they had with him, as well as his behavior and job

performance before and on May 3, 2005." (Def.'s MIL No. 4, Dkt. No. 64, p. 2.) These topics, on which Siemens concedes it encouraged its employees to speak, concerned the workplace environment in which Tom Wellinger functioned on a daily basis and there is no question, as the Court has discussed in numerous rulings on Siemens' motions *in limine*, that these statements are directly relevant to establishing Siemens' knowledge of Tom Wellinger's abuse of alcohol and related job performance problems, a critical element of both Plaintiff's vicarious and direct liability claims. Siemens denies this relevance but argues that, even assuming relevance, these statements are inadmissible hearsay. Plaintiff responds that the statements are (1) admissions of a party opponent under various subsections of Fed. R. Evid. 801(d)(2); (2) admissible as business records under Fed. R. Evid. 803(6); and (3) admissible under the residual hearsay exception, Fed. R. Evid. 807.

### A.    The Witness Statements

The multiple witness statements, to varying degrees, address Tom Wellinger's conduct at Siemens and his job performance issues, which many of the witnesses perceived to be related to an alcohol or medication related problem. Some of the witnesses actually observed Tom Wellinger the day of the accident, others did not.

### 1.    Motion in Limine No. 4 To Exclude Lori Pogoda's Statement summarizing her interview with Farmington Hills Police.

Lori Pogoda was Tom Wellinger's administrative assistant and was not in the office the day of the accident. The salient points of her statement are as follows:

- On February 14, 2005 she saw Tom Wellinger staggering and slurring his words.

- On April 25, 2005 Tom missed a meeting and didn't remember that it was scheduled.

- In March 2004, Tom had a pattern of leaving the office at odd times and not returning.

4

- Tom had "messy pillow hair" which was out of character for him.

   **2.** **Motion in Limine No. 5 to Exclude Statement of Linda Barnes summarizing her interview with Farmington Hills Police**

Ms. Barnes was a receptionist at Siemens and was not in the office the day of the accident.

The salient points of Ms. Barnes statement are as follows:

- In March 2005, Tom couldn't figure out how to use the microwave which was odd for him.

- On that day, he was acting silly and making a scooby-doo sound.

- In April he called the office and his speech was slow.

   **3.** **Motion In Limine No. 6 to Exclude Statement of Kevin Blevins summarizing his interview with Farmington Hills Police**

Mr. Blevins did not see Mr. Wellinger the day of the accident. The salient points of his statement are as follows:

- He counseled Tom on his drinking problems in January 2005. He (along with co-worker Christ Tayon) visited Tom at his home and Tom admitted to Blevins and Tayon that he had a drinking problem.

- He first noticed Tom "not being himself" in December 2004 or early January 2005.

- He noticed that Tom's speech was often slow.

- On January 5, 2005, Blevins was approached by Ed Arlin, Tom's boss, who asked if he had seen Tom on Monday because others had told Ed that Tom appeared to be drunk.

- That same day Blevins went to Tom's house and confronted him and Tom admitted a drinking problem and agreed to check in to the Henry Ford Maplegrove Rehabilitation Center.

- Blevins told Tom that he needed to call Ed and let him know what was going on.

5

- The next day Blevins got a call about an insurance issue with Maplegrove. Blevins called Ed and informed Ed who agreed to look into the insurance issue. The insurance issue was resolved. Tom checked in that night.

- In March, Blevins suspected that Tom was drinking again. His speech was slowing again.

- Lori Pogoda told Blevins that Tom was falling asleep at his desk and asked what should she do.

    **4.    Motion in Limine No. 7 to Exclude Statement of George Lovequist summarizing his interview with Farmington Hills Police.**

George Lovequist was a co-worker who was out of the office the day of the accident. The salient points of his statement are as follows:

- George had known Tom for 18 years.

- Mary Ellen Charnley, Matt Gray and Lori Pogoda shared with Lovequist that they thought Tom was drinking.

- Lovequist noticed some time in December 2004 at a meeting where he and Tom were sitting close together that Tom smelled of alcohol and asked odd questions.

- Lovequist mentioned his impressions to Ed Arlin during lunch that day. Ed stated that he was aware - as a result of Christ Tayon and Kevin Blevins finding Tom drunk at home one day - that Tom had a drinking problem and that he had told Tom to take some time off to address his drinking problems.

- Tom was having a hard time keeping up with all of the extra requirements from Ed Arlin.

- There was an important meeting scheduled for April 26th and Tom didn't show.

- Lovequist was out of town the day of the accident and received a call from Ed Arlin.

    **5.    Motion in Limine No. 8 to Exclude Statements of Mary Ellen Charnley**

**summarizing her interview with Farmington Hills Police.**

Ms. Charnley was not in the office the day of the accident. She is in sales at Siemens, responsible for the Delphi account. Her statement appears in both handwritten and typed format. The salient points of her statements are as follows:

- She recalls two occasions when she thought Wellinger was intoxicated at work.

- Between Christmas and New Years, Tom stumbled and made silly comments about "Galileo's balls" being up on Charnley's weather monitor. This was very uncharacteristic for him. Following this, she went and told Lovequist that Tom was drunk.

- One day in early February at 8:00 a.m. Tom smelled of alcohol and Charnley went to Tom Obuchowski and told him to go see his boss (Tom Wellinger) because he was loaded and shouldn't be near any customers.

- Later that day, Ed Arlin came to her office and she confirmed with Ed that she thought Tom was drunk that morning.

**6.     Motion in Limine No. 9 to Exclude Statement of Matthew Gray summarizing his interview with Farmington Hills Police**

Gray did not see Tom Wellinger the day of the accident. The salient points from his statement are as follows:

- He never had any indication that Tom was under the influence of alcohol at work.

- One evening, Gray called Tom at home and he sounded intoxicated. Gray reported this to George Lovequist.

- Gray received a call from a sales rep who said Tom seemed incoherent. Gray reported this to George Lovequist.

- Gray believed that Ed Arlin was aware of the problem and was addressing the situation.

**7.     Motion in Limine No. 10 to Exclude Statement of Thomas C. Obuchowski summarizing his interview with Farmington Hills Police.**

Obuchowski was the last one to speak to Tom Wellinger the day of the accident.

- He and Tom discussed an email and Tom "seemed like he had over the past couple of months."

- He thought Tom was seriously depressed.

- Obuchowski never detected any alcohol smell over the prior two months, only that Tom wasn't tracking well.

- Tom Wellinger missed an executive level review meeting and asked Obuchowski to pull things together for him at the last minute.

- Obuchowski told Ed Arlin of his concerns.

**8.     Motion in Limine No. 11 to Exclude Statement of Nabil Sater summarizing his interview with Farmington Hills Police.**

Sater saw Tom Wellinger the day of the accident.  The salient points of his statement are as follows:

- He saw Tom the morning of the accident between 8:30 and 11:00 am. Tom did not appear intoxicated at that time.

- Tom was the brother he never had.

- He noticed a change in Tom's behavior in December but Tom said he had stomach trouble and Sater had no reason to doubt this explanation. He never saw Tom drunk or drinking.

- Tom's business habits became "bizarre" as he began coming in late, not responding to emails, he would sit in his office with his hands on his stomach.

- In January Tom called Sater to tell him he was going to miss the important annual sales

meeting scheduled for that day and informed Sater that he had a drinking problem and was checking himself into a rehabilitation program.

- Sater sometimes smelled alcohol in Tom's office but didn't suspect it was from drinking until after he learned of things in January.

### 9. Motion in Limine No. 12 To Exclude Statement of Francoise Sudres-Kovac summarizing her interview with Farmington Hills Police.

Francoise Sudres-Kovac was Ed Arlin's Executive Assistant. She saw him just before he left work the day of the accident. The salient points of her statement are as follows:

- Sudres-Kovac first realized Tom had a problem in January 2005. He seemed absent-minded and arrived for work later than usual and often left earlier than was his habit.

- Sudres-kovac often heard Lori Pogoda, Tom Wellinger's administrative assistant, call Tom on his cell when he had missed a meeting or a conference call. This was very uncharacteristic of Tom.

- She saw him asleep at his desk twice. He said it was the medication that made him sleepy.

- On March 31, 2005, she called to remind him to send in his self-evaluation form so she could complete his review and he seemed confused.

- She had to re-type the self-evaluation form when she did receive it because it was "gibberish" and she told Ed Arlin about this.

- She started hearing rumors Tom was drinking but she thought it was medication.

- She smelled alcohol on his breath a couple of times in the two weeks before the accident - in particular at an April 25, 2005 staff meeting.

- On day of accident, Tom met with Ed from 11:00 to 11:56 a.m. and Tom left looking preoccupied and upset.

- She later saw Tom in his office at 2:45 p.m. He came up behind her and playfully hit her in the back. She turned around and he was standing, grinning wild-eyed, in a boxer's stance with his fists up. He looked scary but smiling with a wild look in his eyes. He had never acted like that before.

- She went back to her office and told Rose Cofman that she thought it was weird.

   **10.    Motion in Limine No. 13 To Exclude Statement of Christ Tayon summarizing his interview with Farmington Hills Police.**

Tayon was standing in the parking lot on a smoking break and saw Tom Wellinger leave the office at approximately 2:00 p.m. the day of the accident. The salient points of his statement are as follows:

- Lori Pogoda and Linda Barnes came to talk to Tayon in December, 2004 because they were concerned that Tom had a drinking problem.

- The first week of January, Ed Arlin came to Kevin Blevins and Tayon to see if they had any recent contact with Tom. Blevins and Tayon decided to visit Tom at his apartment on January 5, 2005. Tom admitted to Blevins and Tayon that day that he had a drinking problem and Blevins and Tayon gave Tom the information about the Siemens' Employee Assistance Program (EAP) and told Tom to contact Ed Arlin the next day to make arrangements.

- The next morning, Blevins and Tayon went back to Tom's apartment and Sally Baker, Tom's girlfriend, was helping Tom get ready to go to rehabilitation.

- During the last week of April, Tayon observed that Tom was again speaking very slowly and Tom reported that his medication was making him sick.

- On the morning of the accident, Ed Arlin came to Tayon's office to ask how he thought Tom

10

was doing. Ed told Tayon that he was going to be talking to Tom about his problems later that morning.

• Tayon saw Tom walk to his car at approximately 2:00 p.m. the day of the accident and Tom did not stumble or stagger and appeared in a normal state when he left the building.

**11. Motion in Limine No. 14 To Exclude the Statement of Dennis Rahn summarizing his interview with Farmington Hills Police.**

Rahn saw Tom Wellinger as he was leaving the building the day of the accident. The salient points of his statement are as follows:

• Tom used to vacation up north with Rahn. Just prior to the accident, Tom had not been visiting up north as often.

• Rahn never saw Tom drink.

• Rahn was in the parking lot with Tayon on the day of the accident and saw Tom walk to his car and get in and drive away.

**12. Motion in Limine No. 15 - To Exclude Statements of Ed Arlin summarizing his interview with Farmington Hills Police.**

Ed Arlin was Tom Wellinger's boss and met with Tom the morning of the accident to discuss Tom's job performance and to address Tom's plans for improving that performance.

Ed actually made two statements, one summarizing a telephone call that Ed had with Tom's ex-wife, Nancy, and a second statement summarizing other aspects of his interview with the Farmington Hills Police. Siemens seeks to exclude both statements.

The salient points of the summary of his phone call with Nancy Wellinger are as follows:

• Ed called Nancy the week of April 25, 2005 to tell her he was concerned about Tom and to get some insight as to what was going on with Tom.

- Ed inquired if Nancy thought that Tom was still drinking and she stated that she thought he was.

- She told him Tom had not seen the kids in two months, which surprised Ed because Tom had missed an important company event recently, stating that he had to spend the day with the kids.

- Ed recalls telling Nancy that Tom's performance at work was poor and that he was planning to have a meeting with Tom to discuss this.

The salient points of Ed Arlin's statement summarizing other aspects of his interview with Farmington Hills Police are as follows:

- He had suspected that Tom had been drinking, at least at home, toward the end of the year 2004.

- Tom finally told Ed he had a drinking problem the first week of January after Tom's friends Blevins and Tayon confronted him.

- Ed was able to get the EAP [insurance] numbers and benefit to a health clinic for detoxification.

- Ed authorized Tom to go on a company trip to Australia January 29 - February 5, 2005. He did not hear reports of any issues with this trip.

- In January, 2005, the company determined it needed a new organization going forward and Tom Wellinger was to be the head of the New Value Team as part of that reorganization.

- On the day of the accident Ed met with Tom at approximately 11:00 a.m.

- Ed knew that Tom had been seeing a doctor twice a week.

- Tom seemed "ok" at the meeting, but slow like someone on cold medicine. Ed did not smell

alcohol but his sense of smell is not good.

- Ed started the meeting by telling Tom that they needed to talk about Tom's nonperformance of his job.

- Tom had failed to schedule critical meetings with Ed, and also missed meetings that had been scheduled.

- Ed told Tom that meeting five out of eight of his objectives was "terrible."

- He told Tom that he was not engaged enough in the sales activities of his people.

- Ed told Tom that he was a burden on Ed.

- Ed asked him if he was still drinking. Tom said no. Ed asked Tom if he would understand if Ed didn't believe him.

- Ed asked if Tom was attending his AA meetings and Tom said that he was.

- Ed asked Tom if he had attended a scheduled appointment with his doctor the previous week. Tom told Ed that he couldn't make the appointment because his doctor was out of town.

- Tom informed Ed that he had an appointment that afternoon with his doctor and Ed told him to get to that appointment, and get whatever medication he needed because whatever he had been doing wasn't working.

- Ed told Tom he needed to change his performance immediately.

- Ed told Tom he wanted to hear at their meeting the next morning what the doctor said at that day's afternoon appointment.

### B.    The Party Admission Rule

"Employees who talk to investigators are either speaking on matters within the scope of their

duties under Fed. R. Evid. 801(d)(2)(D) or are in effect "authorized" to cooperate with investigators, so their statements fit Fed. R. Evid. 801(d)(2)(C)." Christopher B. Mueller and Laird C. Kirkpatrick, 4 Federal Evidence § 8.80 (3d ed. 2008). Plaintiff argues that the Siemens employee statements are admissible under both 801(d)(2)(C) and 801(d)(2)(D) and also argues that the reports are admissible under 801(d)(2)(B) as adoptive admissions.

### 1.  801(d)(2)(B) - Adoptive Admissions

"A statement is not hearsay if – . . . The statement is offered against a party and is . . . (B) a statement of which the party has manifested an adoption or belief in its truth . . ." Fed. R. Evid. 801(b)(2)(B). When the statement sought to be introduced is a written statement, "the necessary inquiry involves "asking whether 'the surrounding circumstances tie the possessor and the document together in some meaningful way.'" *Pilgrim v. Trustees of Tufts College*, 118 F.3d 864, 870 (1st Cir. 1997) abrogation recognized on other grounds in *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 406 (1st Cir. 2002) (quoting *United States v. Paulino*, 13 F.3d 20, 24 (1st Cir.1994)) (finding a grievance report admissible as an adoptive admission when the college president accepted the report and acted on its contents); *Paulino*, 13 F.3d at 24 (noting that "courts frequently have construed possession of a written statement as an adoption of what its contents reveal."). *See also Wright-Simmons v. The City of Oklahoma City*, 155 F.3d 1264, 1268-1269 (10th Cir. 1998) (where city manager accepted a report summarizing and containing notes of witness interviews and subsequently took action that indicated acceptance of at least part of the witness's comments, notes and report were admissible under 801(d)(2)(B) as an adoptive admission).

In the instant case, Siemens' corporate counsel, Jo Anne Williams, instructed the individual employees to memorialize their statements in writing. Siemens maintains that the statements were

prepared solely at the request of the police investigators but Plaintiff maintains otherwise and several of the employees confirmed that they prepared written statements following the interviews at the express direction of Ms. Williams. Siemens retained copies of these statements in their company files. The Court concludes that this is sufficient evidence to constitute an adoptive admission by Siemens of these witness statements. Siemens argues that finding an adoptive admission under these circumstances would mean that anytime an employee retells his or her story to police in connection with an investigation, the employer would subsequently be bound by whatever the employee says. Siemens understates its role in actively urging the employees to give statements to the police, in arranging to have the interviews take place at Siemens' offices and in placing its corporate counsel at those interviews. Further, on a separate note, an employee's statement to police in connection with an investigation may bind the corporation for several reasons unrelated to the adoptive aspects of the statement, i.e. if the employee was also speaking on a matter within the scope of his or her agency. The employer is subsequently bound by such admissions and does not have the option of "deciding" whether or not to be bound. The issue is whether the employer gave some indication that it accepted the statement. A directive to the employee by corporate counsel, who remained silent during the interview and did not attempt to clarify or otherwise correct the witness's statements, to make a written record of his or her statement to be retained in company files appears to the Court to go beyond simply "allowing" the employees to speak to police investigators. If corporate counsel was of the opinion that the assertions of fact made by the witnesses were untrue, "the party would under all circumstance naturally be expected to deny" them. Graham, 30B Federal Practice & Procedure, § 7021 (2000 interim ed.). At the very least, it would be expected that Siemens would not have retained copies of the statements for its own files had it intended to disassociate itself with

their contents.  Siemens had the opportunity during depositions, and presumably will have at trial, the chance to deny or contest the content of the statements.  This, however, will go to the weight of the evidence, and perhaps to its foundation, but not to its admissibility.  This ability of a party to explain or deny such admissions forms the very rationale for the party admission rule and distinguishes such party admissions from third-party affidavit testimony, which is classically categorized as hearsay because such extrajudicial statements are not subject to cross-examination. The Court concludes that the witness statements are adoptive admissions under Rule 801(d)(2)(B).

## 2. 801(d)(2)(C) - Authorized Admissions

"A statement is not hearsay if – . . . The statement is offered against a party and is . . . (C) a statement by a person authorized by the party to make a statement concerning the subject . . ." Fed. R. Evid. 801(d)(2)(C).  Plaintiff relies on *Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd*., 505 F. Supp. 1190 (E.D. Pa. 1980), *rev'd on other grounds*, 475 U.S. 574 (1986), to support its argument that the Siemens employees whose statements are being offered into evidence were authorized by Siemens to speak on the subject matter of Mr. Wellinger's behavior and job performance.  In *Matsushita*, certain employees were authorized by the defendant company to give statements before the Japanese Fair Trade Commission ("the JFTC") in connection with the JFTC's investigation into  alleged antitrust violations of a number of defendants who were competitors in the consumer electronic market.  *Id*. at 1209 n.2.  These officials were interviewed by and gave statements to the JFTC which were referred to as "protocols."  *Id*. at 1211.[1]  The protocols were

---

[1] Siemens attempts to distinguish *Matsushita* by arguing that "the declarants were speaking about protocols that were directly related to their employments responsibilities and duties." (Def.'s Reply to MIL No. 4, Dkt. No. 136, 5 n. 2.)  In fact use of the word "protocol" in the opinion has nothing to do with the defendant-companies' "protocols," but rather is a term of art ("records of statements") describing the statement given by the employee during the JFTC investigation. The word "protocol"

admitted into evidence under Rule 801(d)(2)(C) and (D), the court observing:

> [W]e are unpersuaded by defendants' position that when appearing before the JFTC investigator, the givers of the protocol were neither authorized by their employers nor within the scope of their employment. At all times they were represented by company counsel, were apparently on company time, were identified with defendant companies, and were ultimately put forward by defendant companies to testify at the JFTC proceedings. Under the circumstances we cannot see how we can conclude other than that the declarants were authorized by their employers to give protocols and that, at all events, they were within the scope of their agency and employment at the time they gave their protocols to the JFTC investigators.

505 F. Supp. at 1297. Importantly, the court is discussing admissibility under both 801(d)(2)(C) and 802(d)(2)(D) and concluding that "authorization" to speak on behalf of the companies could be gleaned in part from the fact that the officials were represented by company counsel, were on company time and were put forward by the companies to testify at the JFTC proceedings. This observation regarding indicia of "authorization" (necessary under 801(d)(2)(C) but not under 801(d)(2)(D)) was in addition to indicia of scope of employment (necessary under 801(d)(2)(D) but not under 801(d)(2)(C)). In essence, direct authorization to speak on a particular subject constitutes its own indicia of agency, an indication that the principal appoints the agent to speak on a particular topic, and only that particular topic. *See also Reid Bros. Logging Co. v. Ketchikan Pulp Co.*, 699 F.2d 1292, 1306 (9th Cir. 1983) (admitting as an admission a survey prepared by an employee of a parent company at the request of the chairman of the board and also noting that the requirement that the report have been published to a third party was legislatively overruled by Fed. R. Evid. 801(d)(2)(C)).

The five exclusions in rule 801(d)(2) are listed in the disjunctive and Siemens' attempt to

---

does not define the subject matter of their statements and indeed the court does not discuss the testifying witnesses job responsibilities in the portion of its opinion discussing the admissibility of the protocols.

impose the restrictions set forth in 801(d)(2)(D) to each of the party-opponent admission exclusions must fail. There is no requirement under 801(d)(2)(C) that the statement be concerning a matter within the scope of the speaker's regular employment if he has been authorized by the employer to speak on a particular subject. The distinction between these two hearsay exceptions can be seen in the *Zenith* court's discussion regarding the various witnesses's testimony relating to export business, a subject on which the declarants were not authorized by their employers to speak: "While the witnesses may have been authorized to testify before the JFTC, thus rendering their statements concerning the domestic market authorized admissions under Rule 801(d)(2)(C), the JFTC proceeding did not concern the export market, and therefore any testimony concerning that market would have been outside their authority under subsection (C). Under Rule 801(d)(2)(D), our inquiry is whether the witnesses whose testimony included so-called export references in fact held positions in their companies which gave them any responsibility for exports." *Zenith*, 505 F. Supp. at 1293.[2]

By Siemens' own description, these witnesses were authorized, indeed encouraged, by Siemens to cooperate in the investigation concerning Tom Wellinger's employment at Siemens, to describe to police their "observations of [him], conversations they had with him as well as his behavior and job performance before and on May 3, 2005." (Def.'s Reply on MIL 5, Dkt. No. 137,

---

[2] Siemens also cites *Hill v. Spiegel, Inc*., 708 F.2d 233, 237 (6th Cir. 1983), as distinguishing *Zenith*, stating that authorization to speak is not alone sufficient "to create a vicarious admission under 801(d)(2)(D)." (Def.'s Reply Br., Dkt. No. 136, 5 n. 2.) Again, however, Siemens confuses the requirements of 801(d)(2)(C) and 801(d)(2)(D). *Spiegel* deals with the latter and does stand for the inarguable proposition that under that exclusion, the employee must be speaking concerning a matter within the scope of his or her employment. This is not necessarily so under 801(d)(2)(C) where authorization is given to speak on a particular subject, without regard to whether that topic relates to the employees specific job responsibilities. Siemens' interpretation would in effect write out the exclusion found in 801(d)(2)(C) and permit exclusion only when the requirements of 801(d)(2)(D) are also met.

5; Def.'s MIL No. 4, Dkt. No. 64, 2.)  Company counsel was present when the Siemens employees

spoke to police and Siemens' corporate counsel requested that the employees memorialize their

statements in writing and retained copies.  Their statements were confined to the subject matter

about which they were authorized to speak.  It is difficult to conclude that these statements were not

"authorized" by Siemens for purposes of the 801(d)(2)(C) hearsay exclusion, regardless of the job

duties of these witnesses at Siemens, which becomes a relevant inquiry only under 801(d)(2)(D).[3]

The Court concludes that the witness statements are admissible as non-hearsay party admissions

under Rule 801(d)(2)(C).

### 3.     801(d)(2)(D) - Vicarious Admissions

"A statement is not hearsay if – . . . The statement is offered against a party and is . . . (D)

a statement by the party's agent or servant concerning a matter within the scope of the agency or

employment, made during the existence of the relationship." Fed. R. Evid. 801(d)(2)(D).  There is

no dispute that these statements were made by Siemens employees during their employment with

Siemens.  The issue is whether the subject matter of the statements concerns "a matter within the

---

[3] The fact that these statements may be non-hearsay under the party opponent admission rule does not necessarily mean that they are admissible in their entirety.  "Rule 801(d)(2) deals only with the hearsay problem that would otherwise be created by the use of party admissions. Party statements must still comply with other evidence rules, such as Rule 402's requirement of relevance. Similarly, Rule 403 would be grounds for excluding a party admission if its probative value is substantially outweighed by its potential for unfair prejudice. Party admissions might also be excluded under the limitations of Rule 404 or Rule 405. Furthermore, a proper foundation for the statement must be laid or the statement will be disallowed." 5-801 Weinstein's Federal Evidence § 801.30 (2006). *See also Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 791 F.2d 288, 293 (4th Cir. 1986) (handwritten notes of former employee were not admissible under 801(d)(2) where proper foundation for their creation could not be laid because creator of the notes testified that he "could not recall the specific meeting at which he took the notes, that the notes were not intended to be a transcript of the meeting, that he had no independent memory of the meeting, and that he could not now make much sense of the notes.")

scope of the agency or employment" relationship. Siemens argues that none of these employees' job descriptions required them to monitor and report Tom Wellinger's sobriety and mannerisms. (Def.'s Reply MIL No. 5, Dkt. No. 137, 5.)  Plaintiff responds that these written statements "concerned the employee's scope of employment because [they] were made as part of an investigation with which UGS was cooperating and [they] were based on information the employee received as a result of [their] scope of employment for UGS."  (Pl.'s Resp. to MIL No. 4, Dkt. No. 92, 9.)  Plaintiff argues that these witnesses were duty-bound, as a part of their employment responsibilities, to give these statements to the police and therefore their statements are admissible separately and independently under the 801(d)(2)(D) exception because they were given concerning a matter within the scope of their employment.  Plaintiff refers to the Siemens' Corporate Code of Business Conduct and Ethics which authorizes employees to cooperate with government investigations with the presence of corporate counsel, which occurred in this case with respect to an investigation of the conduct of a Siemens employee, including aspects of his workplace behavior and job performance.  (Pl.'s Resp. MIL No. 4, Dkt. No. 92, Ex. B, pp. 12-13.)  Therefore, these employees were acting within the scope of their employment responsibilities when speaking to police as required by company policy.  *See Hill v. Spiegel, Inc.*, 708 F.2d at 237.

This conclusion finds support in the court's discussion of the declarants' statements in *Zentith*:  "[T]he declarants were authorized by their employers to give protocols and [], at all events, they were within the scope of their agency and employment at the time they gave their protocols to the JFTC investigators."  505 F. Supp. at 1297.  In concluding that the declarants were within the scope of their agency *at the time* they gave their statements, the court does not discuss the relationship between the declarants' regular job duties and the subject matter of their statements to

the JFTC, implying that authorization to speak on the subject created sufficient agency as to that subject for purposes of 801(d)(2)(D). "Employees who talk to investigators are either speaking on matters within the scope of their duties under Fed. R. Evid. 801(d)(2)(D) or are in effect "authorized" to cooperate with investigators, so their statements fit Fed. R. Evid. 801(d)(2)(C)." Graham, 30B, Federal Practice & Procedure, § 7021. The Court finds that the Siemens witness statements also fall within the 801(d)(2)(D) hearsay exclusion.

Siemens again relies on *Dilley v. The Chesapeake & Ohio Railway Co.*, 327 F.2d 249 (6th Cir. 1964) to support its argument that these witness statements do not qualify as party admissions because they were not made concerning a matter within the scope of their employment, but *Dilley* does not compel the Court to reach this conclusion. As discussed above, Siemens never addresses Plaintiff's argument regarding exclusion under 801(d)(2)(C) and *Dilley*, a case decided before adoption of Rule 801(d)(2), that addresses only the question of whether the report at issue was prepared within the scope of the employee's authority. This issue, under the current rules, would be analyzed under 801(d)(2)(D). In *Dilley*, the employer gave his foreman the authority to prepare an accident report and the court held that the intracompany report was based upon a limited authority to investigate the accident and was not admissible as a party admission. *Id*. at 252-253. Plaintiff responds that the holding in *Dilley* was expressly rejected by the enactment of Fed. R. Evid. 801(d)(2) which, as expressed in the Advisory Committee Notes, covers both statements authorized to be made to the principal as well as statements authorized to be made to third parties. Regardless of the viability of this aspect of *Dilley*, the Court does not find *Dilley* instructive in the instant case because the Court concludes that these witnesses were both authorized to speak on the issue of Mr. Wellinger's conduct at Siemens and job performance, and that the witnesses were acting within the

scope of their employment when they participated, at Siemens' direction, in the investigation of Mr. Wellinger's employment at Siemens. In fact, *Dilley* would not compel a different conclusion, as the court there recognized that where "an agent [] makes a statement to a third person, the statement is the principal's if the agent was authorized to make the statement or was authorized to make on the principal's behalf true statements concerning the subject matter." 327 F.3d at 252. In the instant case, these employees were authorized by Siemens, a corporation which only speaks through its employees, to speak to police concerning "observations of Tom Wellinger, conversations they had with him as well as his behavior and job performance before and on May 3, 2005." The instant case does not involve an intracompany accident report and *Dilley* does not compel the conclusion that these statements cannot be considered non-hearsay under the party opponent admission rule.

### 4. The statements need not be based on personal knowledge.

Further, the Court finds that because these witness statements are admissible as party admissions, they need not be based on the witnesses personal knowledge, but may summarize the information provided to them by others. Although the Court recognizes that there is some authority to the contrary, it concludes that the better reasoned view is that the author of a party admission need not have personal knowledge of the statements contained in the party admission:

> The bulk of modern authority holds that personal knowledge is not required for agent's admissions, although some cases treat the question as remaining open. The few scraps of legislative history that bear on the question support the conclusion that personal knowledge is not required. The ACN [Advisory Committee Note] accompanying Fed. R. Evid. 602 indicates that a witness who testifies about an out-of-court statement must have knowledge about "the making of the statement," and one might expect a comment that hearsay declarants are witnesses and need personal knowledge if this result were intended, but no such comment appears. More persuasively, the ACN to Fed. R. Evid. 801(d)(2) comments approvingly about "freedom" that admissions enjoy "from the restrictive influences of the opinion rule and the rule requiring firsthand knowledge," which implies that personal knowledge is not required for admissions.

Mueller and Kirkpatrick, Federal Evidence § 8:55. *See also Mister v. Northeast Illinois Commuter Railroad* Co., 571 F.3d 696, 698-699 (7th Cir. 2009) (holding that an internal investigative report, which included multiple hearsay statements based on interviews with employees, was admissible as a party admission under 801(d)(2)(D), concluding that 801(d)(2)(D) "does not require anything else along the lines of internal verification of the report's contents," but ruling that the report could have been properly excluded under Fed. R. Evid. 403 for lack of trustworthiness based on the absence of any factual content in the hearsay statements); *Brookover v. Mary Hitchcock Memorial Hosp.*, 893 F.2d 411, 415, 419 (1st Cir. 1990) (finding that "there is nothing in [Fed. R. Evid. 801(d)(2)] requiring that the admission be based on personal knowledge by the relator of the event triggering the statement" and refusing to impose a requirement that the author of an admission receive its knowledge from non-hearsay sources.); *Blackburn v. United States Parcel Service, Inc*., 179 F.3d 81, 96-97 (3d Cir. 1999) ("Admissions by a party-opponent need not be based on personal knowledge to be admitted under Rule 801(d)(2). Therefore, we need not be concerned here that the basis for Knowles's statement is likely hearsay-i.e., she was told by someone (or discerned from a written document) that Bill and Tim Jawor were father and son, and that Jackie and Sal Biancardi were married-which would ordinarily require an additional exception to make her statements admissible.") (citing *United States v. Ammar*, 714 F.2d 238, 254 (3d Cir.1983)); *Mahlandt v. Wild Canid Survival & Research Center, Inc*., 588 F.2d 626, 630-631 (8th Cir. 1978) (refusing to impose a requirement that the declarant of a party admission have personal knowledge of the facts underlying his statement). Even those authorities imposing some level of personal knowledge in the context of a Rule 801(d)(2) admission do so when the statement contains nothing more than repetitions of gossip with no indicia of trustworthiness. *Brookover*, 893 F.2d at 416. These witness

statements, given pursuant to a police investigation and based largely on personal observations, do not merely reiterate speculative gossip and contain sufficient factual matter and indicia of trustworthiness to sustain their admissibility despite any lack of personal knowledge. The proper course is to admit these statements and to permit their reliability to be tested on cross-examination. *See Mister*, 571 F.3d at 699 (holding that it would have been proper to admit party opponent admissions, although they were based on multiple levels of hearsay, and test their reliability on cross-examination but upholding the district court's exclusion of the statements where the hearsay statements lacked any factual content and lacked any indicia of trustworthiness). The Court concludes that the witness statements that are the subject of Siemens' motions *in limine* Nos. 4-15 are non-hearsay and are admissible as admissions of a party opponent under Fed. R. Evid. 801(d)(2)(B), (C) and (D).

### C.     The Witness Statements Are Relevant and More Probative Than Prejudicial

The Sixth Circuit has adopted a very liberal standard for the determination of relevancy. *Dortch,* 588 F.3d at 400 ("The standard for relevancy is 'extremely liberal' under the Federal Rules of Evidence. Evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' Fed. R. Evid. 401.") (citing *United States v. Whittington*, 455 F.3d 736, 738 (6th Cir. 2006)). "[E]ven if a district court believes the evidence is insufficient to prove the ultimate point for which it is offered, it may not exclude the evidence if it has the slightest probative worth." *Whittington*, 455 F.3d at 738-739 (internal quotation marks and citation omitted).

This Court has already held, in ruling on many of Siemens' motions *in limine*, that evidence tending to establish Siemens' knowledge of Tom Wellinger's problems with alcohol is highly

relevant to both Plaintiff's vicarious and direct theories of liability. In proving its vicarious liability claim, Plaintiff will be required to establish that Siemens stood to benefit from Mr. Wellinger's attendance at his doctor's appointment the day of the accident. In order to establish that his attendance would result in a benefit to Siemens, Plaintiff must be able to establish that Mr. Wellinger's drinking habits previously had an adverse affect on his job performance. Proof of this fact is absolutely crucial to Plaintiff's vicarious liability claim and evidence tending to establish that Mr. Wellinger's job performance suffered as a result of his intoxication is relevant to establishing this fact. Many of the witness statements bear directly on this issue.

As to Plaintiff's direct liability claim, one issue before the jury will be whether Siemens knew or should have known that the conduct Wellinger was exhibiting the day of the accident was consistent with conduct he had exhibited on prior occasions when he was suspected of being intoxicated and whether Siemens should have entrusted Mr. Wellinger with the responsibility it imposed on him that day to attend his doctor's appointment. While Siemens attempts to limit the permissible use of such evidence to the "rare instance" where the same individual both observed Mr. Wellinger's alcohol related behaviors on prior occasions and on the day of the accident, the Court disagrees that the permissible scope of such evidence is so limited. In establishing whether Siemens "knew or should have known" of Mr. Wellinger's intoxication on the day of the accident, or whether Siemens knew or should have known that Wellinger could not be entrusted with the responsibility it imposed on him that day, prior instances of drunken behavior, which were known by management or generally known among the employees, are highly relevant to proof of Siemens' knowledge. Again, many of the witness statements bear directly on this issue.

Despite, or perhaps in response to, the Court's earlier ruling that such evidence is relevant

to both Plaintiff's direct and vicarious liability claims, counsel for Siemens argued at the hearing that the witness statements are not relevant to Plaintiff's direct liability claim because the evidence contained in the witness statements is not legally sufficient to charge Siemens with knowledge of Mr. Wellinger's propensity to drive while intoxicated. This Court has already ruled that this is an issue for the jury and will not repeat its reasoning here. *See Weinstein*, 673 F. Supp. 2d at 547 n. 4. While the Court is cognizant of the fact that the Plaintiff faces a heavy burden in establishing this claim, the jury will be instructed on the law in this case and they will decide whether Plaintiff has met its burden, under the applicable law, of establishing Siemens' knowledge on this issue. The witness statements, which speak in part to Mr. Wellinger's prior instances of suspected intoxication at work (to which he presumably arrived, and from which he presumably left, in his own vehicle) unquestionably make the existence of such knowledge more probable than not and they are, therefore, relevant to Plaintiff's direct liability claim.

Siemens also argued at the hearing that the evidence contained in the witness statements is not relevant to the issue of vicarious liability. Counsel for Siemens stated at the hearing on this motion that there is no evidence that anyone at Siemens blamed Mr. Wellinger's work problems on alcohol abuse. Siemens argues that therefore there is no connection between Mr. Wellinger's history of abuse of alcohol and his urged or expected attendance at his doctor's appointment the day of the accident because Mr. Arlin had no idea why Mr. Wellinger might have been visiting the doctor that day and had no reason to suspect that it involved Mr. Wellinger's problems with alcohol. Therefore, Siemens reasons, evidence of Mr. Wellinger's alcohol abuse, or Siemens' knowledge of that abuse, does not make the existence of any fact of consequence to the vicarious liability claim more probable than not because from Siemens' perspective attendance at the appointment that day

was unrelated to Mr. Wellinger's alcohol abuse.

The Court disagrees with Siemens' narrow interpretation of the subject matter of Mr. Wellinger's meeting with Mr. Arlin the day of the accident, which assumes the resolution of facts that are in dispute. First, as counsel for Plaintiff pointed out at the hearing, there is substantial evidence that Mr. Wellinger's meeting with Mr. Arlin the morning of the accident was all about Tom Wellinger's alcohol abuse, that Mr. Arlin suspected that Mr. Wellinger was lying when Mr. Wellinger told Mr. Arlin that morning that he had stopped drinking and that Mr. Arlin was well aware that Mr. Wellinger's appointment with his doctor that day was intended to address Mr. Wellinger's alcohol related problems in some meaningful way. There is evidence that Mr. Wellinger's alcohol abuse was having a significant negative effect on his job performance and that attending the doctor's appointment that day was expected to address whatever it was that was making Mr. Wellinger's job performance suffer. There is a legitimate connection between Mr. Wellinger's suffering job performance, an issue touched upon in most every witness statement and often linked to suspected problems with alcohol, and attendance at his appointment that day.

Plaintiff argues that what Siemens calls "a stew" of irrelevant evidence in the witness statements as to Mr. Wellinger's abuse of alcohol and related performance issues are actually the pieces of a puzzle which, when put together, establish that Siemens was aware that Mr. Wellinger's performance at work had declined due to his abuse of alcohol and that attending the doctor's appointment that day to get back on track as leader of Mr. Arlin's all-important "New Value Team" had potential to benefit Siemens. The Court concludes that the witness the statements are relevant to both Plaintiff's vicarious and direct claims of liability. The Court further concludes that the probative value of this evidence is not outweighed by its potential prejudicial effect. *See* Fed. R.

27

Evid. 403; *United States v. Lloyd*, 462 F.3d 510, 516 (6th Cir. 2006) (district court has broad discretion in balancing probative value and prejudicial effect).[4]

### D. Admission of the Witness Statements Will Not Cause Undue Delay

Nor is the Court concerned, as Siemens argues, that permitting testimony regarding these witness statements will invite "several mini-trials." The number of witness statements is clearly defined and the Court is not convinced that evidence relating to these statements will result in several time-consuming mini-trials as Siemens portends. As the Court has previously ruled, this evidence is crucial to Plaintiff's ability to establish knowledge on the part of Siemens that would subject it to liability for Tom Wellinger's acts. "The hazards of prejudice, surprise and time-consumption implicit in this manner of proof are more tolerable when character is itself in issue than when this evidence is offered as a mere indication that the defendant committed the acts that are the subject of the suit." 1 McCormick on Evidence § 187 (6th ed. 2006).

### E. The Witness Statements Are Not Impermissible Character Evidence

As the Court has previously ruled, allowing this evidence does not run afoul of Federal Rule of Evidence 404(a), which prohibits evidence of a person's character to prove that he acted in conformity therewith on a particular occasion. Where "[a] person's character [is] a material fact that

---

[4] Because the Court concludes that the witness statements are admissible under Fed. R. Evid 801(d)(2), it need not address Plaintiff's alternative arguments (1) that the witness statements are not hearsay because they are not offered to prove the truth of the matter asserted but are offered to prove Siemens' knowledge of Mr. Wellinger's alcohol problems; (2) that the witness statements, even if deemed to be hearsay, come within the business records exception to the hearsay rule, Fed. R. Evid. 803(6); or (3) that the witness statements are admissible under the residual hearsay exception, Fed. R. Evid. 807. However, the Court has previously ruled that evidence of Mr. Wellinger's drinking habits and behavior at Siemens prior to May 3, 2005 is admissible for the non-hearsay purpose of proving Siemens' knowledge.

under the substantive law determines rights and liabilities of the parties," character evidence is both relevant and admissible. In the instant case, Plaintiff does not offer the witness statements to prove that Wellinger acted in conformity with the behavior described in some of the statements, i.e. was intoxicated, on the day of the accident. Evidence of these witnesses's observations of Tom Wellinger's alcohol related behavior, and the effect of this behavior on his job performance, establishes Siemens' knowledge of this character trait, an element that is crucial to both Plaintiff's claims of liability against Siemens, as discussed at length above.

Siemens argued at the hearing on these motions that the only character trait at issue in this case is Mr. Wellinger's propensity to drive while intoxicated which, Siemens argues, is only an issue on Plaintiff's direct liability claim. The Court disagrees. As is clear from the Court's discussion of the relevance of these witness statements, Plaintiff's ability to establish Siemens' knowledge of Mr. Wellinger's character trait of abusing alcohol and its further knowledge of the effects of this trait on Mr. Wellinger's job performance, are essential to Plaintiff's proof of its claims of both vicarious and direct liability. Thus, Plaintiff's proffered use of the evidence does not run afoul of the prohibitions of Rule 404(a). *Reyes v. Missouri Pac. R. Co*., 589 F.2d 791, 793 n.4 (5th Cir. 1979) (noting that where a person's character trait is "an operative fact which determines the legal rights and liabilities of the parties," evidence of that trait "is not contemplated by the scope of Rule 404 because such evidence is not offered for the purpose of showing that a person acted in conformity with his character.") (quoting 1 McCormick on Evidence § 187 at 443 (2d ed. 1972)).

## IV.    CONCLUSION

Accordingly, the Court DENIES Siemens' Motions *in Limine* Nos. 4-15 To Exclude Certain Witness Statements. (Dkt. Nos.64-75.)

IT IS SO ORDERED.

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  November 22, 2010

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on November 22, 2010.

s/Denise Goodine
Case Manager