UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GARY WEINSTEIN, Individually and as Representative
of the Estate of JUDITH WEINSTEIN, as Representative
of the Estate of ALEXANDER WEINSTEIN, and as
Representative of the Estate of SAMUEL WEINSTEIN,

        Plaintiff,

vs.                                           Case No. 2:07-CV-15000
                                                 Paul D. Borman
                                                 United States District Judge

SIEMENS, fka UGS CORP.,
        Defendant.

_____/

OPINION AND ORDER GRANTING IN PART AND DENYING IN PART SIEMENS'
MOTIONS *IN LIMINE* NOS. 25 AND 26 TO EXCLUDE CERTAIN EXPERT TESTIMONY
FROM BRIAN S. FRIST, M.D. (DKT. NO. 85) AND TO EXCLUDE CERTAIN EXPERT
TESTIMONY FROM FELIX ADATSI, PH.D (DKT. NO. 86) AND DENYING SIEMENS'
MOTION *IN LIMINE* NO. 27 (DKT. NO. 88)

This matter is before the Court on Defendant Siemens, fka UGS Corp.'s ("Siemens") Motions *in Limine* Nos. 25 To Exclude Certain Testimony From Brian S. Frist, M.D. (Dkt. No. 85), No. 26 To Exclude Certain Expert Testimony From Felix Adatsi, Ph.D (Dkt. No. 86) and No. 27 To Exclude Dr. Adatsi's Letter to the Prosecuting Attorney (Dkt. No. 88.) Plaintiff has filed responses (Dkt. Nos. 119, 120 and 121) and Siemens has filed replies (Dkt. No. 133, 134 and 135.) The Court held a hearing on November 18, 2010. For the reasons that follow, the Court GRANTS IN PART and DENIES IN PART Siemens' motions *in limine* Nos. 25 and 26 and DENIES Siemens' motion *in limine* No. 27.

1

## I. BACKGROUND

The relevant facts underlying this case were set forth by this Court in its November 23, 2009 Opinion and Order Denying Defendant Siemens Corporation's Motion for Summary Judgment. *Weinstein v. Siemens*, 673 F. Supp. 2d 533 (E.D. Mich. 2009). This action arises from a tragic accident that occurred in the early afternoon of May 3, 2005. Thomas Wellinger, then an employee of UGS, a subsidiary of Siemens, left Siemens' offices and was scheduled to attend a doctor's appointment to address his problems with alcohol abuse when he drove his Chevrolet Denali SUV at a high rate of speed and struck the vehicle driven by Plaintiff's wife, Judith Weinstein and occupied also by the Weinstein's two young sons, Alexander and Samuel. All three Weinstein family members were killed. Mr. Wellinger, who was at fault, was injured and survived. Mr. Wellinger was intoxicated at the time of the accident, with a blood alcohol level of nearly four times the legal limit. Subsequently, Mr. Wellinger pled no contest to second degree murder in Oakland County Circuit Court, and is currently incarcerated, serving a 19 to 30 year sentence.

Plaintiff's Complaint against Mr. Wellinger's employer, Siemens, was filed in the United States District Court, Eastern District of Texas, on May 1, 2007. On Siemens' motion for change of venue, the case was transferred to this District and assigned to United States District Judge Nancy G. Edmunds on November 26, 2007. On November 29, 2007, Siemens moved to dismiss the case pursuant to Federal Rule of Civil Procedure 12. The motion was granted in part and denied in part by Judge Edmunds. (Dkt. No. 13.) *Weinstein v. UGS Corp.*, 2008 WL 1766657, No. 07-15000 (April 17, 2008) (dismissing Plaintiff's negligent retention and vice principal claims, but denying the motion to dismiss as to Plaintiff's vicarious liability and negligent supervision claims). Thereafter, due to a change in defense counsel, Judge Edmunds recused herself from the case, and

the case was reassigned by the Court's blind draw system to the undersigned.

On November 23, 2009, this Court denied Siemens' motion for summary judgment, permitting Plaintiff to proceed with this case to a jury on the following two issues: (1) whether Siemens is vicariously liable for the deaths of Plaintiff's family members because "Siemens required Mr. Wellinger as a condition of his employment to attend his doctor's appointment on the day of the accident, and [] Siemens stood to derive a specific benefit from Mr. Wellinger's attendance at the appointment that afternoon," and (2) whether Siemens is directly liable for the deaths of Plaintiff's family members because it "knew or should have known, before it mandated, as a condition of his further employment in his position, that Mr. Wellinger meet with his doctor that day, that Mr. Wellinger was intoxicated and 'could not be entrusted with the responsibility' it imposed upon him to go to that appointment and to report back to Mr. Arlin what the doctor recommended." (*Weinstein,* 673 F. Supp. 2d at 545, 553.)

## II.     LEGAL STANDARD

"The Federal Rules of Evidence, the Federal Rules of Criminal and Civil Procedure and interpretive rulings of the Supreme Court and this court all encourage, and in some cases require, parties and the court to utilize extensive pretrial procedures-including motions in limine-in order to narrow the issues remaining for trial and to minimize disruptions at trial." *United States v. Brawner*, 173 F.3d 966, 970 (6th Cir.1999).  District courts have broad discretion over matters involving the admissibility of evidence at trial. *United States v. Seago*, 930 F.2d 482, 494 (6th Cir.1991).

## III.    ANALYSIS

"In the exercise of [its] gatekeeping role under the Federal Rules of Evidence, district courts are responsible for determining the relevance and reliability of all expert testimony." *See* Fed. R.

Evid. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The court may take into account factors such as the proffered expert's knowledge, experience, education, training and peer review. 509 U.S. at 589. In determining the admissibility of a proposed expert's testimony, the Court must consider:

>   (1) whether the methodology utilized by the expert can and has been tested;
>
>   (2) whether the theory or technique has been subject to peer review;
>
>   (3) the known potential rate of error and the existence of standards controlling the technique's operation;
>
>   (4) the extent to which the methodology or technique employed by the expert is generally accepted in the scientific community.

509 U.S. at 592-594. "The inquiry envisioned by Rule 702 is, we emphasize, a flexible one. Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability-of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id*. at 594-595. Further, "[t]he subject of an expert's testimony must be 'scientific ... knowledge.' The adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Id.* at 590.

### A.     Dr. Adatsi's Expert Report

Siemens does not appear to question Dr. Adatsi's qualifications. Dr. Adatsi has been employed as a toxicologist by the Michigan Department of State Police, Forensic Science Division, for over 16 years. He has a Bachelor of Science Degree in Chemistry and a Ph.D in toxicology. (*Id*. at 14-15.) At the time that Dr. Adatsi analyzed Mr. Wellinger's results, he had performed over 5,000 similar analyses and testified as an expert witness in the field of toxicology over 200 times.

At the time of his deposition in March, 2009, Dr. Adatsi had testified as an expert witness in the field of toxicology over 450 times, only once having been denied the opportunity to express an opinion based on retrograde extrapolation, in a Genesee County district court, a decision which was reversed on appeal. (*Id.* at 21-22.)

Siemens challenges Dr. Adatsi's reliance on retrograde extrapolation to estimate Wellinger's blood alcohol content ("BAC") at the time of the accident. Retrograde extrapolation is a method of estimating a person's BAC at a certain time by using the person's known BAC at a later time. *See* J.N. Bostic, Alcohol Related Offenses: Retrograde Extrapolations After *Wager*, 79 Mich. B.J. 668, 671 (2000). Dr. Adatsi employed the technique of retrograde extrapolation, based on Mr. Wellinger's known BAC following a hospital blood draw at 4:20 p.m. on the day of the accident, to support his opinion that Wellinger's BAC was .36 to .39 at 3:30 p.m., the time of the fatal crash. (Deposition of Felix Adatsi, Ph. D., March 13, 2009, Pl.s' Resp. to MIL No. 25, Ex. A, 36-44.) Utilizing the blood draw taken on the day of the accident, May 3, 2005 at 4:20 p.m., a second taken at 7:16 p.m. and a third taken at 7:05 a.m. the next morning, May 4, 2005, Dr. Adatsi was able to calculate that the rate at which Mr. Wellinger was burning off alcohol, i.e. the "burn-off" or "elimination rate,"was .18g/dL/hr (grams of alcohol per 100 grams of blood in an hour).[1] (Adatsi August 24, 2005 Letter, Def.'s MIL No. 26, Ex. B, Adatsi Dep., Def.'s MIL No. 25, Ex. A, 51.) Dr. Adatsi then applied this elimination rate, "a well defined rate at which we know Mr. Wellinger, his liver processes alcohol," in a backward fashion to conclude that at the time of the accident, 3:30

---

[1] "The elimination rate of .015g/dL/h is an accepted 'normal' for forensic considerations." Bostic, 79 Mich. B. J. 672.

p.m., an hour before the first blood draw, Mr. Wellinger's BAC was .36-.39g/dL/hr.[2]  (Def.'s MIL No. 26, Ex. B, Adatsi Dep. 52-54.)

In *People v. Wager*, 460 Mich. 118 (1999), the Michigan Supreme Court clearly opened the door for the utilization of such expert testimony.  In *Wager*, the Supreme Court reversed the Court of Appeals, which had concluded that the trial court had erred in admitting expert testimony that a blood test administered two hours after an accident could be useful in determining whether a person was intoxicated two hours earlier, at the time of the accident.  The Supreme Court held that the tests results were admissible and "to the extent that the passage of time reduces the probative value of the test, the diminution goes to the weight, not admissibility, and is for the parties to argue before the trier of fact."  460 Mich. at 126.

Since *Wager, r*etrograde extrapolation has gained wide acceptance as a method of establishing blood alcohol levels in numerous types of litigation.  "Some courts have emphasized the need for care in admitting retrograde extrapolations, but arguments that the extrapolation process itself is so uncertain as to be inadmissible under Frye or Daubert have not prevailed."  McCormick § 205 (citing *Mata v. State*, 46 S.W.3d 902 (Tex. Crim. App. 2001) as the seminal case).  Although the methodology appears to have been generally accepted in the scientific community, several factors will affect the reliability of the use of the methodology in any given set of circumstances.

---

[2]  Siemens argues that the reliability of the retrograde extrapolation to the time of the accident is unreliable because no one knows whether Mr. Wellinger's BAC was increasing or decreasing at the time of the accident.  Dr. Adatsi explains that his analysis takes account of this unknown by expressing the BAC as a range, .36 to .39, taking into account the possibility that his BAC may have been decreasing at the time of the accident (.39) or increasing at the time of the accident (.36). (Def.'s MIL No. 26, Ex. A, Adatsi Dep. 43-44; Pl.'s Resp. to MIL 26, p. 7 n. 3.)  Dr. Adatsi bases this conclusion on his interpretation of the scientific literature.  Any objection to this portion of Dr. Adatsi's opinion goes to its weight, not its admissibility.  Siemens will be able to address this issue on cross-examination or through its own expert witness.

In *Lomax v. Thaler*, No. 09-0705, 2010 WL 3362203 at * 8-9 (S.D. Tex. Aug. 25, 2010), the court analyzed the scientific acceptance of the retrograde extrapolation method:

> The court evaluating the reliability of a retrograde extrapolation should also consider (a) the length of time between the offense and the test(s) administered; (b) the number of tests given and the length of time between each test; and (c) whether, and if so, to what extent, any individual characteristics of the defendant were known to the expert in providing his extrapolation. These characteristics and behaviors might include, but are not limited to, the person's weight and gender, the person's typical drinking pattern and tolerance for alcohol, how much the person had to drink on the day or night in question, what the person drank, the duration of the drinking spree, the time of the last drink, and how much and what the person had to eat either before, during, or after the drinking.
>
> Obviously, not every single personal fact about the defendant must be known to the expert in order to produce an extrapolation with the appropriate level of reliability. As the Kentucky Supreme Court has recognized, if this were the case, no valid extrapolation could ever occur without the defendant's cooperation, since a number of facts known only to the defendant are essential to the process.
>
> If the State had more than one test, each test a reasonable length of time apart, and the first test were conducted within a reasonable time from the time of the offense, then an expert could potentially create a reliable estimate of the defendant's BAC with limited knowledge of personal characteristics and behaviors. In contrast, a single test conducted some time after the offense could result in a reliable extrapolation only if the expert had knowledge of many personal characteristics and behaviors of the defendant. Somewhere in the middle might fall a case in which there was a single test a reasonable length of time from the driving, and two or three personal characteristics of the defendant were known to the expert.

2010 WL 3362203 at * 8-9 (quoting *Mata v. State*, 46 S.W.3d 902, 916-917 (Tex. Crim. App. 2001)). In *Lomax*, the district court reviewed petitioner's habeas petition which claimed that the trial court had erred in admitting retrograde extrapolation testimony and held that, because the expert knew the results of one blood test within an hour and a half after the collision, and knew from circumstantial evidence (hospital records and the arresting officer's report) that Lomax was a moderate to heavy drinker and what liquor and what amount Lomax drank, the trial court did not abuse its discretion in overruling Lomax's objection to retrograde extrapolation evidence. *Id.* at *

7

9.

Dr. Adatsi relied on three consecutive blood draws to determine Mr. Wellinger's rate of elimination and applied that rate in its retrograde extrapolation analysis to conclude that Mr. Wellinger's BAC at the time accident was .36 to .39. There was no "interim" time which degraded this analysis in any respect and the Court concludes that Dr. Adatsi's testimony regarding the scientific methodology of retrograde extrapolation, and testimony regarding his utilization of that methodology to determine Mr. Wellinger's BAC at the time of the accident, is admissible.

Dr. Adatsi was also asked to express an opinion as to what a BAC of .36 to .39 "might mean and what they could do to a individual who may have that type of blood alcohol content in their systems." (Def.'s MIL No. 25, Ex. A, Adatsi Dep. 20.) Dr. Adatsi was asked to "express an opinion on how I would expect that [BAC] to affect Mr. Wellinger's – Mr. Wellinger's behavior.) (*Id*. at 46.) On this subject, Dr. Adatsi testified, based on "a large body of evidence documented that actually correlates the levels of alcohol in an individual to their behavior," that "a human male with this level of blood alcohol is expected to exhibit a severe adverse effect of alcohol intoxication." (Def.'s MIL 27, Ex. B, Adatsi Letter; Def.'s MIL 25, Ex. A, Adatsi Dep. 50.) The Court concludes that this portion of Dr. Adatsi's testimony is supported by scientific knowledge and a general acceptance in the scientific community correlating BAC levels with known and expected behaviors. "There is – as I said before, alcohol is probably the most studied drugs [sic] among - in human among all other drugs. So, there is a solid base for the behavior, in general, the expected signs. Medical/Legal Aspects of Alcohol by Garriott . . . actually documents levels of alcohol which will engender or lead to certain types of behavior in general in the adult individual, knowing that alcohol affects people differently." (Def.'s MIL 25, Ex. A, Adatsi Dep. 61-62.) Following this summary of

8

the scientific literature, Dr. Adatsi testified as follows:

> So having said that, then, I would - I would go ahead and answer the question as that from .36 to .35 we - it's surprising that he's even, you know, walking. It's a level that is generally expected that he would be falling down drunk, he could be comatose at that level In general, that is the expectation and he would be disoriented, he would not be able to form clear opinions an his judgment to [sic] be impaired. He will have difficulty coordinating certain types of sensory observations with his motor skills. His reaction time will be lengthened, so he will be slow to react to events, and as I said before, poor decision-making. We would expect to see all of that, confused as well. In general this is what we expect.

(*Id*. at 62-63.) Siemens in fact relies on Garriot's treatise on the subject, Medical and Legal Aspects of *Alcohol,* James C. Garriot, 4th ed., for other propositions. The Court concludes that Dr. Adatsi can offer expert testimony as to the signs that an individual adult male such as Mr. Wellinger would be expected to exhibit with a BAC of .36-.39. Similarly, Dr. Adatsi can offer testimony in a hypothetical sense as to what expected levels of behavior would be at various levels of BAC, these correlations being the subject of much scientific study. (*Id*. at 63-68.) To the extent that Siemens disagrees with these correlative behaviors, they are free to attack Dr. Adatsi's opinion on cross-examination. Such challenges go to the weight, not the admissibility, of this category of evidence.

Dr. Adatsi was asked in his deposition if he had conducted an analysis of the amount of alcohol that was present in Mr. Wellinger's system at a point in time prior to 3:30 p.m., the time of the accident. (*Id*. at 51.) Dr. Adatsi stated that he had not been asked to perform that calculation and that he could perform such a calculation, using the .18/g/dL/hr elimination rate established for Mr. Wellinger, but that he would need information as to when Mr. Wellinger stopped drinking, "some evidence that the drinking must have occurred prior to the time in question that they would want me to relate the blood alcohol to." Dr. Adatsi did not have that information as it pertained to Mr. Wellinger. (*Id.* at 52-53.) Thus, by his own admission, Dr. Adatsi could not, with the

9

information he was given, establish a BAC for Mr. Wellinger at any point in time before 3:30 p.m. While he could respond to numerous hypotheticals about when Mr. Wellinger might have consumed alcohol, he could not calculate a BAC without information as to when Mr. Wellinger last drank and what he drank. It is true, as Plaintiff argues, that Dr. Adatsi's opinions as to Mr. Wellinger's BAC at the time of accident do not depend in any way on knowledge of when Mr. Wellinger drank, because Dr. Adatsi knew that Mr. Wellinger did not consume alcohol after the accident and before the first BAC level was drawn. However, as to any point in time before the accident, this same assumption does not apply.

The problem with this latter category of testimony is illustrated by the court's opinion in *United States v. DuBois*, 645 F.2d 642 (8th Cir. 1981). The defendant in *DuBois* fled the scene of the accident and was not arrested until two hours later and his BAC was not calculated until almost an hour after that, so three hours from the time of the accident, using a standard presumed elimination rate of .15. During the two hour time frame in which the defendant remained at large, there was evidence that he stopped to buy a 12-pack of beer and speculation that he had consumed "some" alcohol, the expert assumed three beers based on the testimony of some children and a woman who testified that they saw him drink anywhere from 2-4 beers. *Id*. at 643. Because the defendant had consumed an unknown quantity of alcohol between the time of the accident and the time of the blood test determining his BAC, the court held that the retrograde extrapolation testimony was insufficient to establish a rational connection between the test results and the inference of intoxication:

> Delays between an accident and a blood test are common, as it is often necessary to take the defendant to a police station or medical facility. If a defendant is placed in custody immediately after an accident and remains under the control of officers or others and consumes no more alcohol before the test is given, a conviction may be

> based upon the test results and expert testimony estimating the blood alcohol level at the time of the accident. In contrast, where there is a gap between the accident and the test during which the defendant is not in custody or otherwise supervised and has consumed alcohol, evidence that he was drunk when arrested has been held insufficient to show he was drunk when the accident occurred, particularly when there was little or no evidence of intoxication or drinking at the earlier time.
>
> While there may be instances where an expert's estimate could account for intervening consumption and could thus serve as sufficient evidence of intoxication at the earlier time, this is not such a case. When there has been intervening consumption an accurate estimate requires knowledge of three variables: the blood alcohol level at the later time, the time elapsed since the accident, and the amount consumed in the interim. In this case, the expert did not know the amount consumed in the interim. Possibilities ranged anywhere from three to twelve beers. As a result, Ms. Pearson's conclusion that the defendant had a .22 or even a .1 per cent blood alcohol at the time of the accident is simply conjecture, and it is well established that "a jury is not justified in convicting a defendant on the basis of mere suspicion, speculation or conjecture."

*Id*. at 644-645 (internal citations omitted). As Plaintiff correctly points out, *DuBois* can be distinguished in part because the court's decision was as to the sufficiency, not the admissibility, of the evidence and the "interim" period during which alcohol could have been consumed was over two hours.

In *Wallis v. Carco Carriage Corp.*, 124 F.3d 218, 1997 WL 580498 (10th Cir. 1997) (unpublished) (table case), the court was faced with facts more analogous to the instant case and held that evidence of an extrapolated BAC could be admitted despite the fact that during a 45 minute interim period, plaintiff's whereabouts and activities were unknown. Plaintiff in *Wallis* rented a car and 45 minutes later was involved in an accident with a BAC at the time of the accident of .32 to .36. *Id*. at * 1. The retrograde extrapolation expert, admittedly not knowing how much, if any, alcohol the person consumed during the 45 minute interim, prepared a chart that "calculated what [the driver's] blood alcohol content would have been depending on how much he drank in the 35 to 45 minute interval between the rental transaction and the accident." For example, the expert

11

testified that if the driver had consumed no alcohol in the interim, he would have had a BAC of .39 at the time of the rental transaction. If he consumed twelve ounces of 90-proof whiskey, his BAC would have been .15 at the time of the rental transaction. The expert also admitted that his findings depended on the driver's drinking habits and other factors. *Id*. at * 7. But the expert did not try to establish or offer an opinion on the driver's exact BAC at the time of the rental transaction. The court held that objections to the speculative nature of such testimony went to the weight of the expert's testimony, not its admissibility. *Id*. at * 8. The court distinguished *DuBois*, while agreeing that "there may be inherent difficulties in making a retrograde extrapolation calculation when there is an intervening consumption of alcohol," for the same reasons discussed above, i.e. the court was ruling on the sufficiency, not the admissibility of the evidence and the interval between the event and the test was closer to three hours, compared to the 45 minutes in *Wallis*.

While the instant case appears closer to *Wallis* than to *DuBois*, and the Court is inclined to allow Dr. Adatsi to testify as to the potential different scenarios that might have occurred in the interim between the time Mr. Wellinger left the office and the time of the accident, as the expert did in *Wallis*, the Court will not permit Dr. Adatsi to offer an opinion as to the likely level of Mr. Wellinger's intoxication at the time that he left Siemens' offices on the day of the accident. Any such opinion would be based on pure speculation as Dr. Adatsi admits in his deposition that it is "possible" that Mr. Wellinger consumed the entire amount of alcohol scientifically necessary to reach a BAC of .36 to .39 in less than an hour. Thus, Dr. Adatsi cannot say with any degree of scientific certainty how much alcohol Mr. Wellinger might have consumed before he left the Siemens offices that day. He can express his opinion that it is not probable that he consumed all twenty ounces after leaving Siemens, but his deposition testimony clearly indicates that he cannot

state with any level of certainty how much Mr. Wellinger must have had to drink prior to leaving Siemens that day. For these same reasons, Dr. Adatsi cannot testify to what signs of intoxication Mr. Wellinger must have been exhibiting at Siemens before he left the office that day. While Dr. Adatsi can opine as to certain behaviors that attend certain BAC levels, because he cannot speculate about what Mr. Wellinger's BAC might have been when he left Siemens that day, he cannot testify to the correlative behaviors that would have been exhibited by Mr. Wellinger that day. Dr. Adatsi conceded in his deposition that he was not aware that Mr. Wellinger was an alcoholic and that this fact would enhance Mr. Wellinger's ability to "mask" the normal signs of intoxication. (Def.'s MIL No. 25, Ex. A, Adatsi Dep. 93-94.) Dr. Adatsi also conceded that "an alcoholic can consume a lot of alcohol in a short time." (*Id.* at 101.) Dr. Adatsi also conceded that it was entirely possible that Mr. Wellinger had some alcohol in his system before he left Siemens, at a sub-clinical level that would not have caused outward signs of visible intoxication, and that he "topped it off" after leaving to achieve the BAC of .36 to .39 at the time of the accident. (*Id.* at 145.) Given this testimony, it would be pure speculation for Dr. Adatsi to opine that Mr. Wellinger must have exhibited certain visible signs of intoxication before leaving Siemens offices on the day of the accident. He can offer his opinion as to the signs of intoxication exhibited by individuals with certain BACs, and he can opine as to what Mr. Wellinger's BAC was at the time of the accident and the signs he would have been exhibiting at that time. But he cannot speculate further as to what signs Mr. Wellinger must have been exhibiting at Siemens before he left that day. Such an opinion is not based on "sufficient facts or data" nor "the product of reliable principles and methods . . ." Fed. R. Evid. 702. In order to assume, with any degree of certainty, that Mr. Wellinger must have been exhibiting signs of intoxication at the Siemens offices before he left that day, i.e. that he had a BAC that correlates with

13

certain observable behaviors, we must speculate about the amount of alcohol that Mr. Wellinger consumed after he left the offices that day and further speculate that whatever that amount was, it was something less than the full 20-22 ounces necessary to produce a BAC of .36 to .39 at the time of the accident. This proposed testimony simply contains too may "speculative jumps" in the chain of events to render this opinion reliable or helpful to the jury. *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670 (6th Cir. 2010).

### B. Dr. Frist's Report

Plaintiff intends to offer the expert testimony of Dr. Brian Frist, M.D. that: "(1) Mr. Wellinger's blood alcohol level at the time of the accident was .4, (2) given Mr. Wellinger's blood alcohol level at the time of the accident, he "likely" consumed alcohol on Siemens' premises, (3) Mr. Wellinger "must have" portrayed visible signs of intoxication while at Siemens on the day of the accident, (4) Mr. Wellinger's assumed and alleged visible intoxication at Siemens on the day of the accident was "consistent" with his prior history of being visibly intoxicated at work, and (5) any testimony by Siemens employees that Mr. Wellinger was not visibly intoxicated at work on the day of the accident and did not have a history known to them of being visibly intoxicated at work is biased, and, thus unreliable." (Def.'s MIL 25, Dkt. No. 85, 3.)

Siemens first challenges Dr. Frist's qualifications as an expert in the field of toxicology. Dr. Frist is a forensic pathologist, not a toxicologist, and is not board certified in toxicology. Siemens argues that Dr. Frist has never published on the subjects on which he intends to offer an opinion. In his role as a medical examiner, Dr. Frist, on a routine basis, reviews toxicology reports and analyzes how those findings relate to cause of death. (Pl.'s Resp. to MIL 25, Ex. C, Declaration of Brian Frist, Weinstein Report, Ex. 1-A, p. 4.) Dr. Frist has often testified in non-death cases relating

14

to driving while under the influence. (*Id*.) The Court concludes that Dr. Frist is qualified to offer expert testimony on the issue of toxicology and the effects of alcohol on individual behavior.

Dr. Frist relies on numerous scholarly publications, excerpts of which he includes in his report. These treatises uniformly describe the expected effects of various levels of BAC on the behavior of individuals. These are well accepted and often utilized guidelines as to the standard correlation between BAC and human behavior. (*Id.* pp. 6-9.) Dr. Frist can offer testimony about these expected behaviors at various hypothetical BAC levels.

Beyond these matters, Dr. Frist's Report suffers from the same speculative shortfalls as Dr. Adatsi's and his testimony will be similarly circumscribed. Dr. Frist, in his Declaration, states that: "It is my opinion to a reasonable degree of forensic and medical probability that Mr. Wellingr's co-workers would have observed and recognized signs of Mr. Wellinger having been intoxicated at the office on the day of the accident." (Declaration of Brian Frist, Def.'s MIL No. 25, Ex. C, ¶ 9.) Dr. Frist offers no scientific methodology to support this opinion and offers no scientific literature that would support the rendering of such an opinion. Dr. Frist states that Mr. Wellinger would only have been able to mask the visible signs of intoxication up to a certain, very minimal, level of intoxication, but beyond that would be incapable of masking the signs. (*Id*. at ¶ 6.) Again, Dr. Frist offers no scientific basis for this opinion and in fact this statement is directly contradicted by the authorities on which Dr. Frist relies: "Considerable variability exists as to the effect of alcohol. Long-term use results in a greater capacity to metabolize alcohol, and Perper et al. have shown that alcoholics develop an increased tolerance and often are functional at blood alcohol concentrations generally considered to be potentially fatal. Clinical experience, they write, contradicts the general accepted dogma whereby, *regardless of the degree of tolerance, blood alcohol levels above .4 %*

*(400 mg per 100 ml) produce stupor and or coma. . . .* In fact it has been found that high blood alcohol concentrations do not necessarily result in observable clinical manifestations of drunkeness in all cases." (*Id*. at 7) (emphasis in original). Dr. Frist has offered no scientific support for his opinion that Mr. Wellinger would necessarily have exhibited visible signs of intoxication at the Siemens offices that day before he left to attend his doctor's appointment. The Court will exclude any such opinion testimony from Dr. Frist.

Dr. Frist also offers an opinion as to how much time Mr. Wellinger had to consume alcohol after leaving Siemens and before the accident, analyzing excerpts from police reports and Yahoo maps to determine that Mr. Wellinger only had "14-29 minutes to spend at his house." (*Id*. at 13.) Nothing in Dr. Frist's background qualifies him to render an opinion on this subject and the Court will exclude Dr. Frist's opinion as to the amount of time that Mr. Wellinger had to consume alcohol after leaving Siemens and before the accident. There is no evidence in this case that Mr. Wellinger went to his house after leaving Siemens on the day of the accident. This information will not aid the jury, who can make this calculation without the aid of expert opinion.

Dr. Frist further attempts to prove that any alcohol that Mr. Wellinger may have consumed between the hours of 6 a.m. and 8 a.m. (Dr. Frist assumes that Mr. Wellinger consumed alcohol between 6 a.m. and 8 a.m. based on statements made by Mr. Wellinger to police), would have been eliminated by the time Mr. Wellinger left the Siemens offices that day so that his BAC at the time he left would have been 0%. This conclusion makes numerous speculative leaps based upon complete unknowns in this case. For example, this assumption does not account for the fact that Mr. Wellinger may have consumed other alcohol after 8 a.m. and before he left at 2:30 p.m., for example during his lunch break when he left Siemens' offices.

Dr. Frist goes on to opine that if Mr. Wellinger went home and started drinking (another complete unknown in this case) he would have had 29 minutes to consume alcohol. The Court has already rejected Dr. Frist's speculative opinion as to the amount of time Mr. Wellinger may have had to consume alcohol during this time frame, as no testimony or evidence supports where or when Mr. Wellinger consumed alcohol after he left Siemens. From his speculative assumption that Mr. Wellinger had a BAC of 0% when he left Siemens, and had 29 minutes to consume alcohol before the crash, Dr. Frist states that Mr. Wellinger would had to have consumed 20 ounces of 80 proof alcohol to achieve the BAC of .4 at the time of the accident. Dr. Frist states that it would have been "virtually impossible" for Mr. Wellinger to have absorbed the necessary amount of alcohol in this time frame to have attained his accident BAC level of .4. While Dr. Frist may be able to opine about the metabolism of alcohol in any given time frame, and about the "virtually impossibility" that an individual could consume such a great amount in a short period of time, he cannot offer an opinion specific to Mr. Wellinger in this regard. Because he cannot opine as to how much time Mr. Wellinger might have had to consume alcohol after leaving Siemens, or what Mr. Wellinger's BAC might have been when he left Siemens' offices, he cannot offer an opinion as to exactly how much alcohol Mr. Wellinger must have consumed between the time he left Siemens' offices and the time of the accident.

Dr. Frist states that in reaching this conclusion he relied on Dr. Adatsi's retrograde extrapolation to a BAC of .36 to .39 at the time of the accident. As discussed above, however, this determination by Dr. Adatsi does not purport to extrapolate Mr. Wellinger's BAC at any point in time prior to the accident, an assumption that Dr. Frist makes in rendering his expert opinion as to how much Mr. Wellinger must have had to drink after leaving Siemens. Dr. Frist then relies on Dr.

17

Adatsi's testimony in his deposition where, in response to a series of hypotheticals (none of which are in evidence with regard to Mr. Wellinger in this case), that if Mr. Wellinger left Siemens' offices exhibiting no signs of intoxication, drank vodka, and if he had less than an hour to do so, he would have had to consume 20-22 ounces to reach the BAC he had at the time of the accident. Neither Dr. Frist nor Dr. Adatsi has provided any scientific basis for reaching back in time, on the facts of this case, to establish a BAC for Mr. Wellinger prior to the accident. Nor has either of them provided a scientific basis for concluding what and how much Mr. Wellinger drank in the interim. Only if given a set of variables, i.e. he left Siemens' offices with a sub-clinical BAC, he then began drinking and he had less than an hour to go from 0% to .4%, none of which are known in this case, was either of them able to further speculate that he must have therefore consumed some alcohol before he left Siemens. Of course neither of them can say with any certainty how much that might have been or what amount it would have been possible for Mr. Wellinger to consume after leaving Siemens, given his history as an alcoholic. The speculative leaps in this testimony are enormous and not based on any reliable scientific methodology. This proposed testimony simply contains too may "speculative jumps" in the chain of events to render this opinion reliable or helpful to the jury. *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670 (6th Cir. 2010).

The Court concludes that testimony from Dr. Frist as to how much alcohol Mr. Wellinger must have consumed after leaving Siemens that day, or about how much he must therefore have consumed before he left Siemens, is unreliable and inadmissible expert testimony. It follows from this that Dr. Frist cannot testify as to what the Siemens employees must have observed that day or why their testimony that they observed nothing is biased. This testimony will also be excluded as unreliable expert testimony.

The Court concludes that Dr. Frist's testimony will be limited in scope to the same degree as Dr. Adatsi's. Dr. Frist may testify as to Mr. Wellinger's BAC at the time of the accident based upon retrograde extrapolation and may also testify as to the signs of intoxication Mr. Wellinger would have exhibited at that time. He can also testify as to signs of intoxication typically associated with certain BAC levels, but cannot speculate as to what Mr. Wellinger's BAC was at the time he left Siemens offices or what signs of intoxication Mr. Wellinger would have been exhibiting at that time.

### C. Dr. Adatsi's Letter - MIL No. 27

The Court will permit Plaintiff to introduce Dr. Adatsi's letter to Mr. Kenneth Frazee of the Oakland County Prosecutor's Office. (Def.'s MIL No. 27, Ex. B.) This letter discusses only those matters as to which this Court has concluded both Dr. Adatsi and Dr. Frist may testify and qualifies as a public record under Fed. R. Evid. 803(B) and (C). The letter, composed on State of Michigan, Department of Police letterhead, directed to the office of the Oakland County Prosecutor concerning a matter under investigation, containing Dr. Adatsi's conclusions based on his factual investigations, meets all of the necessary criteria to qualify as a public record. *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 (1988). *See also Government of the Virgin Islands v. Petersen*, 131 F. Supp. 2d 707, 712 (D.V.I. 2001) (holding that an FBI toxicology report should have been admitted "under Rule 803(8)(C) as a factual finding based upon a lawful investigation contained in a public record or report.") The fact that Dr. Adatsi wears two hats, one as the State of Michigan toxicologist in the criminal matter and the other as Plaintiff's expert in this matter, does not affect the nature of his opinion, communicated to the Oakland County Prosecutor in the criminal matter, as a public record.

## IV. CONCLUSION

Accordingly, the Court GRANTS IN PART AND DENIES IN PART Siemens' Motions *In Limine* Nos. 25 and 26 (Dkt. Nos. 85 and 86) and DENIES Siemens Motion *in Limine* No. 27 (Dkt. No. 88.)

IT IS SO ORDERED.

S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: November 22, 2010

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on November 22, 2010.

S/Denise Goodine
Case Manager